

# EXHIBIT A

Docusign Envelope ID: 8E808A41-AF59-8734-8388-575B75C74BAB

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRCT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| KINZIE ADVANCED POLYMERS, LLC, | : | |
| d/b/a Grove Bags, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Case No. 1:25-cv-1217-CEF |
| v. | : | |
| | : | Judge Charles E. Fleming |
| CHAZ M. HERMANOWSKI, et al., | : | |
| | : | |
| Defendants. | : | |

**DECLARATION OF DANIEL JAFFE IN SUPPORT OF
PLAINTIFF'S  POSITIONS THAT THIS COURT IS THE PROPER
VENUE AND DEFENDANT JACOB MARK TORRISON IS
SUBJECT TO JURISDICTION IN OHIO**

I, Daniel Jaffe, being duly cautioned and sworn, hereby declare as follows:

1.     I am the Chief Financial Officer for Plaintiff Kinzie Advanced Polymers, LLC d/b/a Grove Bags ("Plaintiff" or "Grove Bags").

2.     I have held the Chief Financial Officer position for Grove Bags at all times relevant to the captioned-lawsuit.

3.     I am submitting this Declaration in support of Plaintiff's Memorandum in Opposition to Defendant Jacob Mark Torrison's Motion to Dismiss the First Amended Complaint of Plaintiff Kinzie Advanced Polymers, LLC for Lack of Personal Jurisdiction and Failure to State a Claim upon which Relief can be Granted (the "Motion").

4.     Defendants Chaz M. Hermanowski ("Hermanowski") and Jacob Mark Torrison ("Torrison") (Hermanowski and Torrison are collectively, "Defendants") are former employees of Grove Bags.

1

5. I am familiar with Defendants' employment with Grove Bags and this Declaration is based on my personal knowledge and Grove Bags' business records.

**Grove Bags**

6. Grove Bags is an Ohio limited liability company.

7. The sole member of the limited liability company is an individual who resides in Ohio.

8. Grove Bags' principal place of business is located in Cuyahoga County at 26201 Richmond Road, Unit D, Bedford Heights, Ohio 44146.

9. Grove Bags' principal place of business has always been in Ohio.

10. Grove Bags' warehouse is located in Bedford Heights, Ohio.

11. When Grove Bags' sales employees make sales of Grove Bags' products to customers, those products are shipped to the customer from the Ohio warehouse.

12. The vast majority of Grove Bags' employees reside and work in Ohio.

13. Any Grove Bags' employees who reside outside of Ohio report to Ohio management and are regularly required to visit Ohio as part of their job duties.

14. Due to Grove Bags' deep Ohio connections, all of its employee and contractor agreements provide that Ohio law applies.

15. This Ohio choice of law provision for employees and contractors has been consistently utilized by Grove Bags since Grove Bags opened for business.

16. Grove Bags has utilized a standard employment agreement for many years. This standard employment agreement includes an Ohio choice of law provision.

17. Although based in Ohio, Grove Bags' business is nationwide domestically.

18. In addition, Grove Bags conducts a significant amount of business outside of the United States.

19. All Grove Bags' employees, whether based in Ohio or remote, are required to sign the standard employment agreement as a condition of employment with Grove Bags.

### GROVE BAGS' PRODUCTS

20. Due to Grove Bags' superior product and marketing efforts, Grove Bags is well known in the cannabis industry.

21. Grove Bags is the market leader in the cannabis industry for packaging products.

22. Grove Bags sells high quality packaging products to commercial and retail customers.

23. Grove Bags developed and distributes packaging products that create the optimal cannabis climate inside every package.

24. Grove Bags created TerpLoc®, a cannabis film that is the first of its kind.

25. Based on the superior quality of TerpLoc® and Grove Bags' sales procedures, Grove Bags is a leader in the cannabis industry with valuable contacts with all levels of the supply chain from growers to retailers.

26. Grove Bags' products support all phases of the cannabis industry from the grower, to the distributor, to the warehouse, the retailer and finally the end-using customer.

27. Grove Bags has developed customers throughout the cannabis retail business.

28. Grove Bags has developed significant customer information that is highly valuable.

29. Grove Bags takes significant precautions to protect this customer information from use outside of Grove Bags.

3

30.     All Grove Bags' employees are required to sign employment agreements that contain confidentiality agreements.

31.     Confidential Information is defined broadly under Grove Bags' standard employment agreement:

> Employee acknowledges and agrees that during the Employment Period, confidential employee, customer, and/or Company information will be or may be made available to Employee, which may include, without limitation, financial information of the Company, information regarding the Company's employees, customers, suppliers, and/or vendors, information regarding the Company's pricing and materials, the Company's computer programs, confidential website and other internet information, and other trade secrets and proprietary information including, without limitation, information relating in any way to any (i) purchasing practices, procedures and/or techniques used or employed by the Company; (ii) pricing received by the Company from any of the Company's suppliers or vendors; (iii) pricing given by the Company to any of the Company's customers; (iv) names, addresses, email addresses, telephone numbers and all other information regarding the Company's customers; (v) any products, services, methods, computer/software or any other similar or related matters/items developed, enhanced or modified (collectively, the "Confidential Information").

32.     The Confidential Information definition is an accurate description of the information that is developed and protected by Grove Bags.

33.     The confidentiality provisions in the employment agreements comply with federal law, the Defendant Trade Secrets Act of 2016, 18 U.S.C. §1836 (the "DTSA"), and Ohio law.

34.     All Grove Bags' employees are required to sign employment agreements that also include non-compete and non-solicitation provisions.

35.     The employment agreements are consistently enforced to protect Grove Bags' trade secrets and contracts.

4

Docusign Envelope ID: 8E808A41-AF59-8734-8388-575B75C74BAB

36. In addition to the employment agreements, the Grove Bags' Employee Handbook includes a Non-Disclosure of Confidential Information section. This section, consistent with the employment agreement, requires employees to maintain the confidentiality of Grove Bags' business information.

37. Grove Bags limits access of customer information to employees with a need to utilize such information for their Grove Bags' job duties and responsibilities.

38. Grove Bags' computer systems are password protected.

39. Grove Bags further limits access to certain customer, financial and product information.

40. Grove Bags requires that employees leaving their employment with Grove Bags to return all Grove Bags' property and equipment.

41. Grove Bags trains its employees to utilize Grove Bags' valuable customer information and trade secrets to perform their Grove Bags' duties.

42. Grove Bags' customer information and training provide Grove Bags with a competitive advantage in the industry.

43. Grove Bags' valuable business information and trade secrets include, but are not limited to, Grove Bags' costs, Grove Bags' pricing, Grove Bags' customer contracts, Grove Bags' proposed contracts, Grove Bags' distribution channels, Grove Bags' sales information, Grove Bags' customer list, Grove Bags' prospective customer lists, and information and documents relating to the manufacturing and selling of TerpLoc®.

44. The confidential business information is highly valuable.

45. The confidential business information provides Grove Bags with a competitive advantage in the marketplace.

5

46. Accordingly, whenever employees leave Grove Bags employment, for any reason, they are advised of their continuing obligations to Grove Bags and advised that Grove Bags will take action if violations occur.

## TORRISON'S EMPLOYMENT WITH GROVE BAGS

47. Torrison signed three employment agreements with Grove Bags during his employment. The three agreements are attached to the Amended Complaint (Doc. #22) and to this Declaration as Exhibit 1.

48. Torrison began his Grove Bags' employment on December 7, 2020.

49. Torrison's employment with Grove Bags was terminated for cause effective April 7, 2023. A copy of the termination letter is attached to this Declaration as Exhibit 2.

50. The three employment agreements signed by Torrison are Grove Bags' standard employment agreement.

51. The three employment agreements include Ohio choice of law and Cuyahoga County jurisdiction provisions.

52. Torrison's initial position with Grove Bags was as a Salesman for Grove Bags. (Section 4(a) of the 2020 employment agreement).

53. Exhibit A to the 2020 employment agreement was a commission and bonus plan that provided Torrison with the eligibility to earn commissions and bonuses in addition to his base salary.

54. Torrison was hired by Grove Bags based on his prior work with Michael Ryan Tatum ("Tatum").

55. In fact, Torrison began his Grove Bags' employment on December 7, 2020, the same date that Grove Bags hired Tatum full-time as the company's Chief Commercial Officer.

Docusign Envelope ID: 8E808A41-AF59-8734-8388-575B75C74BAB

56. Tatum was working as an independent contractor for Grove Bags before being hired as a full-time employee.

57. Tatum provided training to Torrison throughout Torrison's Grove Bags' employment.

58. Tatum managed Torrison throughout Torrison's Grove Bags' employment.

59. Tatum was highly involved in the decision to terminate Torrison's Grove Bags' employment for cause.

60. Torrison signed his second employment agreement with Grove Bags on January 5, 2021. Torrison's second position with Grove Bags was Colorado Solutions Specialist. (Section 4(a) of 2021 employment agreement).

61. Torrison's final employment agreement with Grove Bags was effective January 1, 2022.

62. Section 4(a) of the 2022 employment agreement provided that Torrison's position with Grove Bags was Central Territory Sales Manager.

63. Paragraph 3 provided Torrison with an increase in his base salary and the opportunity to earn commissions under the 2022 employment agreement.

64. A term and condition of Torrison's employment with Grove Bags was execution of the Grove Bags Employment Agreement.

65. Grove Bags would not have hired Torrison and provided him with access to its valuable and confidential customer and training information had Hermanowski not executed the Grove Bags Employment Agreement.

66. The Grove Bags Employment Agreement broadly protected Grove Bags' confidential information in Paragraphs 7 and 8.

7

67. In addition, the Grove Bags Employment Agreement protected Grove Bags' customer, employee, and vendor relationships in Paragraph 6.

68. Torrison was directly involved in Grove Bags' sales during his employment with Grove Bags.

69. Torrison's access to Grove Bags' confidential information included access and assistance in development of: (1) Customer information in Grove Bags' CRM system; (2) information on the likes and dislikes of customers; (3) Grove Bags' pricing policies; (4) Grove Bags' costs; (5) product information; (6) customer lists; (7) prospective customer lists; (8) pricing information; (9) Grove Bags' business strategy; (10) Grove Bags' competitors; (11) competing products; and (12) Grove Bags' growth areas.

70. The confidential business information developed and maintained by Grove Bags' sales team from 2020 through 2023 was maintained at Grove Bags' company headquarters.

71. The confidential business information developed and maintained by Grove Bags' sales team from 2020 through 2023 was kept confidential by Grove Bags and the Grove Bags' sales team. Passwords were required for computers, the CRM system, and other computer systems. In addition, the employment agreements and Grove Bags' handbook required the employees to maintain the confidentiality of this sales information.

72. During Torrison's employment, Tatum was responsible for training Torrison and all of the sales employees on how to develop confidential sales information, how to properly store confidential sales information, and the need to maintain the confidentiality of the confidential sales information.

8

Docusign Envelope ID: 8E808A41-AF59-8734-8388-575B75C74BAB

73. The confidential business information developed and maintained by Grove Bags' sales team from 2020 through 2023 was highly valuable. The information provided Grove Bags with a competitive advantage in the marketplace.

74. As with all Grove Bags' sales employees, Torrison regularly visited Grove Bags' headquarters for training, Grove Bags' employee events, and sales meetings.

### TORRISON'S SEPARATIONS FROM EMPLOYMENT

75. Torrison's employment with Grove Bags was terminated for cause effective April 7, 2023. A copy of the termination letter is attached to this Declaration as Exhibit 2.

76. At no point during Torrison's employment did Torrison come forward with any complaints of improper conduct.

77. Torrison was offered a severance package, but he elected not to sign the agreement.

### THIS LAWSUIT IS PART OF MULTI-STATE LITIGATION BETWEEN COMPETITORS

78. This lawsuit arises from a dispute between Grove Bags, Tatum, and Grove Bags' competitor, Calyx Containers, LLC ("Calyx").

79. Tatum began his relationship with Grove Bags as an independent contractor on September 1, 2020.

80. On December 7, 2020, Grove Bags hired Tatum full-time as the company's Chief Commercial Officer. Tatum worked as an employee under three employment agreements with Grove Bags.

81. Tatum's Grove Bags' employment ended pursuant to a severance agreement effective August 25, 2023. The severance agreement required Tatum to comply with his non-

compete, non-solicitation, and confidentiality obligations in his Grove Bags' employment agreements.

82. The defendants in this lawsuit -- Hermanowski and Torrison – reported to Tatum during their Grove Bags' employment.

83. Like Tatum, Defendants signed Grove Bags' employment agreements.

84. While still being paid severance, Tatum began discussions with Calyx regarding employment. Tatum ultimately began to provide services to Calyx in early 2024 in violation of his Grove Bags' contracts.

85. Neither Calyx nor Tatum advised Grove Bags of the relationship. Rather, in October 2024, Grove Bags learned of the relationship and a lawsuit was filed in this Court by Grove Bags against Tatum and Calyx in 2024, Case No. 1:24-cv-01887-SO (the "First Lawsuit"). The District Court Judge assigned to the First Lawsuit is District Court Judge Solomon Oliver, Jr.

## THE FIRST LAWSUIT

86. The First Lawsuit was filed on October 29, 2024 against Tatum and Calyx. (ECF #1).

87. Like Defendants in this lawsuit, Tatum alleged that he is a resident of Colorado and not subject to jurisdiction or venue in this Court.

88. On January 24, 2025, Tatum filed a motion to dismiss Grove Bags' complaint. (ECF #20).

89. Tatum's motion to dismiss was based on Fed. R. Civ. P. 12(b)(2), 12(b)(3), 12(b)(6), 28 U.S.C. § 1391, and 28 U.S.C. § 1406(a). (ECF #20, pg. 1).

10

90. Relevant to this Opposition, Tatum argued that this Court lacked personal jurisdiction over Tatum (ECF #20, pgs. 5-9) and improper venue (ECF #20, pgs. 9-10).

91. Grove Bags filed a motion for a preliminary injunction in the First Lawsuit.

92. Judge Oliver held a hearing on Grove Bags' preliminary injunction motion on May 22, 27, and 28, 2025. (ECF No. 56, pg. 1).

93. Relevant to this Opposition, on August 21, 2025, Judge Oliver granted, in part, the preliminary injunction motion. (ECF #56). A true and correct copy of the preliminary injunction order is attached as Exhibit 3.

94. The injunction order thoroughly reviewed the choice of law issue and held that Ohio law applies to Tatum's former employment with Grove Bags. (ECF #56, pgs. 11-20). The injunction order also thoroughly reviewed personal jurisdiction and held that the Court has jurisdiction over Tatum. (ECF #56, pgs. 20-26).

95. Calyx and Tatum did not appeal the injunction order.

96. On September 17, 2025, the Court denied Tatum's motion to dismiss the First Lawsuit for lack of jurisdiction and improper venue. (ECF #61, pgs. 6-9). A true and correct copy of the order on the motion to dismiss is attached as Exhibit 4.

97. The First Lawsuit remains pending today.

98. Judge Oliver held a hearing on Grove Bags' preliminary injunction motion on May 22, 27, and 28, 2025. (ECF No. 56, pg. 1).

99. Discovery has revealed that Calyx is paying the attorney fees for Hermanowski and Torrison in order to get the two to litigate against Grove Bags.

11

## THE SECOND LAWSUIT

100. In advance of the injunction hearing, Tatum and Calyx filed a second lawsuit in federal district court in Colorado against Grove Bags. (ECF No. 56, pg. 7). The case number for the second lawsuit filed in the United States District Court of Colorado is Case No. 1:25-cv-01321-CYC (the "Second Lawsuit").

101. The Second Lawsuit was filed by Tatum and Calyx on April 25, 2025. (ECF #1).

102. During the injunction hearing in the First Lawsuit, Tatum testified that Hermanowski and Torrison were assisting him and Calyx in their litigation efforts. Tatum testified that Hermanowski and Torrison had filed state charges against Grove Bags and they planned to joined the Second Lawsuit.

103. This lawsuit was filed on June 10, 2025 based on Tatum's testimony and the fact that Torrison and Hermanowski were violating their contractual obligations to Grove Bags by assisting Calyx in its litigation efforts against Grove Bags.

104. On June 24, 2025, consistent with Tatum's testimony, a Verified First Amended Complaint and Jury Demand (the "Amended Complaint") was filed in the Second Lawsuit. (ECF #19).

105. A copy of the Amended Complaint is attached as Exhibit 5.

106. Paragraph 99 of the Amended Complaint alleges that Torrison attended a convention on behalf of Grove Bags on March 31, 2023.

107. Paragraph 100 of the Amended Complaint alleges that "multiple prospective customers asked Torrison to provide proof of a patent for the Terploc product. . . ."

108. Paragraph 102 of the Amended Complaint alleges that Torrison raised the patent issue with Grove Bags' "management."

109. Paragraph 104 of the Amended Complaint alleges that Torrison was discharged shortly after he allegedly raised the patent issues.

110. Torrison asserts three claims for relief in the Amended Complaint. (ECF #19).

111. The First Claim for Relief seeks a declaration that Torrison's restrictive covenants with Grove Bags are void.

112. The Seventh Claim for Relief alleges a claim under C.R.S. § 8-2-113. (ECF #19, ¶¶174-183). The Seventh Claim for Relief alleges that Hermanowski's employment agreement with Grove Bags should be governed by Colorado law. (ECF #19, ¶¶ 174-183).

113. The Eighth Claim for Relief alleges tortious interference with contract. (ECF #19, ¶¶184-191). The Ninth Claim for Relief alleges that Grove Bags violated a duty of good faith by enforcing the employment agreement. (ECF #19, ¶¶192-198).

114. Paragraph 119 of the Amended Complaint alleges: "Although their employment agreements contain Ohio forum selection clauses, those clauses are unenforceable in this context because Defendant's claims arise from the same employment relationships and implicate restrictive covenants that must be litigated under Colorado law. See C.R.S. § 8-2-113(6)." (ECF #19, ¶119).

115. The Amended Complaint is verified by Torrison. (ECF #19 ("I, Jacob Torrison, the undersigned, verify under the penalty of perjury, that the contents of this document are true and correct to the best of my knowledge. I am over the age of 18 and I am competent to testify").

116. On July 15, 2022, Grove Bags filed a motion to dismiss the Amended Complaint because this case was the first filed lawsuit and both lawsuits addressed the same factual and legal issues. (ECF #22).

117. On July 15, 2022, Grove Bags filed a motion to stay the litigation. (ECF #23).

13

118. The Colorado Court in the Second Lawsuit granted the stay of litigation pending a ruling on the motion to dismiss. (ECF #39).

119. The motion to dismiss was granted on March 29, 2026. A copy of the Court's order is attached as Exhibit 6.

## THE SECOND COLOARDO LAWSUIT

120. Following the issuance of an injunction against Tatum, Calyx filed a second Colorado lawsuit against Grove Bags.

121. Torrison filed a declaration in the second Colorado lawsuit in support of Calyx's claims against Grove Bags.

122. A true and correct copy of Torrison's declaration is attached as Exhibit 7.

123. The declaration purports to provide information relating to Torrison's Grove Bags' training to Calyx.

124. The declaration further purports to disclose information relating to Torrison's sales pitches made to Grove Bags' customers.

## THIS LAWSUIT

125. Calyx has admitted to reverse engineering Grove Bags' product and hiring Tatum in order to improperly compete with Grove Bags.

126. In order to gain leverage over Grove Bags, Calyx has filed two Colorado lawsuits and a quasi-judicial complaint.

127. In addition, Calyx has paid the attorney fees for Tatum, Hermanowski and Torrison in order to get the three former employees to litigate against Grove Bags.

128. Count I of this lawsuit alleges that Torrison has breached his employment agreement.

14

Docusign Envelope ID: 8E808A41-AF59-8734-8388-575B75C74BAB

129. In addition, Calyx has paid the fees of the three former employees in order to gain knowledge of Grove Bags' advertising, sales, and other product information. Count III addresses Torrison's disclosure of Grove Bags' trade secrets.

1. Count IV addresses Torrison's efforts to damage Grove Bags' business through false allegations with state agencies.

2. Count V addresses the conspiracy between Calyx, Tatum, Hermanowski and Torrison.

3. Finally, Count VI of the complaint seeks to confirm that Torrison's employment agreement is valid.

4. The above is true and correct.

I have read the foregoing declaration and I affirm under penalty of perjury under the laws of Ohio and the United States of America that the foregoing is true and accurate to the best of my knowledge, information, and belief.

Dan Jaffe

Printed Name

*Dan Jaffe*

Signature

6/15/2026

Date

15

# EXHIBIT 1

DocuSign Envelope ID: 1152BC65-94A0-4839-95FF-FB9597B95D55



## GROVE BAGS EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement"), is made and entered into as of January 1st, 2022 by and between **KINZIE ADVANCED POLYMERS LLC**, an Ohio limited liability company (dba Grove Bags), having a principal place of business at 1648 Clair St Ave NE Cleveland OH, 44114 (the "Company"), and Jacob Torrison having an address at 4460 E 121st CT Thornton, CO 80241 ("Employee").

WHEREAS, the skill and business acumen of Employee are valuable to the Company; and

WHEREAS, the Company desires to employ Employee under the terms and conditions set forth below, and Employee desires to accept such employment;

NOW, THEREFORE, in consideration of the promises and mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the parties hereto declare and agree as follows:

1. Employment. Beginning as of January 1st, 2022 (the "Commencement Date"), the Company agrees to, and does hereby, engage Employee and Employee hereby agrees to provide to the Company the Services (as hereinafter defined) upon the terms and conditions of this Agreement.

2. Term. This Agreement shall be effective as of the Commencement Date and continue for no definite term or tenure of employment, subject to the termination and notice requirements set forth in Paragraph 5 below (the

DocuSign Envelope ID: 1152BC65-94A0-4839-95EF-ED9E97B95D55

"Employment Period"). The first three (3) consecutive months of the Employee's employment under this Agreement are agreed to constitute a period of probation during which the Company shall have the opportunity to assess the suitability of the Employee's performance and conduct (the "Probation Period"). At any time during the Probation Period, Company may terminate the Employee's employment, on the grounds of unsuitability, without providing any working notice or payment in lieu thereof.

3. Compensation. The Company shall pay Employee a base annual salary of $60,000.00 ("Compensation") to be paid in bi-monthly installments. All compensation will be payable in installments in accordance with the Company's standard payroll practice. Employee shall also receive a commission, calculated as percentage of revenue, for profitable sales from accounts made solely by Employee. The breakdown of commission is outlined in Exhibit A to this Agreement. The Company may consider, in its sole discretion, whether to adjust the Employee's compensation from time to time. The Compensation will be paid to Employee less all applicable withholding of income taxes, social security taxes, or any other required deductions.

4. Position & Duties

(a) Position. Employee shall serve as a Central Territory Sales Manager for Company with a goal of generating at least ██████ in revenue.

(b) Duties. Employee shall have the duties, responsibilities and obligations customarily assigned to individuals serving in the Position in which Employee serves hereunder and such other duties, responsibilities and obligations as the Company shall from time to time specify.

(c) Extent of Duties. Employee shall devote Employee's full business time to the duties required of Employee hereunder and shall use his or her best efforts, judgment, skill, and energy to perform such duties. Employee shall comply with all policies, practices, and procedures of the Company and that Company may elect to adopt from time-to-time, all of which shall remain subject to modification and/or termination at the Company's discretion.

DocuSign Envelope ID: 1152BC65-94A0-4839-05EF-ED9E97B95D55

Employee agrees that Employee owes a duty of loyalty and good faith to the Company.

(d) Exclusive Employment. Employee shall not, without the prior written consent of the Company, directly or indirectly, during the term of this Agreement, other than in the performance of Employee's duties for the Company and in furtherance thereof, provide services to any person, firm or corporation, or entity, whether for compensation or otherwise.

(e)Kickback. Employee shall not receive any compensation from any vendors or customers while employed at Company. Violation this provision will result in immediate termination, return of compensation to Company, and any damages.

5. Termination.

(a) The Company or Employee may terminate the Agreement and the Employment Period by giving the other party written notice of such termination. The Employee is and shall remain an at-will Employee of the Company and nothing contained in this Agreement shall be deemed to create a principal/agent, partnership, or joint venture relationship between the parties.

(b) The termination of this Agreement and the Employment Period under any circumstances shall not be deemed to deprive the Company of any rights or release the Employee from any duties which were intended to survive the termination of the employment relationship including, without limitation, such rights and duties established under **Paragraph 6, Paragraph 7,** and **Paragraph 8** herein.

(c) Upon termination of this Agreement, Employee shall immediately discontinue any and all representations that he or she is an Employee of, or otherwise affiliated with, the Company. Employee shall submit all client lists and active accounts to the Company, and Employee acknowledges and agrees that all such client lists and active accounts belong to, and are the property of, the Company.

6. Restrictive Covenants.

DocuSign Envelope ID: 1152BC65-94A0-4839-05FF-ED9597B95D55

(a) Non-Competition. Employee agrees that during Employee's employment with the Company and for one (1) year following the termination of Employee's employment  with the Company, for any reason, Employee will not, in the United States or Canada, either directly or indirectly, either independently or by act in concert with others, whether as an employee, consultant, advisor, independent contractor, agent, sole proprietor, partner, joint venture, officer, owner, or director, engage in, provide any services to or on behalf of, or promote or assist, financially or otherwise, any business entity which is engaged, in whole or in part, in any business activity which is competitive with the business of the Company or its affiliates including, but not limited to, the manufacturing, marketing, distribution, or sale of packaging including packaging targeted to the hemp and/or cannabis industries.

(b) Non-Solicitation of Customers. Employee agrees that during Employee's term of employment with the Company and for two (2) years following the termination of Employee's employment with the Company, for any reason, Employee will not, either directly or indirectly, either independently or by act in concert with others, whether as an employee, consultant, advisor, independent contractor, agent, sole proprietor, partner, joint venture, officer, owner, or director of any business entity, solicit, divert, take away, or attempt to divert or take away any: (a) customer or business of the Company or its affiliates; or (b) any potential customer or business of the Company or its affiliates that had been actively solicited by the Company or its affiliates at any time during Employee's employment with the Company.

(c) Non-Solicitation of Employees. Employee agrees that during Employee's term with the Company and for two (2) years following the termination of Employee's employment with the Company, for any reason, Employee will not, either directly or indirectly, either independently or in concert with others, whether as an employee, consultant, advisor, independent contractor, agent, sole proprietor, partner, joint venture, officer, owner, or director of any business entity, solicit any employee, partner, member, shareholder, agent, representative, or other person associated with the Company or its affiliates for the purpose of causing

DocuSign Envelope ID: 1152BC65-94A0-4839-95EF-ED9597B95D55

such person(s) to terminate such person(s) employment and/or association with the Company or its affiliates.

(d) Remedies for Breach of Restrictive Covenants. Employee acknowledges that a breach of this Agreement may cause the Company continuing and irreparable injury which may not be adequately compensated through monetary damages. Employee therefore agrees that in the event of any actual or threatened breach of this Agreement, the Company will be entitled, in addition to any other remedies available to it, to immediate injunctive relief and may obtain a temporary restraining order and injunctive relief to prevent any violations of this Agreement.

(e) Continuation of Restrictive Covenants. Employee's obligations under the Restrictive Covenants contained in this Paragraph 6, including its subparagraphs, are continuing in nature and are intended to survive the termination of this Agreement and Employee's employment with the Company.

7. Confidential Information.

(a) Employee acknowledges and agrees that during the Employment Period, confidential employee, customer, and/or Company information will be or may be made available to Employee, which may include, without limitation, financial information of the Company, information regarding the Company's employees, customers, suppliers, and/or vendors, information regarding the Company's pricing and materials, the Company's computer programs, confidential website and other internet information, and other trade secrets and proprietary information including, without limitation, information relating in any way to any (i) purchasing practices, procedures, and/or techniques used or employed by the Company; (ii) pricing received by the Company from any of the Company's suppliers or vendors; (iii) pricing given by the Company to any of the Company's customers; (iv) names, addresses, email addresses, telephone numbers and all other information regarding the Company's customers; and (v) any products, services, methods, computer/software or any other similar or related matters/items developed, enhanced or modified (collectively, the "Confidential Information").

DocuSign Envelope ID: 1152BC65-94A0-4839-05EF-ED9E97B95D55

(b) Employee agrees that the Confidential Information (a) shall be used by Employee solely for the performance of Employee's duties for the Company as directed by the Company from time to time; (b) is the sole and exclusive property of the Company (and Employee shall execute and deliver, at any time, such documents as the Company shall request in order to confirm the same); (c) is absolutely confidential to the Company; and (d) except as expressly permitted in writing by the Company, must not be disseminated, disclosed to others (including, without limitation, employees who do not have the Company's authorization to know any such Confidential Information), or used outside of the Company in any manner whatsoever. During the Employment Period, and in the event of the termination of this Agreement, whether voluntary or involuntary, Employee agrees not to use, disclose, transfer or exploit the Confidential Information at any time and in any manner whatsoever (other than using such Confidential Information for the Company's benefit and as expressly permitted by the Company during the Employment Period). Employee further agrees to immediately return all Company property and documents upon the termination of Employee's contractual relationship with the Company including, without limitation, all such Confidential Information. At all times, Employee agrees that Employee will not take or otherwise remove from the Company any of the Company's property and/or Confidential Information, without the express written consent of the Company.

(c) Notwithstanding anything contained in this Agreement to the contrary, if Employee is requested or required (by oral questions or request for information or documents in court or administrative proceedings, interrogatories, subpoena, civil investigation, demand or similar court or administrative agency process) to disclose any Confidential Information, Employee will promptly notify the Company of such request or requirement prior to any disclosure of the Confidential Information so that the Company may seek an appropriate protective order and/or consider the possible waiver of Employee's compliance with this Agreement. However, if in the opinion of Employee's counsel, Employee is required by law or regulation to disclose the requested information prior to notice to the Company or prior to receipt of the Company's agreement of waiver, Employee may

DocuSign Envelope ID: 1152BC65-04A0-4839-05FF-FD9F97B9FD55

make such disclosure of such information (and only such information) without liability to the Company.

(d) Employee hereby acknowledges and agrees that the Company's remedy at law for any breach of any of Employee's obligations under this **Paragraph 7** would be inadequate, and Employee agrees and consents that temporary and permanent injunctive relief may be granted in any proceeding which may be brought to enforce any provision of this **Paragraph 7** without the necessity of proof of actual damages, it being acknowledged by Employee that any such breach would cause irreparable injury to the Company.

(e) For purposes of this **Paragraph 7**, the term "Company" shall include the Company and all of its parents, subsidiaries, affiliates and related companies and/or entities.

8. Intellectual Property. Employee acknowledges and agrees that all Intellectual Property (hereinafter defined) developed by Employee, solely by Employee or jointly with others, during the Employment Period, whether or not during regular work hours, is a "work made for hire" to the greatest extent permitted by applicable law. Employee hereby assigns, conveys, and transfers to the Company, all of Employee's right, title, estate and interest which Employee has, or may have during the Employment Period, in and to the following:

Any and all intellectual and other intangible property including, without limitation, trade names, trademarks and service marks (whether registered or unregistered) and all registrations and applications therefor, mask works, websites, domain names, works of authorship and all copyrights related thereto, and all registrations and applications therefor, inventions, discoveries, developments, concepts, improvements, designs, industrial models (whether patentable or not), and all patent rights relating thereto and all applications therefor and all reissues, divisions, continuations and extensions thereof, know-how, trade secrets, processes, technology, discoveries, formulae and procedures, and software (collectively hereinafter referred to as "Intellectual Property"), together with the right to

DocuSign Envelope ID: 1152BC65-94A0-4839-95EF-ED9587B85D55

sue for infringement or improper, unlawful or unfair use or disclosure of any of the foregoing.

The assignment set forth in this **Paragraph 8** shall apply to Intellectual Property which meets any one of the following criteria: (a) results, at least in part, from Employee's use of time, equipment, supplies, facility, or trade secret information of the Company; (b) relates, at the time of conception or reduction to practice, directly or indirectly, (i) to the business, project or products of the Company, or the manufacture or utilization thereof, or (ii) to the Company's actual or anticipated research or development; and/or (c) results or arises, directly or indirectly, from any work performed or expected to be performed by Employee for the Company and is conceived or reduced to practice by Employee during or within two (2) years after termination of the Employment Period. The assignment set forth herein shall extend to all Intellectual Property resulting from information obtained by the Employee during the Employment Period, whether or not conceived or reduced to practice by Employee during or after termination of the Employment Period, except as explicitly set forth in this **Paragraph 8.**

9. Reasonableness of Restrictions and Assignment. Employee acknowledges that Employee has carefully read and considered the provisions of this Agreement and, having done so, agrees that the restrictions and requirements set forth in this Agreement including, without limitation, the non-competition provisions set forth in **Paragraph 6**, the Confidential Information restrictions set forth in **Paragraph 7**, and the assignment of Intellectual Property set for in **Paragraph 8** herein, are fair and reasonable and are reasonably required for the protection of the interests of the Company and its officers, members, directors, shareholders and other employees.

10. Employee Benefits. Employee shall be eligible to participate in any benefit plan sponsored or maintained by the Company to the extent that the Company offers such plans and the Employee is eligible to participate under the terms thereof.

11. Expenses. The Company shall pay or reimburse Employee for out-of-pocket business expenses specific to the Employee's scope of work and

DocuSign Envelope ID: 1152BC65-04A0-4838-95EF-5D9E87B8FD55

sales efforts, in accordance with Company policy. To be eligible for reimbursement, an itemized documentation of expenses must be submitted monthly to the appropriate administrator.

12. Entire Agreement; Modification. This Agreement sets forth the entire agreement and understanding of the parties hereto concerning the subject matter hereof, and, except as otherwise specifically provided below, supersedes all prior and contemporaneous correspondence, agreements, arrangements and understandings, both oral and written, between the parties hereto concerning the subject matter hereof. No modification hereof shall be binding upon the parties hereto except by written instrument duly executed by such parties or their duly authorized representatives.

13. Successor in Interest. This Agreement and the various rights and obligations arising hereunder shall inure to the benefit of and be binding upon the Company and the Company's successors and assigns including, without limitation, any successors in interest as a result of a merger, consolidation or change of name. This Agreement may not be assigned by Employee.

14. Severability. If any term or provision of this Agreement or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the other terms of this Agreement, or the application of such terms or provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

15. Interpretation. The paragraph headings of this Agreement are inserted for convenience only and shall not constitute a part of this Agreement in construing or interpreting any provision hereof. Whenever the context requires, words used in the singular shall be construed to include the plural and vice versa, and pronouns of any gender shall be deemed to include and designate the masculine, feminine, or neuter gender.

16. Governing Law. This Agreement shall in all respects be construed in accordance with and governed by the laws of the State of Ohio. Any suit

DocuSign Envelope ID: 1152BC65-04A0-4838-95EF-5D9E87B8FD55

involving any dispute or matter arising under this Agreement may only be brought in the courts of the State of Ohio, in Cuyahoga County. Employee hereby consents to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

17. Counterparts. This Agreement may be executed in any number of counterparts, including electronically, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

18. Waiver. The failure of the Company at any time or from time to time to require performance of any of Employee's obligations under this Agreement shall in no manner affect the Company's rights to enforce any provision of this Agreement at a subsequent time, and the waiver of any rights arising out of any breach shall not be construed as a waiver of any rights arising out of any subsequent or prior breach.

19. Notices. Any notice which may be or is required to be given pursuant to the provisions of this Agreement shall be personally delivered, sent by certified or registered mail, postage prepaid, return receipt requested, or by overnight delivery service and addressed as follows: if to the Company, to Kinzie Advanced Polymers LLC, Attention: Jacob Grover at 1648 St Clair Ave. NE, Cleveland, OH 44114; if to the Employee, to Jacob Torrison at 4460 E 121st CT Thornton, CO 80241

**[SIGNATURE PAGE FOLLOWS]**

DocuSign Envelope ID: 1152BC65-94A0-4838-95EF-5D9E97B8FD55

The parties hereto have executed this Agreement as of the day and year first above written.

Company:

KINZIE ADVANCED POLYMERS LLC ,
an Ohio limited liability company, dba Grove Bags

By: Daniel Jaffe
Its: Director of Finance & HR

DocuSigned by:

*Dan Jaffe*

8F06C007B06B407...

Date: 1/10/2022

Employee:

Jacob Torrison

DocuSigned by:

*Jacob Torrison*

83B903C9530B497...

Date: 1/10/2022

DocuSign Envelope ID: 1152BC65-04A0-4838-95EF-5B9E87B8FD55

Page 12 of 12                          Torrison Employment

## <u>EXHIBIT A</u>

| Commission Granted as a % of Revenue | Realized GP% for Project |
|---|---|
| | |

DocuSign Envelope ID: 46AEBFEC-132B-4120-BF9C-A523032085DB



# GROVE BAGS COLORADO SOLUTIONS SPECIALIST
# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement"), is made and entered into as of January $^5$____,2021, by and between **KINZIE ADVANCED POLYMERS LLC**, an Ohio limited liability company (dba Grove Bags), having a principal place of business at 1648 Clair St Ave NE Cleveland OH, 44114 (the "Company"), and **JACOB TORRISON** having an address at _4460 E 121st CT Thornton, CO 80241_____("Employee").

WHEREAS, the services, expertise, knowledge and contacts of Employee are valuable to the Company; and

WHEREAS, the Company desires to employ Employee under the terms and conditions set forth below, and Employee desires to accept such employment;

NOW, THEREFORE, in consideration of the promises and mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the parties hereto declare and agree as follows:

1. Employment. Beginning as of January 4, 2021, (the "Commencement Date"), the Company agrees to, and does hereby, engage Employer and Employee hereby agrees to provide to the Company the Services (as hereinafter defined) upon the terms and conditions of this Agreement.

2. Term. This Agreement shall be effective as of the Commencement Date and continue for no definite term or tenure of employment, subject to the

1

DocuSign Envelope ID: 46AEBFEC-132B-4120-BF0C-A523032085DB

termination and notice requirements set forth in Paragraph 5 below (the "Employment Period").

3. Compensation. The Company shall pay Employee base compensation of $40,000.00 USD ("Compensation") to be paid in bi-monthly installments. Employee will receive commission as outlined in the attached Compensation Plan and included in Exhibit A to this Agreement. Employee will receive an annual bonus of ▇▇▇▇▇▇ contingent upon meeting quota goal. Employee may receive discretionary bonus payments based on performance. All compensation will be payable in installments in accordance with the Company's standard payroll practice. The Company may consider, in its sole discretion, whether to adjust the Employee's compensation from time to time. The Compensation will be paid to Employee less all applicable withholding of income taxes, social security taxes, or any other required deductions.

4. Position & Duties

(a) Position. Employee shall serve as a Colorado Solutions Specialist for Company.

(b) Duties. Employee shall have the duties, responsibilities, and obligations customarily assigned to individuals serving in the Position in which Employee serves hereunder and such other duties, responsibilities, and obligations as the Company shall specify, including but not limited to, generating revenue through sales, servicing customer accounts, sales support, training and monitoring new salesmen, attending trade shows, participating in Company meetings, communicating with prospects, vendors, and customers both written and orally with prompt response times. In this role, you will have a self-prospecting quota of ▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ in sales annually with exceptional focus on growing existing accounts, as well as adding new accounts in the following states: Colorado.

(b)(2) Job Description and Role Expectation. Your principal goal is growing the Company's presence, reputation, and book of business in the state of

2

DocuSign Envelope ID: 46AEBFEC-132B-4120-BF9C-A523032085DB

Colorado. It is expected in this role that Jacob Torrison represent themselves and the Company in the highest possible manner. This includes, but is not limited to: professional, timely, and routine communication; fostering and nurturing of key relationships the Company possesses; cultivating relationships with grandfather and house accounts; and being mutually helpful to the sales and revenue team. You are expected to exemplify the Company's core values and philosophy at all times and with all interactions with customers, suppliers, and other stakeholders.

(c) Extent of Duties. Employee shall devote Employee's full business time to the duties required of Employee hereunder and shall use his or her best efforts, judgment, skill, and energy to perform such duties. Employee shall comply with all policies, practices, and procedures of the Company and that Company may elect to adopt from time-to-time, all of which shall remain subject to modification and/or termination at the Company's discretion. Employee agrees that Employee owes a duty of loyalty and good faith to the Company.

(d) Exclusive Employment. Employee shall not, without the prior written consent of the Company, directly or indirectly, during the term of this Agreement, other than in the performance of Employee's duties for the Company and in furtherance thereof, provide services to any person, firm or corporation, or entity, whether for compensation or otherwise.

5. Termination.

(a) The Company or Employee may terminate the Agreement and the Employment Period by giving the other party written notice of such termination. The Employee is and shall remain an at-will Employee of the Company and nothing contained in this Agreement shall be deemed to create a principal/agent, partnership, or joint venture relationship between the parties.

(b) The termination of this Agreement and the Employment Period under any circumstances shall not be deemed to deprive the Company of any rights or release the Employee from any duties which were intended to

3

DocuSign Envelope ID: 46AEBFEC-132B-4129-BF0G-A523032985DB

survive the termination of the employment relationship including, without limitation, such rights and duties established under **Paragraph 6, Paragraph 7,** and **Paragraph 8** herein.

(c) Upon termination of this Agreement, Employee shall immediately discontinue any and all representations that he or she is an Employee of, or otherwise affiliated with, the Company. Employee shall submit all client lists and active accounts to the Company, and Employee acknowledges and agrees that all such client lists and active accounts belong to, and are the property of, the Company.

6. Restrictive Covenants.

(a) Non-Competition. Employee agrees that during Employee's employment with the Company and for two (2) years following the termination of Employee's employment with the Company, for any reason, Employee will not, in the United States or Canada, either directly or indirectly, either independently or by act in concert with others, whether as an employee, consultant, advisor, independent contractor, agent, sole proprietor, partner, joint venture, officer, owner, or director, engage in, provide any services to or on behalf of, or promote or assist, financially or otherwise, any business entity which is engaged, in whole or in part, in any business activity which is competitive with the business of the Company or its affiliates including, but not limited to, the manufacturing, marketing, distribution, or sale of packaging including packaging targeted to the hemp and/or cannabis industries.

(b) Non-Solicitation of Customers. Employee agrees that during Employee's term of employment with the Company and for two (2) years following the termination of Employee's employment with the Company, for any reason, Employee will not, either directly or indirectly, either independently or by act in concert with others, whether as an employee, consultant, advisor, independent contractor, agent, sole proprietor, partner, joint venture, officer, owner, or director of any business entity, solicit, divert, take away, or attempt to divert or take away any: (a) customer or business of the Company or its affiliates; or (b) any potential customer or business of the Company or its affiliates that had been actively solicited by the

4

DocuSign Envelope ID: 46AEBFEC-132B-4120-BF0C-A523032085DB

Company or its affiliates at any time during Employee's employment with the Company.

(c)Non-Solicitation of Employees. Employee agrees that during Employee's term with the Company and for two (2) years following the termination of Employee's employment with the Company, for any reason, Employee will not, either directly or indirectly, either independently or in concert with others, whether as an employee, consultant, advisor, independent contractor, agent, sole proprietor, partner, joint venture, officer, owner, or director of any business entity, solicit any employee, partner, member, shareholder, agent, representative, or other person associated with the Company or its affiliates for the purpose of causing such person(s) to terminate such person(s) employment and/or association with the Company or its affiliates.

(d) Remedies for Breach of Restrictive Covenants. Employee acknowledges that a breach of this Agreement may cause the Company continuing and irreparable injury which may not be adequately compensated through monetary damages. Employee therefore agrees that in the event of any actual or threatened breach of this Agreement, the Company will be entitled, in addition to any other remedies available to it, to immediate injunctive relief and may obtain a temporary restraining order and injunctive relief to prevent any violations of this Agreement.

(e)Continuation of Restrictive Covenants. Employee's obligations under the Restrictive Covenants contained in this Paragraph 6, including its subparagraphs, are continuing in nature and are intended to survive the termination of this Agreement and Employee's employment with the Company.

7. Confidential Information.

(a) Employee acknowledges and agrees that during the Employment Period, confidential employee, customer, and/or Company information will be or may be made available to Employee, which may include, without limitation, financial information of the Company, information regarding the Company's employees, customers, suppliers, and/or vendors, information

5

DocuSign Envelope ID: 46AEBFEC-132B-4120-BF0C-A523032085DB

regarding the Company's pricing and materials, the Company's computer programs, confidential website and other internet information, and other trade secrets and proprietary information including, without limitation, information relating in any way to any (i) purchasing practices, procedures, and/or techniques used or employed by the Company; (ii) pricing received by the Company from any of the Company's suppliers or vendors; (iii) pricing given by the Company to any of the Company's customers; (iv) names, addresses, email addresses, telephone numbers and all other information regarding the Company's customers; and (v) any products, services, methods, computer/software or any other similar or related matters/items developed, enhanced or modified (collectively, the "Confidential Information").

(b) Employee agrees that the Confidential Information (a) shall be used by Employee solely for the performance of Employee's duties for the Company as directed by the Company from time to time; (b) is the sole and exclusive property of the Company (and Employee shall execute and deliver, at any time, such documents as the Company shall request in order to confirm the same); (c) is absolutely confidential to the Company; and (d) except as expressly permitted in writing by the Company, must not be disseminated, disclosed to others (including, without limitation, employees who do not have the Company's authorization to know any such Confidential Information), or used outside of the Company in any manner whatsoever. During the Employment Period, and in the event of the termination of this Agreement, whether voluntary or involuntary, Employee agrees not to use, disclose, transfer or exploit the Confidential Information at any time and in any manner whatsoever (other than using such Confidential Information for the Company's benefit and as expressly permitted by the Company during the Employment Period). Employee further agrees to immediately return all Company property and documents upon the termination of Employee's contractual relationship with the Company including, without limitation, all such Confidential Information. At all times, Employee agrees that Employee will not take or otherwise remove from the Company any of the Company's property and/or Confidential Information, without the express written consent of the Company.

6

DocuSign Envelope ID: 46AEBFEC-132B-4120-BF0C-A523032085DB

(c)Notwithstanding anything contained in this Agreement to the contrary, if Employee is requested or required (by oral questions or request for information or documents in court or administrative proceedings, interrogatories, subpoena, civil investigation, demand or similar court or administrative agency process) to disclose any Confidential Information, Employee will promptly notify the Company of such request or requirement prior to any disclosure of the Confidential Information so that the Company may seek an appropriate protective order and/or consider the possible waiver of Employee's compliance with this Agreement. However, if in the opinion of Employee's counsel, Employee is required by law or regulation to disclose the requested information prior to notice to the Company or prior to receipt of the Company's agreement of waiver, Employee may make such disclosure of such information (and only such information) without liability to the Company.

(d) Employee hereby acknowledges and agrees that the Company's remedy at law for any breach of any of Employee's obligations under this **Paragraph 7** would be inadequate, and Employee agrees and consents that temporary and permanent injunctive relief may be granted in any proceeding which may be brought to enforce any provision of this **Paragraph 7** without the necessity of proof of actual damages, it being acknowledged by Employee that any such breach would cause irreparable injury to the Company.

(e) For purposes of this **Paragraph 7**, the term "Company" shall include the Company and all of its parents, subsidiaries, affiliates and related companies and/or entities.

8. Intellectual Property. Employee acknowledges and agrees that all Intellectual Property (hereinafter defined) developed by Employee, solely by Employee or jointly with others, during the Employment Period, whether or not during regular work hours, is a "work made for hire" to the greatest extent permitted by applicable law. Employee hereby assigns, conveys, and transfers to the Company, all of Employee's right, title, estate and interest which Employee has, or may have during the Employment Period, in and to the following:

7

DocuSign Envelope ID: 46AEBFEC-132B-4120-BF0C-A523032085DB

Any and all intellectual and other intangible property including, without limitation, trade names, trademarks and service marks (whether registered or unregistered) and all registrations and applications therefor, mask works, websites, domain names, works of authorship and all copyrights related thereto, and all registrations and applications therefor, inventions, discoveries, developments, concepts, improvements, designs, industrial models (whether patentable or not), and all patent rights relating thereto and all applications therefor and all reissues, divisions, continuations and extensions thereof, know-how, trade secrets, processes, technology, discoveries, formulae and procedures, and software (collectively hereinafter referred to as "Intellectual Property"), together with the right to sue for infringement or improper, unlawful or unfair use or disclosure of any of the foregoing.

The assignment set forth in this **Paragraph 8** shall apply to Intellectual Property which meets any one of the following criteria: (a) results, at least in part, from Employee's use of time, equipment, supplies, facility, or trade secret information of the Company; (b) relates, at the time of conception or reduction to practice, directly or indirectly, (i) to the business, project or products of the Company, or the manufacture or utilization thereof, or (ii) to the Company's actual or anticipated research or development; and/or (c) results or arises, directly or indirectly, from any work performed or expected to be performed by Employee for the Company and is conceived or reduced to practice by Employee during or within two (2) years after termination of the Employment Period. The assignment set forth herein shall extend to all Intellectual Property resulting from information obtained by the Employee during the Employment Period, whether or not conceived or reduced to practice by Employee during or after termination of the Employment Period, except as explicitly set forth in this **Paragraph 8.**

9. Reasonableness of Restrictions and Assignment. Employee acknowledges that Employee has carefully read and considered the provisions of this Agreement and, having done so, agrees that the restrictions and requirements set forth in this Agreement including, without limitation, the non-competition provisions set forth in **Paragraph 6**, the Confidential Information restrictions set forth in **Paragraph 7**, and the

8

DocuSign Envelope ID: 46AEBFEC-132B-4129-BF9C-A523032085DB

assignment of Intellectual Property set for in **Paragraph 8** herein, are fair and reasonable and are reasonably required for the protection of the interests of the Company and its officers, members, directors, shareholders and other employees.

10. Employee Benefits. Employee shall be eligible to participate in any benefit plan sponsored or maintained by the Company to the extent that the Company offers such plans and the Employee is eligible to participate under the terms thereof.

11. Expenses. The Company shall pay or reimburse Employee for out-of-pocket business expenses specific to the Employee's scope of work and sales efforts, in accordance with Company policy. To be eligible for reimbursement, an itemized documentation of expenses must be submitted monthly to the appropriate administrator.

12. Entire Agreement; Modification. This Agreement sets forth the entire agreement and understanding of the parties hereto concerning the subject matter hereof, and, except as otherwise specifically provided below, supersedes all prior and contemporaneous correspondence, agreements, arrangements and understandings, both oral and written, between the parties hereto concerning the subject matter hereof. No modification hereof shall be binding upon the parties hereto except by written instrument duly executed by such parties or their duly authorized representatives.

13. Successor in Interest. This Agreement and the various rights and obligations arising hereunder shall inure to the benefit of and be binding upon the Company and the Company's successors and assigns including, without limitation, any successors in interest as a result of a merger, consolidation or change of name. This Agreement may not be assigned by Employee.

14. Severability. If any term or provision of this Agreement or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the other terms of this Agreement, or the application of such terms or provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be

9

DocuSign Envelope ID: 46AEBFEC-132B-4130-BF0C-A523032085DB

affected thereby, and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

15. Interpretation. The paragraph headings of this Agreement are inserted for convenience only and shall not constitute a part of this Agreement in construing or interpreting any provision hereof. Whenever the context requires, words used in the singular shall be construed to include the plural and vice versa, and pronouns of any gender shall be deemed to include and designate the masculine, feminine, or neuter gender.

16. Governing Law. This Agreement shall in all respects be construed in accordance with and governed by the laws of the State of Ohio. Any suit involving any dispute or matter arising under this Agreement may only be brought in the courts of the State of Ohio, in Cuyahoga County. Employee hereby consents to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

17. Counterparts. This Agreement may be executed in any number of counterparts, including electronically, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

18. Waiver. The failure of the Company at any time or from time to time to require performance of any of Employee's obligations under this Agreement shall in no manner affect the Company's rights to enforce any provision of this Agreement at a subsequent time, and the waiver of any rights arising out of any breach shall not be construed as a waiver of any rights arising out of any subsequent or prior breach.

19. Notices. Any notice which may be or is required to be given pursuant to the provisions of this Agreement shall be personally delivered, sent by certified or registered mail, postage prepaid, return receipt requested, or by overnight delivery service and addressed as follows: if to the Company, to Kinzie Advanced Polymers LLC, Attention: Jacob Grover at 1648 St Clair Ave. NE, Cleveland, OH 44114; if to the Employee, to Jacob Torrison, 4460 E 121st CT Thornton, CO 80241

_____

DocuSign Envelope ID: 46AEBFEC-132B-4120-BF0C-A523032085DB

The parties hereto have executed this Agreement as of the day and year first above written.


Company:

KINZIE ADVANCED POLYMERS LLC ,
an Ohio limited liability company, dba Grove Bags

By: Jacob C. Grover
Its: CEO



DocuSigned by:

Jacob Grover

D411B48AD956403...

Date: ___1/7/2021_____




_____


Employee:

Jacob Torrison

DocuSigned by:

Jake Torrison

83B903C9530B497...

Date:___1/5/2021_____

11

DocuSign Envelope ID: 46AEBFEC-132B-4120-BF0C-A523032085DB

# Exhibit A

### Effective Date: January 4, 2021

**Purpose**
The purpose of this Plan Document is to outline the guidelines of the Colorado Solutions Specialist Compensation Plan.  This document is a guideline of the pay and requirements of the Plan and is subject to change at the discretion of Kinzie Advanced Polymers LLC.

**Base Salary**
Jacob will be eligible for a $40,000.00 base salary.  The base salary is reviewed annually by the CEO of Kinzie Advanced Polymers LLC.

**Quota**
The annual quota is contained in the agreement above is  ███████████████

The quota may be adjusted during the year as needed by the organization and as approved by the CEO of Kinzie Advanced Polymers LLC.

**Commission**
Jacob Torrison will be eligible to receive commission of ████████████████ on all sales.

**Commission Adjustments**
Contracts can be reviewed by the CEO of Kinzie Advanced Polymers LLC to ensure the intent is to secure and grow Kinzie Advanced Polymers LLC business.  Commission payments may be adjusted as a result if the sale is deemed counter to this intent.

All sales must be quoted to customers at prices that ensure the profitability of the sale. If an unprofitable sale is made it will be not be commissioned.

**Additional Bonus Incentives ("Spiff")**
The Kinzie Advanced Polymers LLC may provide opportunities for additional bonus incentives during the plan year.  Incentive parameters and metrics communication to occur prior to the start of the qualifying period.

**Payment**
Quota attainment and commissions are earned when the company receives payment from the customer.  Payment of commission will occur after the completion of the quarter in which payment was received.

Payable commissions will be paid quarterly, after the completion of each quarter.

12

DocuSign Envelope ID: 46AEBFEC-132B-4120-BF0C-A523032085DB

The annual bonus will be paid on the first pay period in the second month following the end of the year.  The Colorado Solutions Specialist must be actively employed on the date of payment to be eligible for the quarterly bonus.

For the purposes of payment, performance to plan will not be rounded to the nearest percentage or half point.

**Windfalls**
A windfall is defined as a large sales event that occurs outside of the Consultants' influence or a sale that exceeds predictable performance levels and has the potential to substantially increase commissionable dollars that create concerns with aligning pay with business objectives. If a windfall occurs, it will be up to CEO of Kinzie Advanced Polymers LLC to determine how the participant will be paid at that time.

**Plan Administration**
The Sales Director (Ryan Tatum) of Kinzie Advanced Polymers LLC will serve as the Plan Administrator and administer the Colorado Solutions Specialist Compensation Plan under the guidelines of this document.  This will include all matters pertaining to the Colorado Solutions Specialist Compensation Plan and its interpretation, including the resolution of matters where the Colorado Solutions Specialist Compensation Plan is silent.

Exceptions to this plan document will require written approval from the CEO of Kinzie Advanced Polymers LLC.

**Customer Accounts**
All customer account lists are the property of Kinzie Advanced Polymers LLC.  On a regular basis, management will review the account list of the Manager to determine whether it can be managed effectively and ensure that customers are successfully served.

Kinzie Advanced Polymers LLC reserves the right to reassign accounts or make modifications at any time.

**Transferability**
The Colorado Solutions Specialist may not sell, pledge, donate or otherwise assign commission under the Colorado Solutions Specialist Compensation Plan to another entity or person.

**Plan Provisions**
*Effective Date:*
*January 4, 2021*
Prior pay arrangements for participants under this compensation plan will terminate and this plan will go into effect as January 4, 2021.

13

DocuSign Envelope ID: C8E6CD09-9810-457E-9EF9-845442E90B1A



## GROVE BAGS SALESMAN
## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement"), is made and entered into as of December 4 2020, by and between **KINZIE ADVANCED POLYMERS LLC**, an Ohio limited liability company (dba Grove Bags), having a principal place of business at 1648 Clair St Ave NE Cleveland OH, 44114 (the "Company"), and **Jacob Mark Torrison** having an address at 4460 E 121st Ct Thornton, CO 80241 _____("Employee").

WHEREAS, the services, expertise, knowledge and contacts of Employee are valuable to the Company; and

WHEREAS, the Company desires to employ Employee under the terms and conditions set forth below, and Employee desires to accept such employment;

NOW, THEREFORE, in consideration of the promises and mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the parties hereto declare and agree as follows:

1. Employment. Beginning as of December 7th 2020, (the "Commencement Date"), the Company agrees to, and does hereby, engage Employer and Employee hereby agrees to provide to the Company the Services (as hereinafter defined) upon the terms and conditions of this Agreement.

2. Term. This Agreement shall be effective as of the Commencement Date and continue for no definite term or tenure of employment, subject to the

1

DocuSign Envelope ID: C8E6CD99-9810-457E-9FF9-845442FD0B1A

termination and notice requirements set forth in Paragraph 5 below (the "Employment Period").

3. Compensation. The Company shall pay Employee base compensation of $38,000.00 USD ("Compensation") to be paid in bi-monthly installments. Employee will receive commission as outlined in the attached Compensation Plan and included in Exhibit A to this Agreement. Employee may receive discretionary bonus payments based on performance. All compensation will be payable in installments in accordance with the Company's standard payroll practice. The Company may consider, in its sole discretion, whether to adjust the Employee's compensation from time to time. The Compensation will be paid to Employee less all applicable withholding of income taxes, social security taxes, or any other required deductions.

4. Position & Duties

(a) Position. Employee shall serve as a Salesman for Company.

(b) Duties. Employee shall have the duties, responsibilities, and obligations customarily assigned to individuals serving in the Position in which Employee serves hereunder and such other duties, responsibilities, and obligations as the Company shall specify, including but not limited to, generating revenue through sales, servicing customer accounts, sales support, training and monitoring new salesmen, attending trade shows, participating in Company meetings, communicating with prospects, vendors, and customers both written and orally with prompt response times.

(c) Extent of Duties. Employee shall devote Employee's full business time to the duties required of Employee hereunder and shall use his or her best efforts, judgment, skill, and energy to perform such duties. Employee shall comply with all policies, practices, and procedures of the Company and that Company may elect to adopt from time-to-time, all of which shall remain subject to modification and/or termination at the Company's discretion.

2

DocuSign Envelope ID: C8E6CD09-0810-457E-8FF9-845442FD0B1A

Employee agrees that Employee owes a duty of loyalty and good faith to the Company.

(d) Exclusive Employment. Employee shall not, without the prior written consent of the Company, directly or indirectly, during the term of this Agreement, other than in the performance of Employee's duties for the Company and in furtherance thereof, provide services to any person, firm or corporation, or entity, whether for compensation or otherwise.

5. Termination.

(a) The Company or Employee may terminate the Agreement and the Employment Period by giving the other party written notice of such termination. The Employee is and shall remain an at-will Employee of the Company and nothing contained in this Agreement shall be deemed to create a principal/agent, partnership, or joint venture relationship between the parties.

(b) The termination of this Agreement and the Employment Period under any circumstances shall not be deemed to deprive the Company of any rights or release the Employee from any duties which were intended to survive the termination of the employment relationship including, without limitation, such rights and duties established under **Paragraph 6, Paragraph 7,** and **Paragraph 8** herein.

(c)Upon termination of this Agreement, Employee shall immediately discontinue any and all representations that he or she is an Employee of, or otherwise affiliated with, the Company. Employee shall submit all client lists and active accounts to the Company, and Employee acknowledges and agrees that all such client lists and active accounts belong to, and are the property of, the Company.

6. Restrictive Covenants.

(a) Non-Competition. Employee agrees that during Employee's employment with the Company and for two (2) years following the termination of Employee's employment with the Company, for any reason, Employee will not, in the United States or Canada, either directly or

3

DocuSign Envelope ID: C8E6CD99-9810-457E-8FF9-845442FD0B1A

indirectly, either independently or by act in concert with others, whether as an employee, consultant, advisor, independent contractor, agent, sole proprietor, partner, joint venture, officer, owner, or director, engage in, provide any services to or on behalf of, or promote or assist, financially or otherwise, any business entity which is engaged, in whole or in part, in any business activity which is competitive with the business of the Company or its affiliates including, but not limited to, the manufacturing, marketing, distribution, or sale of packaging including packaging targeted to the hemp and/or cannabis industries.

(b) Non-Solicitation of Customers. Employee agrees that during Employee's term of employment with the Company and for two (2) years following the termination of Employee's employment with the Company, for any reason, Employee will not, either directly or indirectly, either independently or by act in concert with others, whether as an employee, consultant, advisor, independent contractor, agent, sole proprietor, partner, joint venture, officer, owner, or director of any business entity, solicit, divert, take away, or attempt to divert or take away any: (a) customer or business of the Company or its affiliates; or (b) any potential customer or business of the Company or its affiliates that had been actively solicited by the Company or its affiliates at any time during Employee's employment with the Company.

(c) Non-Solicitation of Employees. Employee agrees that during Employee's term with the Company and for two (2) years following the termination of Employee's employment with the Company, for any reason, Employee will not, either directly or indirectly, either independently or in concert with others, whether as an employee, consultant, advisor, independent contractor, agent, sole proprietor, partner, joint venture, officer, owner, or director of any business entity, solicit any employee, partner, member, shareholder, agent, representative, or other person associated with the Company or its affiliates for the purpose of causing such person(s) to terminate such person(s) employment and/or association with the Company or its affiliates.

(d) Remedies for Breach of Restrictive Covenants. Employee acknowledges that a breach of this Agreement may cause the Company

4

DocuSign Envelope ID: C8E6CD99-9810-457E-8FF9-845442FB0B1A

continuing and irreparable injury which may not be adequately compensated through monetary damages. Employee therefore agrees that in the event of any actual or threatened breach of this Agreement, the Company will be entitled, in addition to any other remedies available to it, to immediate injunctive relief and may obtain a temporary restraining order and injunctive relief to prevent any violations of this Agreement.

(c) Continuation of Restrictive Covenants. Employee's obligations under the Restrictive Covenants contained in this Paragraph 6, including its subparagraphs, are continuing in nature and are intended to survive the termination of this Agreement and Employee's employment with the Company.

7. Confidential Information.

(a) Employee acknowledges and agrees that during the Employment Period, confidential employee, customer, and/or Company information will be or may be made available to Employee, which may include, without limitation, financial information of the Company, information regarding the Company's employees, customers, suppliers, and/or vendors, information regarding the Company's pricing and materials, the Company's computer programs, confidential website and other internet information, and other trade secrets and proprietary information including, without limitation, information relating in any way to any (i) purchasing practices, procedures, and/or techniques used or employed by the Company; (ii) pricing received by the Company from any of the Company's suppliers or vendors; (iii) pricing given by the Company to any of the Company's customers; (iv) names, addresses, email addresses, telephone numbers and all other information regarding the Company's customers; and (v) any products, services, methods, computer/software or any other similar or related matters/items developed, enhanced or modified (collectively, the "Confidential Information").

(b) Employee agrees that the Confidential Information (a) shall be used by Employee solely for the performance of Employee's duties for the Company as directed by the Company from time to time; (b) is the sole and exclusive property of the Company (and Employee shall execute and

5

DocuSign Envelope ID: C8E6CD99-9810-457E-8EF9-845442FD0B1A

deliver, at any time, such documents as the Company shall request in order to confirm the same); (c) is absolutely confidential to the Company; and (d) except as expressly permitted in writing by the Company, must not be disseminated, disclosed to others (including, without limitation, employees who do not have the Company's authorization to know any such Confidential Information), or used outside of the Company in any manner whatsoever. During the Employment Period, and in the event of the termination of this Agreement, whether voluntary or involuntary, Employee agrees not to use, disclose, transfer or exploit the Confidential Information at any time and in any manner whatsoever (other than using such Confidential Information for the Company's benefit and as expressly permitted by the Company during the Employment Period). Employee further agrees to immediately return all Company property and documents upon the termination of Employee's contractual relationship with the Company including, without limitation, all such Confidential Information. At all times, Employee agrees that Employee will not take or otherwise remove from the Company any of the Company's property and/or Confidential Information, without the express written consent of the Company.

(c)Notwithstanding anything contained in this Agreement to the contrary, if Employee is requested or required (by oral questions or request for information or documents in court or administrative proceedings, interrogatories, subpoena, civil investigation, demand or similar court or administrative agency process) to disclose any Confidential Information, Employee will promptly notify the Company of such request or requirement prior to any disclosure of the Confidential Information so that the Company may seek an appropriate protective order and/or consider the possible waiver of Employee's compliance with this Agreement. However, if in the opinion of Employee's counsel, Employee is required by law or regulation to disclose the requested information prior to notice to the Company or prior to receipt of the Company's agreement of waiver, Employee may make such disclosure of such information (and only such information) without liability to the Company.

6

DocuSign Envelope ID: C8E6CD99-9810-457E-9FF9-845442ED0B1A

(d) Employee hereby acknowledges and agrees that the Company's remedy at law for any breach of any of Employee's obligations under this **Paragraph 7** would be inadequate, and Employee agrees and consents that temporary and permanent injunctive relief may be granted in any proceeding which may be brought to enforce any provision of this **Paragraph 7** without the necessity of proof of actual damages, it being acknowledged by Employee that any such breach would cause irreparable injury to the Company.

(e) For purposes of this **Paragraph 7**, the term "Company" shall include the Company and all of its parents, subsidiaries, affiliates and related companies and/or entities.

8. Intellectual Property. Employee acknowledges and agrees that all Intellectual Property (hereinafter defined) developed by Employee, solely by Employee or jointly with others, during the Employment Period, whether or not during regular work hours, is a "work made for hire" to the greatest extent permitted by applicable law. Employee hereby assigns, conveys, and transfers to the Company, all of Employee's right, title, estate and interest which Employee has, or may have during the Employment Period, in and to the following:

Any and all intellectual and other intangible property including, without limitation, trade names, trademarks and service marks (whether registered or unregistered) and all registrations and applications therefor, mask works, websites, domain names, works of authorship and all copyrights related thereto, and all registrations and applications therefor, inventions, discoveries, developments, concepts, improvements, designs, industrial models (whether patentable or not), and all patent rights relating thereto and all applications therefor and all reissues, divisions, continuations and extensions thereof, know-how, trade secrets, processes, technology, discoveries, formulae and procedures, and software (collectively hereinafter referred to as "Intellectual Property"), together with the right to sue for infringement or improper, unlawful or unfair use or disclosure of any of the foregoing.

7

DocuSign Envelope ID: C8E6CD99-9810-457E-8FF9-845442FD0B1A

The assignment set forth in this **Paragraph 8** shall apply to Intellectual Property which meets any one of the following criteria: (a) results, at least in part, from Employee's use of time, equipment, supplies, facility, or trade secret information of the Company; (b) relates, at the time of conception or reduction to practice, directly or indirectly, (i) to the business, project or products of the Company, or the manufacture or utilization thereof, or (ii) to the Company's actual or anticipated research or development; and/or (c) results or arises, directly or indirectly, from any work performed or expected to be performed by Employee for the Company and is conceived or reduced to practice by Employee during or within two (2) years after termination of the Employment Period. The assignment set forth herein shall extend to all Intellectual Property resulting from information obtained by the Employee during the Employment Period, whether or not conceived or reduced to practice by Employee during or after termination of the Employment Period, except as explicitly set forth in this **Paragraph 8.**

9. Reasonableness of Restrictions and Assignment. Employee acknowledges that Employee has carefully read and considered the provisions of this Agreement and, having done so, agrees that the restrictions and requirements set forth in this Agreement including, without limitation, the non-competition provisions set forth in **Paragraph 6**, the Confidential Information restrictions set forth in **Paragraph 7**, and the assignment of Intellectual Property set for in **Paragraph 8** herein, are fair and reasonable and are reasonably required for the protection of the interests of the Company and its officers, members, directors, shareholders and other employees.

10. Employee Benefits. Employee shall be eligible to participate in any benefit plan sponsored or maintained by the Company to the extent that the Company offers such plans and the Employee is eligible to participate under the terms thereof.

11. Expenses. The Company shall pay or reimburse Employee for out-of-pocket business expenses specific to the Employee's scope of work and sales efforts, in accordance with Company policy. To be eligible for reimbursement, an itemized documentation of expenses must be submitted monthly to the appropriate administrator.

8

DocuSign Envelope ID: C856CD99-9810-457E-8FF9-845442FD0B1A

12. Entire Agreement; Modification. This Agreement sets forth the entire agreement and understanding of the parties hereto concerning the subject matter hereof, and, except as otherwise specifically provided below, supersedes all prior and contemporaneous correspondence, agreements, arrangements and understandings, both oral and written, between the parties hereto concerning the subject matter hereof. No modification hereof shall be binding upon the parties hereto except by written instrument duly executed by such parties or their duly authorized representatives.

13. Successor in Interest. This Agreement and the various rights and obligations arising hereunder shall inure to the benefit of and be binding upon the Company and the Company's successors and assigns including, without limitation, any successors in interest as a result of a merger, consolidation or change of name. This Agreement may not be assigned by Employee.

14. Severability. If any term or provision of this Agreement or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the other terms of this Agreement, or the application of such terms or provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

15. Interpretation. The paragraph headings of this Agreement are inserted for convenience only and shall not constitute a part of this Agreement in construing or interpreting any provision hereof. Whenever the context requires, words used in the singular shall be construed to include the plural and vice versa, and pronouns of any gender shall be deemed to include and designate the masculine, feminine, or neuter gender.

16. Governing Law. This Agreement shall in all respects be construed in accordance with and governed by the laws of the State of Ohio. Any suit involving any dispute or matter arising under this Agreement may only be brought in the courts of the State of Ohio, in Cuyahoga County. Employee hereby consents to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

9

DocuSign Envelope ID: C8E6CD09-9810-457E-8FF9-845442ED0B1A

17. Counterparts. This Agreement may be executed in any number of counterparts, including electronically, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

18. Waiver. The failure of the Company at any time or from time to time to require performance of any of Employee's obligations under this Agreement shall in no manner affect the Company's rights to enforce any provision of this Agreement at a subsequent time, and the waiver of any rights arising out of any breach shall not be construed as a waiver of any rights arising out of any subsequent or prior breach.

19. Notices. Any notice which may be or is required to be given pursuant to the provisions of this Agreement shall be personally delivered, sent by certified or registered mail, postage prepaid, return receipt requested, or by overnight delivery service and addressed as follows: if to the Company, to Kinzie Advanced Polymers LLC, Attention: Jacob Grover at 1648 St Clair Ave. NE, Cleveland, OH 44114; if to the Employee, to Jacob Torrison, 4460 E 121st Ct Thornton, CO 80241

_____

**[SIGNATURE PAGE FOLLOWS]**

10

DocuSign Envelope ID: C856CD99-9810-457E-8F79-845442FD0B1A

The parties hereto have executed this Agreement as of the day and year first above written.


Company:

KINZIE ADVANCED POLYMERS LLC ,
an Ohio limited liability company, dba Grove Bags

By: Jacob C. Grover
Its: CEO

DocuSigned by:

Jacob Grover

5E62315036984F8...

Date: _____12/10/2020_____



Employee:

Jacob Mark Torrison



DocuSigned by:

Jake Torrison

83B903C9530B497

Date:_____12/10/2020_____

11

DocuSign Envelope ID: C8E6CD99-9810-457E-9EF9-845442FD0B1A

# Exhibit A

### Effective Date: December 7, 2020

**Purpose**

The purpose of this Plan Document is to outline the guidelines of the Sales Representative (Territory Rep) Compensation Plan.  This document is a guideline of the pay and requirements of the Plan and is subject to change at the discretion of Kinzie Advanced Polymers LLC.

**Base Salary**

The XX Rep will be eligible for a $38,000.00 base salary.  The base salary is reviewed annually by the CEO of Kinzie Advanced Polymers LLC.

**Quota**

The quarterly and annual quota is contained on the schedule below:



| Quarter | Quota |
|---------|-------|
|         |       |

The quota may be adjusted during the year as needed by the organization and as approved by the CEO of Kinzie Advanced Polymers LLC.

**Commission**

The  Rep will receive the following commission rate on all completed sales:



| Commission Rate Schedule |
|--------------------------|
|                          |

**Commission Adjustments**

Contracts can be reviewed by the CEO of Kinzie Advanced Polymers LLC to ensure the intent is to secure and grow Kinzie Advanced Polymers LLC business.  Commission payments may be adjusted as a result if the sale is deemed counter to this intent.

All sales must be quoted to customers at prices that ensure the profitability of the sale. If an unprofitable sale is made it will be not be commissioned. Any sale with a profit margin lower than ▮▮▮ will be paid at ▮▮▮ instead of the current commission rate.

12

DocuSign Envelope ID: C8E6CD99-9810-457E-8FF9-845442FD0B1A



**Commission Rate Schedule- Low Margin Orders**

### Bonus Opportunity
**Quarterly Quota Attainment**

The Rep is eligible for a ▮▮▮▮ quarterly bonus based on quarterly sales quota attainment of greater than or equal to ▮▮▮ of the quarterly sales quota.

**Annual Quota Attainment**

The Rep is eligible for a ▮▮▮▮ annual bonus based on annual sales quota attainment of greater than or equal to ▮▮▮ of the annual sales quota.

The Rep is eligible for a ▮▮▮▮ annual bonus based on annual sales quota attainment of greater than or equal to ▮▮▮ of the annual sales quota.



**Full Year Bonus Opportunity**

### Additional Bonus Incentives ("Spiff")

The Kinzie Advanced Polymers LLC may provide opportunities for additional bonus incentives during the plan year. Incentive parameters and metrics communication to occur prior to the start of the qualifying period.

### Payment

Quota attainment and commissions are earned when the company receives payment from the customer. Payment of commission will occur in the month following the date the order is paid by the customer.

Commissions will be divided over the number of pay periods during the month of payment.

The quarterly bonus will be paid on the first pay period in the second month following the end of the quarter. The Rep must be actively employed on the date of payment to be eligible for the quarterly bonus.

For the purposes of payment, performance to plan will not be rounded to the nearest percentage or half point.

### Windfalls

A windfall is defined as a large sales event that occurs outside of the Reps' influence or a sale that exceeds predictable performance levels and has the potential to substantially increase commissionable dollars that create concerns with aligning pay with business objectives. If a

13

DocuSign Envelope ID: C8E6CD99-9810-457E-8FF9-845442ED0B1A

windfall occurs, it will be up to CEO of Kinzie Advanced Polymers LLC to determine how the participant will be paid at that time.

**Plan Administration**
The Chief Operating Officer of Kinzie Advanced Polymers LLC will serve as the Plan Administrator and administer the Rep Compensation Plan under the guidelines of this document. This will include all matters pertaining to the Rep Compensation Plan and its interpretation, including the resolution of matters where the Rep Compensation Plan is silent.

Exceptions to this plan document will require approval from CEO of Kinzie Advanced Polymers LLC.

**Customer Accounts**
All customer account lists are the property of Kinzie Advanced Polymers LLC. On a regular basis, management will review the account list of the Territory Rep to determine whether it can be managed effectively and ensure that customers are successfully served.

Kinzie Advanced Polymers LLC reserves the right to reassign accounts or make modifications at any time.

**Transferability**
The Territory Rep may not sell, pledge, donate or otherwise assign commission under the Rep Compensation Plan to another entity or person.

**Plan Provisions**
*Effective Date:*
Prior pay arrangements for participants under this compensation plan will terminate and this plan will go into effect as of the date first written below.

**APPENDIX**

**Customer and Rep Payment Example 1**

The Rep completes a sale of ██████ with Company A on January 15th, 2020. Company A pays ██████ to Kinzie Advanced Polymers LLC on February 4th. Company A pays the final ██████ to Kinzie Advanced Polymers LLC on March 1st, 2020.

For this sale, the Rep will earn ██████ of quota retirement in February and ██████ of quota retirement in March. Commissions at a rate of ██ will be paid out to Territory Rep as follow:
- **Payment 1 of 2:** ██████ commission payment in March for the ██████ Kinzie Advanced Polymers LLC received in February.
- **Payment 2 of 2:** ██████ commission payment in April for the ██████ Kinzie Advanced Polymers LLC received in March.

**Customer and CO Rep Payment Example 2**

14

DocuSign Envelope ID: C8E6CD09-0810-457E-8FF9-845442FD0B1A

The Rep completes a sale of ██████ with Company A on April 15th, 2020. Company A pays ██████ to Kinzie Advanced Polymers LLC on May 4th.  Company A pays the final ██████ to Kinzie Advanced Polymers LLC on June 1st, 2020.

For this sale, the Rep will earn ██████ of quota retirement in May and ██████ of quota retirement in June. When the second payment of ██████ is made to Kinzie Advanced Polymers LLC the Rep is already above ██████ for the year. Commissions at a rate of ██ will be paid out for both payments.
- **Payment 1 of 2:** ██████ commission payment in March for the ██████ Kinzie Advanced Polymers LLC received in February.
- **Payment 2 of 2:** ██████ commission payment in April for the ██████ Kinzie Advanced Polymers LLC received in March.



# EXHIBIT 2

**GROVE BAGS**
Powered by TerpLoc®

26201 Richmond Road Unit D,
Bedford Heights, OH 44146

April 10, 2023


<u>VIA OVERNIGHT DELIVERY AND</u>
<u>ELECTRONIC MAIL</u>

Jacob Torrison
4460 East 121 St. Court
Thornton, Colorado 80241
Jtorrison13@gmail.com

Re:    <u>Grove Bags Employment Agreement</u>
       <u>Termination Letter</u>

Dear Jacob:

This letter confirms the termination of your employment with Kinzie Advanced Polymers LLC ("Grove Bags" or the "Company").  If you have any questions regarding this letter, please let me know.  If your counsel has questions, please let me know and I will direct you to the Company's counsel.

As we discussed last week, your employment with Grove Bags has been terminated for cause effective April 7, 2023.  This letter is being sent in order to confirm that you received the written notice required by Paragraph 5(a) of the Employment Agreement.  In addition, as we discussed, you have been paid all amounts owed under the Employment Agreement.

However, if you have any questions regarding your continuing obligations to Grove Bags or your compensation, please let me know.

Sincerely,



Dan Jaffe
Chief Financial Officer
Grove Bags

# EXHIBIT 3

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

KINZIE ADVANCED POLYMERS, LLC  )          Case No. 1:24 CV 1887
d/b/a GROVE BAGS                              )
                                                             )
     Plaintiff                                 )          JUDGE SOLOMON OLIVER, JR.
                                                             )
     v.                                            )
                                                             )
CALYX CONTAINERS, LLC *et. al,*         )
                                                             )
     Defendants                              )          <u>ORDER</u>

Currently pending before the court in the above-captioned case is Plaintiff Kinzie Advanced Polymers, LLC d/b/a/ Grove Bags' ("Plaintiff" or "Grove Bags") Motion for Preliminary Injunction ("Motion") (ECF No. 5). The court held a Preliminary Injunction Hearing ("Hearing") on the Motion on May 22, 27, and 28, 2025, during which the court received exhibits from all parties, and heard testimony from Jack Grover ("Grover") and Daniel Jaffe ("Jaffe") on behalf of Grove Bags, Simon Knobel ("Knobel") on behalf of Defendant Calyx Containers, LLC ("Calyx"), and Defendant Michael Ryan Tatum ("Tatum"). (ECF No. 40.) For the reasons that follow, the court grants in part and denies in part the Motion.

## I. BACKGROUND

This action involves two competing cannabis packaging companies owned and operated by former college friends and fraternity brothers,[1] and a third person who worked for one, and now works for the other. On May 22, 27, and 28, 2025, the court held a Preliminary Injunction Hearing, during which the court heard testimony from all parties, and received exhibits. The following facts are derived from the parties' preliminary injunction filings (ECF Nos. 5, 8, 13, 16, 18), testimony and exhibits presented at the Hearing (ECF Nos. 48–51), and the parties' closing briefs (ECF Nos. 41–43). The court also references the parties' personal jurisdiction arguments in Defendants' Motions to Dismiss (ECF Nos. 19, 20) and Plaintiff's Opposition Briefs (ECF Nos. 23, 24).

### A.     Factual Background

#### 1.     *The Parties*

##### a.     <u>Grove Bags</u>

Plaintiff company, Grove Bags, was founded by Jacob Grover in 2016 as an Ohio limited liability company. Since its founding, the company has maintained its principal place of business and warehouse in Cuyahoga County, Ohio. (Jaffe Prelim. Inj. Decl. ¶¶ 5–8, ECF No. 5-1.) Grove Bags develops and distributes cannabis packaging materials for commercial and retail customers. (*Id.* at ¶¶ 15–16.) The company characterizes itself as the "market leader in the cannabis industry for packaging products[,]" chiefly because its product, TerpLoc, is a "first of its kind" cannabis film that "create[s] the optimal cannabis climate in every package." (*Id.* at ¶¶ 14, 16–17.) Grove Bags does not manufacture TerpLoc itself, nor is the product patented. (Tr. at PageID 982–84.) However, parts

---

[1]     Calyx CEO, Simon Knobel, and Calyx President, Alex Gonzalez, attended college with Jack Grover and Dan Jaffe of Grove Bags, where all four were friends and in the same fraternity. (Knobel Prelim. Inj. Decl. ¶ 5, ECF No. 8-1.)

of its production are patented, such as the chemical makeup. (*Id.*)

Grove Bags employs approximately 30 people, with most living in and working from Ohio, including Grover as CEO, Jaffe as CFO, and others of the company's leadership team. (Pl. Closing Br. at PageID 817, ECF No. 42.) Every employee and independent contractor/consultant signs an employment agreement that includes confidentiality, non-solicitation, and non-compete obligations. (*Id.* at PageID 819.) The company also gives each employee or consultant a handbook that details how to protect the business's confidential information. (*Id.*) It further limits employee access to certain types of information, and password protects confidential information. (*Id.*) When an employee or consultant leaves the company, they must return all Grove Bags property and equipment. (Jaffe Prelim. Inj. Decl. ¶ 31.) Grove Bags customers, however, are not bound by confidentiality agreements, and so may freely share with others pricing information they receive from Grove Bags. (Tr. at PageID 990.)

Grove Bags engages in a variety of marketing and sales tactics to promote its packaging products. Sales team members receive training on Grove Bags' products, sales techniques, and managing and maintaining the company's customer database. (Jaffe Prelim. Inj. Decl. ¶ 34.) One sales tactic employees use is comparative selling, sometimes called the "Pepsi Challenge," whereby Grove Bags sends a sample of its product to potential customers to compare with their current packaging. (Tr. at PageID 899–90, 987.) Grove Bags employees also attend cannabis industry trade shows, including MJBizCon, a three-day event attended by 30,000 cannabis industry executives from around the globe. (Jaffe Prelim. Inj. Decl. ¶¶ 77–78.) Another mechanism through which the company generates customer leads is by subscribing to Cannabiz Media ("Cannabiz"), a public online database housing contact information and data on cannabis companies licensed to operate in

the United States. (Tr. 909, 985; Calyx Closing Br. at PageID 808.) Grove Bags uses Cannabiz to identify prospective customers. (*Id.*) Further, many of Grove Bags' current customers are listed in the database.(*Id.*)

> b.      Calyx Containers

Defendant company, Calyx Containers, also founded in 2016, is a Colorado limited liability company with its principal place of business and manufacturing facility in Utah. (Knobel Mot. to Dismiss Decl. ¶¶ 5–6, ECF No. 19-1.) Calyx also participates in the cannabis packaging industry. (*Id*. at ¶ 7.) Initially, Calyx focused on customer point-of-sale rigid packaging, such as hard containers made of plastic or glass, which was distinct from Grove Bags' flexible packaging. (*Id.*) Around 2023, Calyx began working on a flexible packaging product that used a similar modified atmospheric packaging ("MAP") film as Grove Bags used in its products. (Knobel Prelim. Inj. Decl. ¶¶ 15–17.) The product, called Calyx Cure, was created in Calyx's laboratories by Calyx employees, and differs from Grove Bags' product in the following ways: it includes a flat bottom, rectangular pouch shape, additional film layers, a different zipper design, and uses different mechanisms, additives, chemical composition and layering, humidity targets, and temperatures. (*Id.* at ¶ 21; Calyx Closing Br. at PageID 810.)

Calyx's leadership team and most of its employees live and work in Utah. (Knobel Mot. to Dismiss Decl. ¶¶ 6–7.) The company has one Ohio-based employee, but that employee's work does not involve servicing, increasing, or developing any customers or business specific to Ohio. (*Id.* at ¶ 9.) About two percent of Calyx's revenue comes from Ohio customers, but the company maintains that its business in Ohio is not continuous or systematic. (*Id.* at ¶ 12.)

Calyx engages in similar marketing tactics as Grove Bags, including sending samples of its

product to prospective customers, attending MJBizCon, and subscribing to and using Cannabiz Media for researching potential customers. (Tr. at PageID 1194, 1211; Knobel Prelim. Inj. Decl. ¶ 35.) The company also uses a regional sales model in which eight different sales employees are responsible for specific territories, a sales structure Calyx maintains is common across industries. (Knobel Prelim. Inj. Decl. ¶ 36.)

<u>c.</u>  <u>Michael Ryan Tatum</u>

Defendant Michael Ryan Tatum, resides in and works from Colorado. (Tatum Prelim. Inj. Decl. ¶ 3, ECF No. 16-1.) He has been active in the cannabis industry since 2014, largely working as a consultant through his company, Cultivated Synergy, LLC. (*Id.* at ¶ 5.) In September 2020, Tatum began consulting for Grove Bags. (Pl. Ex. 1.) His consulting agreement ("Grove CA") detailed the services he would provide Grove Bags, explained Tatum's obligations related to confidential information, and discussed compensation. (*Id.*) The Grove CA also included non-competition and non-solicitation clauses, as well as a governing law provision establishing Ohio as the choice of forum and choice of law for any disputes arising from the agreement. (*Id.* at pg. 4–5.) Lastly, the Grove CA noted that the confidentiality, non-competition, non-solicitation, and governing law provisions, among others, extended beyond termination of the agreement. (*Id.* at pg. 6.)

On December 7, 2020, Grove bags hired Tatum full-time as the company's Chief Commercial Officer. (Pl. Ex. 2.) In January 2021, Tatum signed his second Employment Agreement ("EA") and was named Director of Business Development. (Pl. Ex. 3.) Tatum entered his third EA with Grove Bags in February 2023, and once again took on the role of Chief Commercial Officer. (Pl. Ex. 4.)  Like the Grove CA, every EA included provisions detailing how Tatum must treat confidential information, his obligations under non-competition and non-solicitation restrictive

covenants, and a governing law provision making Ohio the forum and choice of law for any lawsuit brought in connection with the EA. (*Id.*) None of these provisions changed from EA to EA, so when Tatum entered his third and final EA in February 2023, he had already seen and agreed to the restrictive covenants and governing law provisions twice before. Moreover, Tatum had time to review each EA and never objected to the provisions now in dispute. (Tr. at PageID 922.)

As the Director of Business Development from January 2021 to February 2023, Tatum managed Grove Bags' outside sales team, had access to the company's customers and their relevant information, and knew about the company's products, pricing, cost of goods sold, prospective customers, business strategy, and finances. (Jaffe Prelim. Inj. Decl. ¶ 49.) Despite his title changing to Chief Commercial Officer in the February 2023 EA, Tatum's duties remained consistent. (*Id.* at ¶ 52.) In addition to managing the sales team, Tatum also traveled on behalf of Grove Bags, often representing it during visits with current and prospective customers, as well as at cannabis industry events such as MJBizCon. (*Id.* at ¶ 55.)

Tatum signed his final agreement, the Severance Agreement ("SA"), with Grove Bags on August 25, 2023. (Pl. Ex. 5.) Plaintiff and Tatum dispute the events leading up to Tatum's departure, including the amount of time Tatum had to review and sign the SA as well as why Tatum left. The SA states that Tatum voluntarily resigned from his position with Grove Bags, which Jack Grover corroborated in his testimony. (Pl. Ex. 5 at pg. 1; Tr. at PageID 924, 926, 1007–08, 1010–12.) However, Tatum testified he was terminated without explanation, and given only 24 hours to sign the SA after receiving it during a last-minute meeting with Grover and Jaffe right before he was scheduled to fly home to Colorado from Ohio. (Tr. at PageID 1024–25; Tatum Closing Br. at PageID 827.) How exactly the termination unfolded need not be settled to decide whether a preliminary

injunction should issue, because it is undisputed that the SA included a provision requiring Tatum's continued compliance with the confidentiality clause and restrictive covenants included in his prior EAs, and the same governing law clause establishing Ohio as the forum and choice of law for any dispute or matter arising from the SA. (Pl. Ex. 5 at pg. 2–3.)

2.    *Tatum's Post-Grove Bags Work*

After leaving Grove Bags, Tatum returned to consulting through his Colorado-based LLC, Cultivated Synergy Strategies, Ltd. (Tatum Prelim. Inj. Decl. ¶ 12.) His clients included those working in mushrooms, nutraceuticals, software development, and Defendant Calyx. (*Id.*) Prior to the Hearing, Plaintiff asserted it learned that Tatum was working for Calyx shortly before it filed the instant lawsuit in October 2024. (Jaffe Prelim. Inj. Decl. ¶ 67.) Calyx claimed it began working with Tatum in September 2024 pursuant to a consulting agreement. (Knobel Prelim. Inj. Decl. ¶ 23.) However, during the Hearing, Plaintiff introduced a complaint filed by Tatum and Calyx against Grove Bags in the District of Colorado ("Colorado Complaint"), which stated that Calyx first approached Tatum about working for it in October 2023. (Pl. Ex. 18 at ¶ 26.[2]) Tatum allegedly declined that offer because he "believ[ed] he was bound by the terms of the restrictive covenants set forth in his [Grove Bags] Employment Agreement[.]" (*Id.* at ¶ 27.) Calyx allegedly approached Tatum again in January 2024 with another job offer, which Tatum declined based on his Grove Bags EA. (*Id.* at ¶¶ 28–29.) Tatum and Calyx then state in the Colorado Complaint that,

> both Tatum and Calyx began evaluating the enforceability of the restrictive covenants contained in the Employment Agreement. Following their investigations, Tatum and Calyx discovered that Colorado Law disfavors restrictive covenants and that the provisions

---

[2]    A review of the Colorado District Court Docket reveals Tatum and Calyx filed an amended complaint on June 26, 2025. *See* Case No. 1:25-cv-1321-CYC.

> contained in the Employment Agreement may be unenforceable under applicable [Colorado] law. After making this determination, but erring on the side of caution, Tatum accepted a lesser role with Calyx as an independent contractor rather than an employee in September 2024.

(Pl. Ex. 18 at ¶ 30–32.) During the Hearing, however, Tatum and Calyx, acknowledged there were some errors in the Colorado Complaint that the parties were in the process of fixing through an amended complaint. (Tr. at PageID 1060–61, 1131.) Even so, it is undisputed that Tatum signed a consulting agreement ("Calyx CA") with Defendant Calyx in late August 2024. (Tatum Ex. A.)

Under the Calyx CA, Tatum agreed to provide a number of services, including "Go-to-Market" Strategy Development, Sales Enablement–such as creating sales collateral and training for sales staff, and Market Analysis by conducting market research and gathering customer feedback. (Tatum Ex. A pg. 1.) In exchange for his services, Calyx agreed to pay Tatum a $1,400 signing bonus, and hourly rate of $35 per hour, and seven percent commission on any net new business Tatum brought into the company. (*Id.* at pg. 2.) The Calyx CA also included a confidentiality provision, a clause whereby Tatum represents he is under no contractual or legal obligations that would prohibit him from working for Calyx, and a governing law section establishing Colorado as the choice of law for any disputes. (*Id.* at pg. 3.) Although the Calyx CA terminated December 4, 2024, Tatum continues to work as a consultant for Calyx under the terms of the original Calyx CA. (Tr. at PageID 1089–91.)

**B.      Procedural Background**

Plaintiff filed a seven-count Complaint (ECF No. 1) on October 29, 2024, alleging Breach of Contract - Employment Agreement (Count I) and Breach of Contract - Severance Agreement (Count II) against Defendant Michael Ryan Tatum, as well as Misappropriation of Trade Secrets

(Count III), Tortious Interference with Economic and/or Business Relations (Count IV), Civil Conspiracy (Count VI), and Injunctive Relief (Count VII) against Tatum and Calyx, and Tortious Interference with Economic, Contract, and/or Business Relations (Count V) against Calyx. Plaintiff later filed an Amended Complaint (ECF No. 9) on January 10, 2025, asserting the same seven counts, but adding one for Deceptive Trade Practices against Calyx and Tatum.[3] (Am. Compl. at PageID 274.)

On December 24, 2024, Plaintiff filed the instant Motion for Preliminary Injunction (ECF No. 5). Defendant Calyx filed its Opposition (ECF No. 8) to the Motion on January 7, 2025, to which Plaintiff filed its Reply in Support (ECF No. 13) on January 14, 2025. Tatum filed his Opposition (ECF No. 16) to the Motion on January 16, 2025, to which Plaintiff filed its Reply in Support (ECF No. 18) on January 23, 2025. Following a Case Management Conference ("CMC") with counsel for the parties on April 30, 2025, the court scheduled a Preliminary Injunction Hearing to take place on May 22, 27, and 28. (ECF Nos. 33, 35.) Between the CMC and the Hearing, Defendants moved to stay discovery (ECF Nos. 30, 31) until the court ruled on their respective Motions to Dismiss the Amended Complaint (ECF Nos. 19, 20) for lack of personal jurisdiction. The court stayed discovery for 30 days, but then lifted the stay against Tatum following Tatum's request for information and documents from Plaintiff in relation to his Colorado Complaint. (ECF No. 35.) The Hearing concluded on May 28, 2025 and the parties submitted their Closing Briefs on June 6, 2025. (*See* ECF Nos. 41–43.) Plaintiff's Motion is now ripe for review.

## II. LEGAL STANDARD

---

[3]     The parties stipulated during the Hearing that Plaintiff's Deceptive Trade Practices claim was not part of the preliminary injunction. (Tr. at PageID 996.)

-9-

A preliminary injunction under Federal Rule of Civil Procedure 65 "is an extraordinary and drastic remedy." *S. Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (quoting *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)). The moving party therefore must show that the circumstances clearly demand it. *Id.* Courts consider four factors when deciding whether to grant a preliminary injunction: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Id.* (quoting *Bays v. City of Fairborn*, 668 F.3d 814, 818–19 (6th Cir. 2012)). These factors apply in aggregate and must be balanced rather than treated as "prerequisites to be met." *Id.* But while no single factor is controlling, the first two—likelihood of success on the merits and irreparable harm—predominate the preliminary injunction analysis. *See O'Toole v. O'Connor*, 802 F.3d 783, 788 (6th Cir. 2015); *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 391 (6th Cir. 2020).

### III. DISCUSSION

Grove Bags seeks a preliminary injunction that (1) prohibits Tatum and Calyx from using or disclosing its confidential business information and trade secrets, and (2) enjoins Tatum from working for or performing services for Calyx and requires that he fully comply with the Severance Agreement and 2023 Employment Agreement. (Mot. at PageID 79.) Defendant Calyx argues that a preliminary injunction should not issue primarily because Plaintiff cannot show a strong likelihood of success on the merits given this court lacks personal jurisdiction, and because Plaintiff failed to show it has been irreparably harmed. (Calyx Closing Br. at PageID 803.) Defendant Tatum also argues the court lacks personal jurisdiction over him, and that Plaintiff failed to show irreparable

harm. (Tatum Closing Br. at PageID 830.) But he primarily challenges the merits of Plaintiff's breach of contract claims on the grounds that Colorado law makes the disputed Agreements void and unenforceable. (*Id.*)[4] Although the choice of law question applies only to the breach of contract claims against Tatum, the court addresses the issue first as both Defendants vehemently assert that Colorado law, not Ohio, governs this case.

## A.      Choice of Law

A federal court exercising diversity jurisdiction applies the choice of law rules of the forum state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496 (1941); *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 366 (6th Cir. 2022). Here, the court sits in Ohio, and so it will apply Ohio's choice of law rules. Ohio courts follow Sections 187 and 188 of the

---

[4]      In his Closing Brief (ECF No. 43), Tatum argues that Plaintiff's Exhibit 9 should be excluded because it is neither certified, nor did Plaintiff offer evidence to authenticate it. (Tatum Closing Br. at PageID 829.) Plaintiff's Exhibit 9 is a transcript of a conversation between Tatum and David Thode of Cannabiz Media. During the Hearing, Plaintiff referenced the exhibit in support of its argument that Tatum had been working with Calyx for months prior to entering a consulting contract in August 2024. (Pl. Closing Br. at PageID 821; Tr. at PageID 106.) In the Sixth Circuit, parties should stipulate to the accuracy of a transcript of a recording. *Am. Signature, Inc. v. Extreme Linen, LLC*, No. 2:12-CV-00601, 2015 WL 1476751 (S.D. Ohio Mar. 31, 2015) (citing *United States v. Vinson*, 606 F.2d 149, 155 (1979)). If there is no stipulation, then "the transcriber should verify that he or she has listened to the [recording] and accurately transcribed its content. The court should also make an independent determination of the accuracy of the transcript against the tape." *Extreme Linen*, 2015 WL 1476751 at *13 (quoting *United States v. Robinson*, 707 F.2d 872, 878–79 (6th Cir. 1983) (internal quotations omitted)). However, this standard is generally applicable only when the court is deciding a case on the merits—such as at trial or at the summary judgment stage. *Ridge Corp. v. Kirk Nat'l Lease Co.*, No. 2:23-CV-03012, 2024 WL 4363226 (S.D. Ohio Sept. 30, 2024). Whereas at the preliminary injunction stage, "district courts do not require stringent adherence to rules of evidence." *Id.* at *1. Thus, the court can consider the unauthenticated transcript provided by Plaintiff in support of its Motion.

Restatement (Second) Conflict of Laws to decide which law applies in contract disputes. *Wise v. Zwicker & Assoc., P.C.*, 780 F.3d 710, 714 (6th Cir. 2015). Under these rules, courts will generally apply and find enforceable choice of law provisions governing the parties' contractual rights and duties. *Extracorporeal All., L.L.C. v. Rosteck*, 285 F. Supp. 2d 1028, 1036 (N.D. Ohio 2003), aff'd, 113 F. App'x 98 (6th Cir. 2004); Restatement (Second) of Conflict of Laws § 187.

The Agreements at issue contain the following choice of law provision: "This Agreement shall in all respects be construed in accordance with and governed by the laws of the State of Ohio." (Pl.'s Exs. 4, 5.) Defendant Tatum argues that the court should set aside the provision because Colorado Revised Statute § 8-2-113 provides significant protections to Colorado citizens from restrictive employment covenants, including prohibiting out-of-state choice of law clauses. The relevant section of the Colorado statute provides:

> A covenant not to compete that applies to a worker who, at the time of termination of employment, primarily resided or worked in Colorado may not require the worker to adjudicate the enforceability of the covenant outside of Colorado. Notwithstanding any contractual provision to the contrary, Colorado law governs the enforceability of a covenant not to compete for a worker who, at the time of termination of employment, primarily resided and worked in Colorado.

Colo. Rev. Stat. § 8-2-113(6). Tatum contends this section renders the Ohio choice of law provision in his contracts void and unenforceable. (Tatum Closing Br. at PageID 831.) Defendant Calyx echos this argument, stating, that to the best of its knowledge, "no Court to date has ever found that C.R.S. § 8-2-113(6) [...] does not operate to bar enforcement of the Ohio choice of law provision here, as the Colorado legislature intended." (Calyx Closing Br. at PageID 811.) This argument is not well-taken.

-12-

The court finds only one non-Colorado case that directly considers the effect of § 8-2-113(6) on an out-of-state choice of law clause, and it does not hold that this provision of the Colorado statute makes non-Colorado choice of law provisions void. *See Access Pro Med., LLC v. Hartman*, No. CV 125-063, 2025 WL 1548745 (S.D. Ga. May 30, 2025). In *Access Pro Medical*, a Colorado defendant, like Tatum here, argued that his non-compete agreement with a Georgia company was void under Colorado law because it did not comply with the requirements of § 8-2-113, and the statute required that such covenants be governed by Colorado law. 2025 WL 1548745, at *3. The Georgia district court rejected the defendant's argument, noting that, "Defendant does not explain why the Court should use Colorado law as the starting point rather than the law of the forum state of Georgia[,]" and found the Georgia choice of law provision valid and governing the parties' contract dispute. *Id.*

A South Dakota court reached a similar conclusion in a case decided before the Colorado statute was amended to require non-compete agreements be governed by Colorado law. In *gpac, LLP v. Andersen*, No. 4:21-CV-4201-LLP, 2022 WL 1469388 (D.S.D. May 10, 2022), the Colorado defendants asserted that their non-compete agreements were unenforceable under Colorado law because the state's law and policy, specifically § 8-2-113, strongly disfavor them. The court applied South Dakota's choice of law principles, which, like Ohio, use Section 187 and 188, and concluded that the forum state had a substantial relationship to the parties and the agreement, and Colorado did not have a materially greater interest despite its strict non-compete statute. 2022 WL 1469388, at *6–7. *But see BDO USA, P.C. v. Rojas*, No. 24 CIV. 101 (CM), 2024 WL 3236822 (S.D.N.Y. June 27, 2024), reconsideration denied, No. 24 CIV. 101 (CM), 2024 WL 3729581 (S.D.N.Y. Aug. 8, 2024) (applying New York choice of law principles and determining Colorado law governs because

-13-

New York does not have a reasonable relationship compared to Colorado).

Accordingly, like the Georgia, South Dakota, and New York district courts, this court will look to the forum state's choice of law principles, here Ohio, to determine whether the Ohio choice of law provision in Tatum's Agreements should be set aside.

As previously mentioned, Ohio has adopted Sections 187 and 188 of the Restatement (Second) of Conflict of Laws to evaluate choice of law issues in contract disputes. Section 187 instructs courts to respect choice of law provisions, unless an exception applies. *Wise*, 780 F.3d at 715. A court should not enforce the provision if:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188 [of the Restatement (Second) of Conflict of Laws], would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Id.* (citing Restatement (Second) of Conflict of Laws § 187(2)). Comment (e) to the Restatement provides examples of when a substantial relationship between the parties or transaction and the chosen state exists:

> [W]here performance by one of the parties is to take place or where one of the parties is domiciled or has his principal place of business. The same will also be the case when this state is the place of contracting except, perhaps, in the unusual situation where this place is wholly fortuitous and bears no real relation either to the contract or to the parties.

Restatement (Second) of Conflict of Laws § 187 cmt. e. Here, Grove Bags is an Ohio limited liability company with its principal place of business in Ohio. This is sufficient to establish a "substantial

relationship" between the parties and the chosen state. *Id. See also Century Business Servs., Inc. v. Barton*, 967 N.E.2d 782, 794 (Ohio Ct. App. 2011) (recognizing a substantial relationship between the parties and the chosen state where parent company of one of the contracting parties is based in Ohio, and other contracting party is not). Thus, to set aside the Ohio choice of law provision, the court must find that Colorado law is the applicable state law under § 188, that Colorado has a materially greater interest than Ohio in determining the issue, and that enforcement of the Ohio choice of law provision would be contrary to Colorado's fundamental policy.

      1.      *Would Colorado Law Apply Absent the Ohio Choice of Law Provision?*

Section 188 of the Restatement provides that, "[t]he rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6." Restatement (Second) of Conflict of Laws § 188 (1971). To determine which state has the most significant relationship, the court applies the following factors: "the place of contracting," "the place of negotiation of the contract," "the place of performance," "the location of the subject matter of the contract," and "the domicile, residence, nationality, place of incorporation and place of business of the parties." *Id.* Application of Section 188 of the Restatement "requires a sensitive, fact-specific analysis." *Wise*, 780 F.3d at 718.

The place of contracting and of negotiation of the contract is unclear from the record given the Agreements were signed by both parties electronically via DocuSign. (*See* Pl.'s Exs. 2, 3, 4, 5.) During the Hearing, Tatum testified he was presented with a physical copy of the Severance Agreement (Pl. Ex. 5) at Grove Bags's office in Ohio, but there was also testimony that he did not sign via DocuSign until about three weeks later, when he would have been back in Colorado. (Tr.

at PageID 1024–25.) These factors standing alone, however, are less important "when the parties do not meet but rather conduct their negotiations from separate states by mail or telephone." *Stone Surgical*, 858 F.3d at 390 (citing Restatement (Second) of Conflict of Laws § 188, cmt. e.). Thus, these factors neither weigh for nor against Ohio as the state with the most significant relationship.

Turning to the place of performance, the court finds that Colorado is the primary place of performance for Tatum's work on behalf of Grove Bags. Although a full-time employee for Grove Bags, Tatum worked remotely from Colorado and traveled to Ohio at least four times a year for specific company events and trainings. (Tr. at PageID 905.) However, the record indicates Tatum performed his Grove Bags duties from other states as well, particularly where he was representing the company at a trade show or conference. (Jaffe Prelim. Inj. Decl. ¶ 55.) The record also shows that when Tatum left Grove Bags he was managing between four and six Ohio employees. (Pl.'s Closing Br. at PageID 817.) Even so, there is no evidence in the current record contradicting that Colorado was Tatum's home base while he was fulfilling his marketing and sales duties for Grove Bags. Accordingly, the court finds this factor weighs slightly in favor of Colorado.

With regard to the location of the contract's subject matter, specifically the non-competition clause, this factor does not weigh for or against Colorado. Here, the non-competition clause applies to work in the United States or Canada, but limits the type of work subject to the clause to "any business activity which is competitive with the business of the Company or its affiliates including, but not limited to, the manufacturing, marketing, distribution, or sale of packaging including packaging targeted to the hemp and/or cannabis industries." (Pl.'s Ex. 4 at pg. 4.) This clause is different from the type at issue in *Stone Surgical*, where the subject matter of the non-compete provision favored Louisiana over Ohio as the state with the most significant relationship to the

transaction because it told the employee "what he can and cannot do in his Louisiana sales territories, should he leave his employment with Stryker." 858 F.3d at 390. The Sixth Circuit determined that this geographic limitation comported with § 188, comment e, which says, in relevant part:

> When the contract ... affords protection against a localized risk, such as the dishonesty of an employee in a fixed place of employment, the location of the thing or of the risk is significant. The state where the ... risk is located will have a natural interest in transactions affecting it. Also the parties will regard the location of the ... risk as important.

*Stone Surgical*, 858 F.3d at 390 (quoting Restatement (Second) of Conflict of Laws § 188, cmt. e). The instant non-compete provision does not restrict Tatum's ability to work in Colorado or Ohio specifically, rather it restricts his ability to work for a company that, like Grove Bags, focuses on the "manufacturing, marketing, distribution, or sale of packaging including packaging targeted to the hemp and/or cannabis industries." (Pl.'s Ex. 4 at pg. 4.) Thus, the location of the contract's subject matter does not weigh for or against Colorado.

Lastly, the domicile of the parties does not favor one state over the other. Grove Bags is incorporated and has its principal place of business in Ohio, and Tatum is a resident of Colorado. Thus, this factor has little impact on the § 188 analysis in this case.

The court finds by the smallest of margins that the § 188 analysis makes Colorado the state with the most significant relationship to the transaction and parties. Most of the factors did not weigh in favor of Colorado or Ohio, but Colorado is the state where Tatum preformed the majority of his duties while working for Grove Bags. Thus, absent the parties choice of law provision, the court concludes that applying Colorado law would be consistent with § 188 of the Restatement (Second) of Conflict of Laws. But this determination does not end the court's analysis. The court must also find that Colorado has a materially greater interest in the dispute and that application of Ohio law

-17-

would be contrary to a fundamental policy of Colorado.

2.      *Does Colorado Have a Materially Greater Interest?*

To determine which state has a materially greater interest in the outcome of the action, Ohio courts evaluate the relationship of the two states to the agreement. *Wise*, 780 F.3d at 716. Even when another state's law would govern absent a choice of law clause, "it does not necessarily follow that [Colorado's] interest is *materially* greater than that of [Ohio]." *Stone Surgical*, 858 F.3d 390 (emphasis in the original). Courts look at "the citizenship of the parties to the contract; the locations of creation, negotiation, and performance of the contract; and the location of the parties with an interest in the specific provision of the contract," to determine if the non-choice of law state has a materially greater interest. *Wise*, 780 F.3d at 716. As previously discussed, one party to the disputed Agreements is an Ohio citizen (Grove Bags), while the other (Tatum) is a Colorado citizen. The location of contract creation and negotiation is similarly unhelpful because the parties executed the Agreements electronically and the record appears devoid of facts specific to where or how the parties negotiated the contracts. The court previously found that the place of performance is primarily Colorado, but that factor alone does not give Colorado a materially greater interest in the dispute than Ohio.

Lastly, the  court evaluates whether Colorado's interest in the specific provisions involved in this case are materially greater than Ohio's interests. The disputed provisions in Plaintiff's breach of contract claims are the restrictive covenants governing Tatum's legal obligations following his employment with Grove Bags. Tatum maintains Colorado's interest is materially greater because the state provides significant protections to its citizens from restrictive employment covenants, such as non-compete and non-solicitation agreements. (Tatum Closing Br. at 830.) But, "[t]he simple fact

-18-

that one state might have greater protections, even significantly greater protections, is not sufficient to find that that state has a materially greater interest than another interested state." *CBIZ, Inc. v. Cryan*, No. 1:24-CV-1027, 2024 WL 5443173, at \*8 (N.D. Ohio July 23, 2024) (quoting *Viking Grp., Inc. v. Grasser*, No. 1:22-CV-933, 2023 WL 4824454 (W.D. Mich. Jan. 19, 2023)).

In *Viking*, the court considered whether Colorado or Michigan law should apply to the plaintiff's breach of contract claim against a former employee who allegedly violated a non-compete provision.[5] The defendant employee, like Tatum here, argued that Colorado had a materially greater interest than Michigan because, "where a state law has substantial protection for its residents and application of another state's law would remove those protections, the state with the more protective law tends to have a materially greater interest." *Viking* 2023 WL 4824454, at \*4. In rejecting the defendant's argument, the court explained that while Colorado has an interest in protecting its citizens from certain employment restrictions, "Michigan has an interest in protecting its companies from breaches of employment agreements." *Id.* Thus, even if Colorado's interests in issues of non-compete agreements otherwise prohibited by Colorado law is equal or somewhat greater than Michigan, "they are not materially so." *Id*. Here, the court similarly concludes that Colorado's interests in restricting non-compete agreements are not materially greater than Ohio's interest in protecting its companies, like Grove Bags, from breaches of employment agreements. Accordingly, the court concludes that Colorado does not have a materially greater interest than Ohio in the resolution of the instant contract dispute.

     3.     *Would Application of Ohio Law be Contrary to a Fundamental Colorado Policy?*

---

[5]     Although *Viking* involved Michigan law, Michigan also analyzes choice of law issues pursuant to Sections 187 and 188 of the Restatement (Second) of Conflict of Laws.

The failure to satisfy any one of the elements of the § 187(2) exception to enforcing a choice of law provision ends the court's analysis. Thus, even if Colorado restricts an employer's use of non-compete agreements more than Ohio does, the court "need not opine on whether these two fundamental policies conflict." *Stone Surgical*, 858 F.3d at 391.

The court concludes that neither exception to § 187 of the Restatement (Second) of Conflict of Laws applies because the chosen state, Ohio, has a substantial relationship to the parties, and Colorado does not have a materially greater interest in the determination of the particular issue. Accordingly, the court will not set aside the Ohio choice of law provision included in Defendant Tatum's Employment and Severance Agreements with Plaintiff Grove Bags. Ohio law, therefore, applies to Plaintiff's breach of contract claims against Defendant Tatum.[6]

**B.      Personal Jurisdiction**

Next, the court addresses Defendants' personal jurisdiction arguments. Both Calyx and Tatum moved to dismiss Plaintiff's Amended Complaint for lack of personal jurisdiction (ECF Nos. 19, 20). Defendants maintained these arguments throughout the Preliminary Injunction Hearing and the parties' respective briefings. Therefore, the court addresses the personal jurisdiction issue because it is inseparable from the preliminary injunction analysis.

In a diversity action, federal courts apply the law of the forum state to resolve questions of personal jurisdiction. *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 721 (6th Cir. 2000). A plaintiff

---

[6]      The parties do not dispute that Ohio law governs Plaintiff's other claims against Defendants. As such, the court will apply Ohio law to determine whether Plaintiff succeeds on the merits in its Misappropriation of Trade Secrets (Count III), Tortious Interference with Economic and/or Business Relations (Count IV), Tortious Interference with Economic, Contract, and/or Business Relations (Count V), or Civil Conspiracy (Count VI) claims.

must establish the court's personal jurisdiction over each individual defendant. *Beydoun v. Wataniya Restaurants Holding, Q.S.C.*, 768 F.3d 499, 504 (6th Cir. 2014). Thus, the court applies Ohio law to determine whether the court has personal jurisdiction over Defendants Tatum and Calyx separately.

The exercise of personal jurisdiction is proper when it satisfies Ohio's long-arm statute and constitutional due process. *Rowlette*, 228 F.3d at 721. However, personal jurisdiction is a waivable right, and contracting parties can consent to the personal jurisdiction of a particular court by including a forum selection clause. *Preferred Capital, Inc. v. Assoc. in Urology*, 453 F.3d 718, 721 (6th Cir. 2006) (citing *Kennecorp Mortg. Brokers, Inc. v. Country Club Convalescent Hosp., Inc.*, 610 N.E.2d 987, 988 (Ohio 1993)). A party seeking to assert personal jurisdiction must show that such jurisdiction exists. *Schneider v. Hardesty*, 669 F.3d 693, 697 (6th Cir. 2012) (quoting *Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002)). The Sixth Circuit explains that, "[t]he weight of [the] burden ... depends on whether the trial court chooses to rule on written submissions or to hear evidence on the personal-jurisdiction issue..." *Serras v. First Tennessee Bank Nat. Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989). If the court relies solely on the parties' written submissions, then it considers the pleadings and affidavits in the light most favorable to the plaintiff, and the plaintiff need only make a *prima facie* showing that personal jurisdiction exists. *Id.* However, if an evidentiary hearing is had on the issue, then a preponderance-of-the-evidence standard applies. *Schneider*, 669 F.3d at 697. In this case, the court conducted a preliminary injunction hearing where some of the parties' testimony was directed at the personal jurisdiction issue. However, the purpose of the hearing was *not* to hear the Plaintiff's evidence on personal jurisdiction. Neither Defendants nor Plaintiff discuss what standard the court should apply given it has before it testimony and written

submissions. Accordingly, because the court did not specifically hold an evidentiary hearing on the issue, the court concludes that it takes all pleadings and affidavits in the light most favorable to Plaintiff, and Plaintiff need only make a *prima facie* showing that personal jurisdiction exists.

The disputed contracts between Plaintiff and Tatum contain a forum selection clause, which, if valid and enforceable, ends the personal jurisdiction analysis against Tatum. As for Calyx, there is no agreement; thus, Plaintiff must show that personal jurisdiction exists based on Ohio's long-arm statute and constitutional due process.

### 1.    *Defendant Michael Ryan Tatum*

Defendant Tatum argues the court lacks personal jurisdiction over him because the forum selection clause included in the disputed Agreements is unenforceable, and Plaintiff makes no allegations involving conduct by Tatum in Ohio. (Tatum Mot. to Dismiss at PageID 440–42, ECF No. 20.) Plaintiff contends the forum selection clause is valid, and even absent the clause, personal jurisdiction is still proper based on Ohio's long-arm statute and constitutional due process. (Pl. Opp'n to Tatum Mot. to Dismiss at PageID 593, ECF No. 24.)

As previously noted, Ohio law controls the court's determination of personal jurisdiction in this case. In Ohio, forum selection clauses between commercial entities are presumptively valid, and Ohio courts will enforce them absent fraud or overreaching. *Kennecorp*, 610 N.E.2d at 989. *See also Sec. Watch, Inc. v. Sentinel Sys., Inc.*, 176 F.3d 369 (6th Cir. 1999) (upholding forum selection clause between two businesses). This presumption of validity, however, does not apply to employment contracts. *Buckeye Check Cashing of Arizona, Inc. v. Lang*, No. 2:06-CV-792, 2007 WL 641824, at *4 (S.D. Ohio Feb. 23, 2007). Thus, Ohio courts must consider other factors to determine the clause's enforceability. An Ohio court will not enforce the forum selection clause in an

-22-

employment contract if the party challenging it shows:

> (1) that the contract was the result of fraud or overreaching; (2) that enforcement would violate the strong public policy of the forum state; and (3) that enforcement under the particular circumstances of the case would result in litigation in a jurisdiction so unreasonable, difficult and inconvenient that the challenger would for all practical purposes be deprived of his day in court.

*Id.* at *5 (citing *Barrett v. Picker Internatl., Inc.*, 589 N.E.2d 1372, 1374 (Ohio Ct. App. 1990)).

Neither party addresses these factors when arguing the enforceability of the disputed forum selection clause. Even so, based on the parties' briefings and testimony during the Hearing, there is enough in the record to evaluate each.

The forum selection clause at issue reads, in relevant part,

> Any suit involving any dispute or matter arising under this Agreement may only be brought in the courts of the State of Ohio, in Cuyahoga County. Employee hereby consents to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

(Pl. Ex. 4 at pg. 11; Pl. Ex. 5 at pg. 3.) First, overreach is shown where a disparity in bargaining power was used to take unfair advantage of an employee. *Buckeye*, 2007 WL 641824, at *6–7. But, making an employment offer contingent on signing an employment agreement does not constitute overreach. *See e.g., Contech Const. Prods., Inc. v. Blumenstein*, No. 1:11CV878, 2012 WL 2871425, at *7 (S.D. Ohio July 12, 2012) (finding that there was no overreach because the defendant knew that his job offer was contingent on signing the agreement). In *Buckeye*, the plaintiff employer, an Ohio corporation doing all of its business in Arizona, sought to enforce an Ohio forum selection clause in its breach of contract suit against Arizona-based former employees for alleged violations of a non-competition, nondisclosure, and non-solicitation agreement. *Buckeye*, 2007 WL 641824, at *1. Examining the first factor, the court determined overreach existed because defendants held "modest-

paying, lower-level jobs, not high-level corporate positions where the applicants could be expected to have a greater degree of bargaining power or sophisticated knowledge about contract terms." *Id.* at \*6. Furthermore, the employees were not informed of or asked to sign the agreement until after they had left their previous jobs and started working for the plaintiff. *Id.* at \*7. Considered together, these facts demonstrated overreach and weighed in favor of nonenforcement.

Here, Tatum cannot show overreach like the *Buckeye* defendants because the Ohio forum selection clause existed in all of his contracts with Plaintiff, making lack of notice highly improbable. Moreover, Tatum served first as a consultant and then in a high-level position with Plaintiff, indicating he had "a greater degree of bargaining power or sophisticated knowledge about contract terms" when he was presented with each consulting or employment agreement. *Id.* at \*6. Tatum does argue he felt pressured to sign the Severance Agreement terminating his relationship with Plaintiff in August 2023,[7] but that alone is not enough to show overreach, and the forum selection clause contained in the Severance Agreement was the same as those in his prior four agreements. Thus, finding no overreach, this factor weighs in favor of enforcement.

The second factor, public policy of the forum, also weighs in favor of enforcement because Ohio recognizes the validity of forum selection clauses, and enforcement would not be against Ohio's public policy. *See generally Kennecorp,* 610 N.E.2d at 987.

The third factor, whether the selected forum is sufficiently unreasonable, demands a multi-

---

[7] There are disputed facts about Tatum's separation from Grove Bags. Jack Grover testified it was an amicable separation, while Tatum characterizes it as a surprise termination where he was told to sign the severance agreement on the spot, and 10 minutes before he was scheduled to leave Ohio. (Tr. at PageID 1024–25.) The court need not resolve this factual dispute, however, to conclude that Tatum has not shown overreach.

prong analysis. A finding of unreasonableness requires more than inconvenience to the party seeking to avoid enforcement of the forum selection clause. *inVentiv Health Comm., Inc. v. Rodden*, 108 N.E.3d 605, 612 (Ohio Ct. App. 2018). Instead, the court must find that enforcing the clause would be "manifestly and gravely inconvenient to the party seeking to avoid enforcement such that it will effectively be deprived of a meaningful day in court." *Id.* Thus, the court weighs the following questions to resolve the third factor: "(1) which law controls the contractual dispute; (2) the residency of the parties; (3) where the contract was executed; (4) where the witnesses and parties to the litigation are located; and (5) whether the forum clause's designated location is inconvenient to the parties." *Buckeye*, 2007 WL 641824, at *7 (citing *Barrett*, 589 N.E.2d at 1374–75).

The court has already determined that Ohio law, not Colorado, controls the instant contract dispute. Thus, the first question weighs in favor of enforcement. With regard to questions two through five, the court finds these also weigh in favor of enforcement. Grove Bags is incorporated in Ohio and has its principal place of business in Ohio. (Am. Compl. ¶¶ 1–2.) The company's CEO and CFO, Jack Grover and Dan Jaffe, respectively, also reside in Ohio, and are likely necessary witnesses for litigation. (*Id.* at ¶ 6.) Tatum resides in Colorado and did during his entire time working for Grove Bags. (*Id.* at ¶ 8.) Even so, he traveled to the Grove Bags office in Ohio at least four times a year, as well as to other states where his duties as Chief Commercial Officer required him to be. (Jaffe Prelim. Inj. Decl. ¶ 55.) This semi-regular travel to Ohio indicates litigating in the state is not unreasonably inconvenient to Tatum as a Defendant and possible witness. Lastly, the contracts between Grove Bags and Tatum were executed electronically via Docusign, which only means question three does not weigh one way or the other. (*See* Pl.'s Exs. 2–5.) Although Tatum permanently resides in Colorado, this fact alone does not indicate that enforcing the forum selection

clause would be "manifestly and gravely inconvenient" to Tatum "such that [he would] effectively be deprived of a meaningful day in court." *Rodden*, 108 N.E.3d at 612.

The court concludes that the Ohio forum selection clause included in Tatum's Agreements with Grove Bags is enforceable. As such, Tatum has consented to the personal jurisdiction of this court.

### 2.     *Defendant Calyx Containers*

Unlike Tatum, Plaintiff does not have an agreement with Calyx designating Ohio as the forum state. Thus, Plaintiff must show that personal jurisdiction exists based on Ohio's long-arm statute and constitutional due process.

### a.     Ohio's Long-Arm Statute

The Sixth Circuit has explained that "Ohio law does not appear to recognize general jurisdiction over non-resident defendants, but instead requires that the court find specific jurisdiction under one of the bases of jurisdiction listed in Ohio's long-arm statute." *Conn v. Zakharov*, 667 F.3d 705, 717 (6th Cir. 2012). Thus, the court's analysis of Ohio law is limited to specific jurisdiction under the long-arm statute.

Grove Bags alleges that the court has personal jurisdiction over Defendant Calyx pursuant to Ohio Revised Code §§ 2307.382(A)(1), (4), and (6), which provide, in relevant part, that:

> (A) A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's:
>> (1) Transacting any business in this state;
>> [...]
>> (4) Causing tortious injury in this state by an act or omission outside this state if the person regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed

> or services rendered in this state;
> [...]
> (6) Causing tortious injury in this state to any person by an act outside this state committed with the purpose of injuring persons, when the person might reasonably have expected that some person would be injured thereby in this state;

Ohio Rev. Code § 2307.382(A) (Am. Compl. ¶ 45.) Calyx asserts that the court "need not address Ohio's long-arm statute, and may proceed directly to the due process analysis." (Reply in Supp. of Calyx Mot. to Dismiss at PageID 688, ECF No. 25.) As such, Calyx does not challenge Plaintiff's arguments pertaining to the Ohio long-arm statute. Nevertheless, the court notes that Plaintiff has made a *prima facie* showing that Calyx caused tortious injury in Ohio by an act outside Ohio with the purpose and reasonable expectation of injuring Plaintiff in Ohio pursuant to § 2307.382(A)(6).

Ohio district courts have "generally taken a broad approach" to applying § 2307.382(A)(6). *Schneider v. Hardesty*, 669 F.2d 693, 700 (6th Cir. 2012) (internal quotations omitted). In cases involving alleged misappropriation of confidential and proprietary customer and business information, subsection (A)(6) is generally satisfied. *See CrossCountry Mortg., Inc. v. Messina*, No. 1:19-CV-1021, 2019 WL 5653288 (N.D. Ohio Oct. 31, 2019) (collecting cases finding § 2307.382(A)(6) met when plaintiff alleges the misuse of confidential information by a non-forum defendant who could reasonably expect an injury to occur in Ohio). Similarly, courts have determined that subsection (A)(6) extends to allegations of tortious interference. *See Int'l Confection Co., LLC v. Z Cap. Grp., LLC*, No. 2:18-CV-1108, 2019 WL 4452754, at *3 (S.D. Ohio Sept. 17, 2019) (denying out-of-state defendants' motion to dismiss for lack of personal jurisdiction because plaintiff's tortious interference allegations satisfied long-arm statute and due process); *accord Horter Inv. Mgmt., LLC v. Cutter*, No. 1:15-CV-477, 2016 WL 339927 (S.D. Ohio Jan. 28, 2016). Here,

Plaintiff alleges Calyx misappropriated its proprietary or customer information and tortiously interfered with its business relationships and contracts, especially its contract with Tatum. (*See generally* Am. Compl. at PageID 262–63, 270, 272.) These claims, coupled with Plaintiff's assertions that Calyx reasonably should have known that such conduct would injure Plaintiff in Ohio is enough for the court to find that Plaintiff's claims against Calyx come within the reach of § 2307.382(A)(6) of Ohio's long-arm statute. Thus, the first prong of the personal jurisdiction analysis is met.

### b.     Due Process

Due process requires that a defendant possess such "minimum contacts . . . with the forum State . . . such that he should reasonably anticipate being hauled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980). Such contacts ensure that the exercise of jurisdiction over a defendant "does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). There are two forms of personal jurisdiction: general and specific. *Schneider*, 669 F.3d at 701 (citing *Indah v. U.S. S.E.C.*, 661 F.3d 914, 920 (6th Cir. 2011)). The parties' briefings and the court's remarks at the Hearing make clear that the court cannot exercise general jurisdiction over Calyx (Tr. at PageID 872.) Accordingly, the court examines only specific jurisdiction.

The Sixth Circuit analyzes specific jurisdiction using a three-part test:

> (1) First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. (2) Second, the cause of action must arise from the defendant's activities there. (3) Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough

-28-

> connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968). If any one of these criterion is not met, the court cannot invoke personal jurisdiction over the defendant. *LAK, Inc. v. Deer Creek Enters.*, 885 F.2d 1293, 1300 (6th Cir. 1989). The court addresses each element of specific jurisdiction in turn.

### i.        Purposeful Availment

To determine purposeful availment, the court asks whether Calyx acted or caused a consequence in Ohio such that it invoked the benefits and protections of Ohio law. *MAG IAS Holdings, Inc. v. Schmuckle*, 854 F.3d 894, 900 (6th Cir. 2017). Framing purposeful availment this way ensures Calyx could have reasonably anticipated being haled into an Ohio court, and that it is not being brought into Ohio court "solely as the result of 'random,' 'fortuitous' or 'attenuated' contacts." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). In *Burger King*, the Supreme Court explained that purposeful availment exists where the defendant creates a "substantial connection" with the forum state, or created "continuing obligations" between the defendant and the forum. 471 U.S. at 475–76 (internal citations omitted).

When a claim involves intentional tortious conduct by an out-of-state defendant, purposeful availment may be shown through application of the *Calder*-effects test. In *Calder v. Jones*, 465 U.S. 783 (1984), the Supreme Court held that personal jurisdiction over an out-of-state defendant may be proper when their intentional conduct in a non-forum state causes injury to a plaintiff in the forum state. To satisfy the *Calder*-effects test, a plaintiff must show that a defendant "expressly aimed tortious conduct at the forum in question and the brunt of the harm is felt there." *Carrier Corp. v.*

-29-

*Outokumpu Oyj*, 673 F.3d 430 (6th Cir. 2012) (quoting *Calder*, 465 U.S. at 789) (internal quotations omitted).

The Supreme Court and Sixth Circuit have applied the *Calder*-effects test narrowly. In *Walden v. Fiore*, 571 U.S. 277, 279 (2014), the Court held that a Nevada district court could not exercise personal jurisdiction over a Georgia defendant based solely on his knowledge that his alleged tortious conduct would injure the Nevada-based plaintiff. Essentially, *Walden* clarified that even under *Calder*, "mere injury to a forum resident is not a sufficient connection to the forum." *Id.* at 290. *See also Air Prods. & Controls, Inc. v. Safetech Intern., Inc.*, 503 F.3d 544, 552 (6th Cir. 2007) ("the mere allegation of intentional tortious conduct which has injured a forum resident does not, by itself, always satisfy the purposeful availment prong."). While these applications of *Calder* appear more limited, "the existence of intentional tortious conduct nonetheless 'enhances' a party's other contacts with the forum state for purposes of a purposeful availment analysis." *Air Prods.* at 553.

Calyx has been registered to do business in Ohio since July 1, 2022, and it keeps an agent for service in the state. (Pl. Opp'n to Calyx Mot. to Dismiss Jaffe Decl. ¶¶ 94–95.) Calyx sells its products to Ohio customers and charges them sales tax because it has a "substantial nexus" with the state. (*Id.* at ¶¶ 96–97.) Two percent of Calyx's total revenue comes from its Ohio sales, and it has one Ohio-based employee. (Pl. Opp'n to Calyx Mot. to Dismiss at PageID 479.) Calyx has also regularly directed communications to Ohio through its long-standing relationship with Grove Bags.[8] (Pl. Opp'n to Calyx's Mot. to Dismiss Jaffe Decl. ¶¶ 101–103; Knobel Prelim. Inj. Decl. ¶ 5; Calyx

---

[8] Simon Knobel describes knowing Grove Bags' leadership both professionally and personally for twelve years. (Knobel Prelim. Inj. Decl. ¶ 5.)

Exs. 1–6; Tr. at PageID 1193–97.) Although Calyx never entered a formal contract with Grove Bags,

management of both companies acknowledge they have a business relationship. (Knobel Prelim. Inj.

Decl. ¶ 8–10; Pl. Opp'n to Calyx's Mot. to Dismiss Jaffe Decl. ¶ 102.) In addition to these ongoing

personal and professional contacts with Ohio, Calyx's president, Alex Gonzalez, met with Jack

Grover in 2024 in Cleveland, Ohio to discuss Tatum's ongoing agreements with Grove Bags. (Pl.

Closing Br. at PageID 825, Tr. at PageID 934.)

The court finds that Calyx's Ohio operations coupled with its longstanding business and

personal relationship with Grove Bags, an Ohio company, demonstrates "continuing obligations"

between the Calyx and Ohio. *Burger King*, 471 U.S. at 475–76. Calyx attempts to downplay its Ohio

contacts that do not appear connected to their longstanding relationship with Grove Bags, describing

its business in the state as "irregular" and that its contacts are not "continuous or systematic." (Calyx

Mot. to Dismiss Knobel Decl. ¶ 12.) However, the company's  years-long business and personal

relationship with Grove Bags and its communications directed at Ohio appear anything but irregular.

Moreover, these contacts are "enhanced" by Calyx's alleged interference with Tatum's non-

compete. *See PFG Ventures, L.P. v. Rizzi*, No. 1:20-CV-2183, 2020 WL 7334783 (N.D. Ohio Dec.

14, 2020) (applying *Air Products* to tortious interference claim against out of state defendants). In

*PFG Ventures*, the Ohio-based plaintiff company sued its former chief sales officer, a Florida

resident, for breach of his non-compete agreement, and two of its out-of-state competitors for

knowingly interfering with the former employee's non-compete by deciding to hire him. 2020 WL

7334783, at *1. The court determined that defendant Petty Marketing had purposefully availed itself

of Ohio law and that its Ohio contacts were "enhanced" by its alleged interference with the non-

compete agreement because its "long-running relationship with Plaintiff PFG, an Ohio corporation,

and Petty Marketing control persons' later decision to later hire Defendant Rizzi with knowledge that it could potentially violate his non-compete should have led Petty Marketing to 'reasonably anticipate being haled into' Ohio court." *Id.* at \*3 (quoting *Third Nat. Bank in Nashville v. WEDGE Gr. Inc.*, 882 F.3d 1087, 1089 (6th Cir. 1989)).[9] Like the *PFG Ventures* court determined, this court concludes Calyx should have reasonably anticipated being haled into Ohio court when it decided to hire Defendant Tatum, knowing it could potentially violate his non-compete with Grove Bags, an Ohio company with whom it had a long-running relationship. Therefore, Calyx has purposefully availed itself of Ohio law.

### ii.     Arising From

The court considers next whether Plaintiff's claims "arise from" Calyx's contacts with Ohio. A plaintiff's claim "arises from" a defendant's activities in the forum state when the claims are "made possible by," or "related to" the defendant's contacts with the forum state. *Air Prods.*, 503 F.3d at 553 (collecting cases articulating the Sixth Circuit's standard). The Sixth Circuit characterizes this standard as "lenient" and has further explained that "the cause of action need not 'formally' arise from the defendant's contacts." *Id.* (quoting *Bird v. Parsons*, 289 F.3d 865, 875 (6th Cir. 2002)).

Calyx argues that whatever limited contacts it does have with Ohio, Grove Bags' tortious interference, misappropriation of trade secrets, and civil conspiracy claims do not "arise from" those activities. (Calxy Mot. to Dismiss at PageID 414–15, ECF No. 19 (discussing *Union Home Mortg.*

---

[9]     While the long-running relationship Petty Marketing had with PFG Ventures was in the form of a franchise agreement through which Petty Marketing sold PFG-affiliated products, the parties' agreement ended thirteen months *before* Rizzi left PFG Ventures and began working for PFG's competitor. *PFG Ventures,* 2020 WL 7334783, at \*2.

*Corp. v. Everett Fin., Inc.*, No. 1:23 CV 00996, 2023 WL 6465171, at \*6 (N.D. Ohio Oct. 4, 2023);

*Midwest Motor Supply Co. v. Nietsch*, 2:22-cv-4049, 2023 WL 8649898 (S.D. Ohio Dec. 14, 2023);

*Total Quality Logistics, LLC v. Tarpon Transportation Servs., Inc.*, No. 1:18CV353, 2019 WL

4413164 (S.D. Ohio Sept. 16, 2019); *Concentrix CVG Corp. v. Daoust*, No. 1:21-CV-131, 2021 WL

1118025 (S.D. Ohio Mar. 24, 2021)).) Generally, these cases illustrate that a court lacks personal

jurisdiction over a non-forum defendant company when the alleged tortious conduct arises from its

hiring of a non-forum defendant employee with whom the Ohio plaintiff company has a non-

compete, non-solicitation, and/or confidentiality agreement.

For example, in *Union Home Mortgage*, the court determined that none of the non-Ohio

defendant company's alleged actions of inducing the Ohio plaintiff's former Florida-based

employees to breach their non-compete agreements, had anything to do with its Ohio contacts.[10]

2023 WL 6465171, at \*1, 5. Similarly, the *Midwest Motor* court determined the non-resident

defendant company's hiring of the plaintiff company's former non-resident employees, and its

alleged wrongful use of plaintiff's confidential information did not arise from the defendant

company's single Ohio-based employee. 2023 WL 8649898, at \*4. While the facts in these cases are

somewhat similar to those here, neither involves a longstanding business and personal relationship

between an Ohio plaintiff company and a non-forum defendant company like that between Grove

Bags and Calyx. Accordingly, the court turns to cases involving a similar relationship for guidance.

In *Air Products*, a Michigan company sued its former customer, a Kansas company, in

Michigan court for, among other things, fraudulent transfer of assets with an intent to injure the

---

[10]    The limited Ohio contacts the non-Ohio defendant had were a registered agent and
        an Ohio branch office accounting for eight of its total employees and
        approximately 0.75% of its 2022 annual revenues. 2023 WL 6465171, at \*1, 5.

-33-

plaintiff. *Air Products*, 503 F.3d at 549. The district court granted the defendant's motion to dismiss for lack of personal jurisdiction because the plaintiff's causes of action did not "arise from" the defendant's activities in Michigan since they related to a transfer of assets "that occurred wholly outside the state, and the transfer did not involve entities in the state." *Id.* at 553. The Sixth Circuit reversed the district court's decision, explaining that the plaintiff's claims did "arise from" the defendant's Michigan contacts because:

> if Defendants had not engaged in a long-term business relationship with Air Products, they would not have accrued the debt or had a judgment entered against them, and Air Products could have no claim for fraudulent transfer. One element of Air Products' cause of action for fraudulent transfer is that there be a debtor-creditor relationship which, as just explained, was made possible by and would not have existed but for Defendants' business relationship with Air Products.

*Id.* This causal connection coupled with the Sixth Circuit's "lenient standard, that the cause of action need not formally arise from the defendant's contacts," was therefore enough to satisfy the second prong of the personal jurisdiction due process analysis. *Id.* at 554 (internal quotations omitted). The *PFG Ventures* court applied *Air Product's* logic to a tortious interference claim like the one here and determined that the defendant company's efforts to interfere with the plaintiff's former employee's non-compete agreement were made possible by its prior long-term business relationship with the plaintiff company. 2020 WL 7334783, at *4. Thus, the court found there was a substantial connection between the non-forum defendant's Ohio contacts and the plaintiff's tortious interference claim to satisfy the second specific jurisdiction prong. *Id.*

In this case, Grove Bags alleges that Calyx hired Tatum, Grove Bags' former Chief Commercial Officer, knowing Tatum had non-compete, non-solicitation, and confidentiality agreements with Grove Bags, and that such interference would lead to Tatum's breach of those

agreements. Grove Bags further alleges that Calyx hired Tatum to gain access to Grove Bags' trade secrets related to its packaging materials, pricing, customers, and other confidential information, so that it could use it and Tatum's industry reputation to sell its own flexible packaging product that directly competes with Grove Bags. (Pl. Opp'n to Calyx Mot. to Dismiss Jaffe Decl. at PageID 509–11.) Viewing these allegations in the light most favorable to Grove Bags, the court finds that Calyx's alleged tortious interference with Tatum's restrictive covenants and alleged use of Grove Bags' trade secrets were made possible, at least in part, by its longtime business and personal relationship with Grove Bags, and Ohio company. Thus, Plaintiff has shown that its claims against Calyx "arise from" Calyx's Ohio contacts.

### iii.    Reasonableness

The final prong of the due process analysis is that "the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." *S. Mach.*, 401 F.2d at 381. In the Sixth Circuit, when the first two elements are met, "an inference of reasonableness arises, and only the unusual case will not meet this third criteria." *Air Products*, 503 F.3d at 554 (cleaned up). The court considers four factors when determining reasonableness: (1) the burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; and (4) other states' interest in securing the most efficient resolution of the policy." *Id.* 554–55.

Here, because the purposeful availment and arising from prongs are met, there is an inference of reasonableness. Calyx does not directly address the four reasonableness factors, but its CEO states in his declaration that, "Calyx would be burdened if required to defend this action in Ohio. Such burden would arise from out-of-state travel throughout this litigation and additional disruption of

Calyx's business operations, none of which are located in Ohio." (Calyx Mot. to Dismiss Knobel Decl. ¶ 25.) This burden, however, does not outweigh Ohio's legitimate interest in protecting the business interests of its citizens. Moreover, any argument Calyx makes regarding the effect of Colorado's statutory restrictions on non-compete agreements like that between Tatum and Grove Bags does not weigh in favor of the fourth factor because Calyx does not dispute that Ohio, not Colorado law, applies to the tort claims against it. Accordingly, the court finds that the exercise of personal jurisdiction over Calyx is reasonable.

Because Grove Bags can show that Ohio's long-arm statute and constitutional due process are satisfied, the court concludes that it has personal jurisdiction over Calyx.

## C.       Likelihood of Success on the Merits

Having established that Ohio law applies to Plaintiff's breach of contract claims, and that the court has personal jurisdiction over Tatum and Calyx, the court evaluates Plaintiff's likelihood of success on the merits for each of its substantive claims. When considering this factor of the preliminary injunction analysis, the court must anticipate the outcome of the underlying lawsuit. To do so, the court applies Ohio law to each claim.

The central issue in this case is whether the non-compete clause in Tatum's Agreements is enforceable. This issue underpins Grove Bags' breach of contract claims against Tatum, tortious interference claims against both Defendants, and civil conspiracy claim against both Defendants. Thus, the court first determines whether the restrictive covenant is enforceable under Ohio law.

Ohio courts apply a "reasonableness" standard to restrictive covenants. The party seeking to enforce the covenant must show by clear and convincing evidence that the agreement is (1) "no greater than is required for the protection of the employer," (2) that it does "not impose undue

hardship on the employee," and (3) is not "injurious to the public." *James B. Oswald Co. v. Neate*, 98 F.4th 666, 673 (6th Cir. 2024) (quoting *Raimonde v. Van Vlerah*, 325 N.E.2d 544, 547 (Ohio 1975)) (cleaned up). Courts evaluate reasonableness on a case-by-case basis, and should consider nine factors during their assessment. *Neate*, 98 F.4th at 673.[11]

The restrictive covenant at issue is an agreement not to directly compete with Grove Bags. The clause provides:

> While employed by the Company and for a period of two (2) years immediately following the voluntary or involuntary termination of Employee's employment with the Company for any reason, Employee will not, in the United States or Canada, either directly or indirectly, either independently or by act in concert with others, whether as an employee, consultant, advisor, independent contractor, agent, sole proprietor, partner, joint venture, officer, owner, or director, engage in, provide any service to or on behalf of, or promote or assist, financially or otherwise, any business entity which is engaged, in whole or in part, in any business activity which is competitive with the business of the Company or its affiliates including, but not limited to, the manufacturing, marketing, distribution, or sale of packaging including packaging targeting to the hemp and/or cannabis industries.

(Pl.'s Ex. 4 at pg. 4.) In its Motion, Plaintiff asserts its non-compete provision is a reasonable restraint on trade under Ohio law because similar two-year non-compete agreements have been

---

[11]    (1) The absence or presence of limitations as to time and space; (2) whether the employee represents the sole contact with the customer; (3) whether the employee is possessed with confidential information or trade secrets; (4) whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition; (5) whether the covenant seeks to stifle the inherent skill and experience of the employee; (6) whether the benefit to the employer is disproportional to the detriment to the employee; (7) whether the covenant operates as a bar to the employee's sole means of support; (8) whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment; and (9) whether the forbidden employment is merely incidental to the main employment. *Neate*, 98 F.4th at 673 n. 4.

enforced by Ohio courts. (Pl.'s Motion at PageID 74, ECF No. 5) (citing *PUI Audio, Inc. v. Van Den Broek*, No. 3:21-CV-284, 2021 WL 4905461 (S.D. Ohio Oct. 21, 2021); *Handel's Enters., Inc. v. Schulenburg*, No. 4:18-CV-508, 2018 WL 3077756, at *5 (N.D. Ohio June 22, 2018); *Try Hours, Inc. v. Douville*, 985 N.E. 2d 955, 965–66 (Ohio Ct. App. 2013).) Tatum does not discuss the enforceability of the non-compete clause under Ohio law. Rather, he rests his case on the proposition that Colorado law applies, and because the agreement does not comport with Colorado's requirements, it is void. (Tatum Closing Br. at PageID 830–31.) Calyx also contends the provision is void under Colorado law, but even if Ohio law applied, it would be unenforceable as overbroad.(Calyx Closing Br. at PageID 811–12.)

After hearing from the parties and comparing the non-compete provision to others found enforceable in Ohio, the court finds that the non-compete agreement in Tatum's contracts with Grove Bags is reasonable and enforceable.

First, Plaintiff's business interest in limiting unfair competition after employing Tatum for more than two-and-a-half years in an executive position where Tatum had regular access to confidential information and managed other sales people is legitimate. Ohio does not have a bright-line rule recognizing some business interests as legitimate and others not. *Horter Inv. Mgmt., LLC v. Cutter*, 257 F. Supp. 3d 892, 907 (S.D. Ohio 2017) (explaining the "danger in trying to formulate black letter law in an area of law that is inherently fact specific). However, Ohio courts have found that an employer has a legitimate business interest in "preventing a former employee from using the skill, experience, training, and confidential information the former employee has acquired during the employee's tenure with his employer in a manner advantageous to a competitor in attracting business." *FirstEnergy Solutions Corp. v. Flerick*, 521 F. App'x 521, 528 (6th Cir. 2013) (quoting

*UZ Engineered Prods. Co. v. Midwest Motor Supply Co.*, 770 N.E.2d 1068 (Ohio Ct. App. 2001) (internal quotations omitted). Similarly, an employer has a legitimate business interest in "maintaining its ability to 'effectively compete' in the market and in protecting customer relationships." *FirstEnergy*, 521 F. App'x at 528 (quoting *Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985 (6th Cir. 2007)).

The parties' briefings and testimony shows Tatum was part of Grove Bags' executive team, serving as the company's Director of Business Development and as the Chief Commercial Officer during his two-and-a-half years with the company. (*See* Pl.'s Exs. 2–4.) Grover testified that Tatum had access to the company's custom pricing information, its Customer Relationship Management ("CRM") tool through which the company managed its current and prospective customer data, and the company's product details allowing Tatum to train and manage the Grove Bags sales team. (Tr. at PageID 900–03.) This information could reasonably be used by Tatum to advantage a competing company, like Calyx. Thus, protecting this information through a non-compete agreement supports Grove Bags' legitimate business interest in "maintaining its ability to 'effectively compete' in the market and in protecting customer relationships." *FirstEnergy*, 521 F. App'x at 528.

The risk of unfair competition is further illuminated by the events leading up to Tatum's eventual employment with Calyx. Initially, the companies operated in separate lanes of the cannabis packaging industry, but they both eventually entered each other's realms. (Knobel Prelim. Inj. Decl. ¶ 16.) In 2021, Grove Bags began "moving into point-of-sale packaging, positioning its MAP film flexible packaging as an alternative to Calyx's rigid packaging for consumer point of sale use." (*Id.* at ¶ 13.) This allegedly caused Calyx to lose several hundred thousand dollars in accounts to Grove Bags. (*Id.* at ¶ 14.) Then, in 2023, Calyx, responding to customer demand, began developing its own

flexible MAP film products. (*Id.* at ¶¶ 15, 17.) At the Hearing, Knobel testified that over a dinner in December 2023, he told Grover and Jaffe that Calyx was developing new flexible packaging. (Tr. at PageID 1200.) Jaffe also testified about this dinner in which Grove Bags learned about their friend's forthcoming competing product. (Tr. at PageID 1247) Notably, at the time of this December 2023 dinner, Tatum had left Grove Bags, and Calyx had already approached him about joining its team. (Pl. Ex. 18 at ¶ 26.) The timing of Calyx moving into Grove Bags' flexible MAP packaging lane, plus its attempt to hire Tatum shortly after he parted ways with Grove Bags shows that Plaintiff's non-compete agreement advanced a legitimate business interest.

The court also finds that the non-compete agreement is no greater than  required to protect Plaintiff's legitimate business interests. The non-compete agreement restricts Tatum's ability to work for a competing packaging company in the United States or Canada  for two years following his employment with Grove Bags (August 24, 2023 to August 24, 2025). (Pl.'s Ex. 4 at pg. 4.) Plaintiff argues the provision is not overbroad, as Ohio courts frequently enforce clauses of the same length and geographic scope. (Pl. Mot. at PageID 74.) Tatum only argues the clause is unenforceable under Colorado law, and Calyx argues it is very broad because it covers the entire packaging sales industry in the United States and Canada for two years. (Calyx Closing Br. at PageID 811.)

Ohio courts do not say how long is too long for a non-compete agreement, but numerous courts have upheld provisions that last for two years. *See Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 992 (6th Cir. 2007) (affirming district court decision that a covenant is reasonable for at least two years); *Handel's Enters., Inc. v. Schulenburg*, No. 4:18CV508, 2018 WL 3077756 (N.D. Ohio June 22, 2018), aff'd, 765 F. App'x 117 (6th Cir. 2019) (collecting cases where two year duration is reasonable). Similarly, Ohio courts find that non-compete agreements are not overbroad

despite applying nationwide. *See PUI Audio, Inc.*, 2021 WL 4905461 (collecting cases where nationwide non-compete provisions in the freight industry are reasonable).

These decisions illustrate that the two-year term of Tatum's non-compete agreement is temporally reasonable. Furthermore, while the restriction applies nationwide, and into Canada, this geographic limitation does not make the provision inherently overbroad. Lastly, while the provision applies to the whole packaging industry, it places particular emphasis on cannabis/hemp packaging, and it does not prohibit Tatum from working in other parts of the cannabis industry, such as in the retail sector. During the Hearing, Grover testified that the non-compete did not restrict Tatum's ability to work in other aspects of the cannabis or hemp industry, such as in retail, nor did it apply to non-cannabis substances. (Tr. at PageID 923–24.) Indeed, Grover knew about Tatum's work for a mushroom company, and noted that such work did not conflict with the non-compete agreement. (Tr. at PageID 925.) Tatum also acknowledges that he can and does work for companies outside the cannabis packaging industry. (Tatum Prelim. Inj. Decl. ¶ 12.) Thus, the court finds the first *Raimonde* factor satisfied.

Under the second *Raimonde* factor, the court considers whether the non-compete agreement imposed undue hardship on Tatum. Determining whether a covenant is unduly harsh "requires a much greater standard than determining whether the covenant is merely unfair." *Robert W. Clark, M.D., Inc. v. Mt. Carmel Health*, 706 N.E.2d 336, 342 (Ohio Ct. App. 1997). A showing of "some hardship" is also not enough. *Id.* The court examines undue hardship "by the terms of the agreement at the time it was entered into." *Id.* (quoting *N. Frozen Foods, Inc. v. McNamara*, No. 71378, 1997 WL 691182 (Ohio Ct. App. Nov. 6, 1997) (internal quotations omitted)). Tatum does not address undue hardship directly in his briefings. However, during the Hearing, Tatum testified that his

employment options were limited due to the restrictive covenants. Employment limitations are not enough to show undue hardship. Moreover, Tatum voluntarily entered into four agreements with Grove Bags, each containing the same restrictive covenants. (Tr. at PageID 1030.) Tatum cannot now claim undue hardship when he knew his employment options would be limited to industries outside of packaging for two years after leaving Grove Bags. Thus, the non-compete agreement does not impose undue hardship on Tatum.

Finally, the court finds that the non-compete agreement is not injurious to the public. This *Raimonde* element primarily deals with the public's interest in promoting fair business competition. *UZ Engineered Prods. Co. v. Midwest Motor Supply Co.*, 770 N.E.2d 1068 (Ohio Ct. App. 2001) (finding enforcement of non-compete agreement not injurious to public because industry is highly competitive, thus unlikely to adversely affect business competition). Where a non-compete clause "would result in an employer's having a near monopoly for its products or services in a given market, enforcement may be denied on the grounds that it would harm the public." *Brentlinger Enters. v. Curran*, 752 N.E.2d 994 (Ohio Ct. App. 2001). Here, there is no dispute that the cannabis packaging industry is highly competitive. Tatum emphasized that Grove Bags is one of many competing companies "in the one trillion-dollar packaging industry," and that customers will use multiple vendors or frequently change packaging vendors. (Tatum Closing Br. at PageID 827–28.) Given the highly competitive nature of the cannabis packaging industry, enforcement of the instant non-compete agreement is unlikely to adversely affect business competition. Accordingly, the third *Raimonde* element also weighs in favor of enforcement.

Taken together, the court concludes that the non-compete agreement is enforceable because it is reasonable, does not create an undue hardship on Tatum, and enforcement of it would not injure

the public. Thus, the court turns to the elements of Grove Bags' breach of contract claims.

### 1. *Breach of Contract - Counts I and II*

Grove Bags alleges two counts of breach of contract against Defendant Tatum: one for breach of the 2023 Employment Agreement, and one for breach of the Severance Agreement. Plaintiff claims that Tatum breached Section 6 of the EA, which deals with restrictive covenants, when he disclosed Grove Bags' proprietary or confidential information, competed with Grove Bags by working for Calyx, and/or solicited business from Grove Bags' customers. (Am. Compl. ¶¶ 211–12; Pl. Ex. 4.) This conduct also shows breach of the SA because the EA's restrictive covenants were incorporated into Section 10 of the SA. (Am. Compl. ¶¶ 220–22; Pl. Ex. 5.) Tatum relies chiefly on his Colorado law argument to assert that Plaintiff cannot show a likelihood of success on the merits of its breach of contract claims. (Tatum Opp'n to Prelim. Inj. at PageID 361–64, ECF No. 16; Tatum Closing Br. at PageID 830–31.) But, he argues, if Ohio law does apply, Plaintiff's breach of contract claims still fail because the restrictive covenants are unreasonable, and Plaintiff breached the SA when Jack Grover told Simon Knobel that Tatum was fired for reasons other than those stated in Section 6 of the SA.[12] (*Id.*)

Under Ohio law, to state a claim for breach of contract, a plaintiff must establish: (1) the existence of a valid contract between the parties; (2) performance by the plaintiff; (3) a breach by the defendant, and (4) resulting damages. *Bihn v. Fifth Third Mortgage Co.*, 980 F.Supp.2d 892, 906

---

[12]     Section 6 of the Severance Agreement deals with how Grove Bags will communicate about Tatum's separation from the company. It reads: "Rayn Tatum is no longer a part of the Grove Bags team. We were very fortunate to have had Ryan help our organization grow and scale over the past 3 years as Grove Bags would not be the company it is today without him. However, he felt it was time to explore other projects and passions. We wish him luck on his new ventures and are excited to continue seeing him as a fixture in the industry." (Pl. Ex. 5.)

(S.D. Ohio 2013) (citing *Pavlovich v. National City Bank*, 435 F.3d 560, 565 (6th Cir. 2006)). When interpreting a contract, the role of a court is to give effect to the intent of the parties. Therefore, "[w]hen the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties." *Sunoco, Inc. (R & M) v. Toledo Edison Co.*, 953 N.E.2d 285, 292 (Ohio 2011).

Because the court has already determined that Ohio law applies and that the non-compete agreement is reasonable and enforceable, the court concludes that Grove Bags has shown the existence of a valid contract between it and Tatum. Grove Bags has also sufficiently alleged damages stemming from Tatum's breach by asserting that Tatum did not return the severance payment despite breaching the agreements. (Pl. Closing Br. at PageID 818, n. 2, ECF No. 42-1.) As for Tatum's alleged breach, evidence presented at the Hearing firmly demonstrates Tatum violated the non-compete agreement when he accepted a consulting job with Calyx. On cross-examination, Tatum conceded that if Section 6(a) of the EA is read literally, without regard to Colorado law, he is violating his agreement with Grove Bags by working for Calyx. (Tr. at PageID 1031.) Thus, Grove Bags has also shown breach by Defendant Tatum.

The only remaining disputed element is Plaintiff's performance. Tatum asserts the affirmative defense of unclean hands based on Grover allegedly telling Knobel that Grove Bags fired Tatum because Tatum was partying too much, doing drugs, and not making sales. (Tatum Closing Br. at PageID 831.) Tatum contends Grover's alleged disparaging comments are a material breach to Section 6 of the SA, and thus Grove Bags has failed to perform its end of the bargain. This argument was not part of Tatum's original briefings in response to Grove Bags' Motion, nor did Tatum assert it in his Motion to Dismiss the Amended Complaint filed prior to the preliminary injunction hearing.

-44-

As such, there is little in the current record to show Tatum's purported defense can overcome the strong evidence Grove Bags has shown regarding Tatum's breach of the non-compete agreement. Moreover, Tatum did not dispute that Grove Bags performed its end of the SA by paying Tatum the agreed-upon severance amount. Accordingly, the court finds that the performance element of an Ohio breach of contract claim is satisfied.

Based on the existing record, the court finds that Plaintiff has shown a strong likelihood of success on the merits of its breach of contract claims.

### 2. *Misappropriation of Trade Secrets - Count III*

Grove Bags alleges one count of Misappropriation of Trade Secrets against both Defendants. To succeed on a misappropriation of trade secrets claim, a plaintiff must show, "(1) the existence of a trade secret: (2) acquisition of a trade secret as a result of a confidential relationship; and (3) unauthorized use of a trade secret." *Hoover Transp. Servs, Inc. v. Frye*, 77 F. App'x 776, 782 (6th Cir. 2003). Under Ohio law, actual or threatened misappropriation of a trade secret may be enjoined. *Dexxon Digital Storage, Inc. v. Haenszel*, 832 N.E.2d 62, 67 (Ohio Ct. App. 2005) (citing Ohio Rev. Code § 1333.62(A)). Thus, a court may grant an injunction even if the plaintiff proves only threatened misappropriation. *Dexxon*, 832 N.E. 2d at 68.

Plaintiff identifies the following as trade secrets: customer information, product information, pricing information, and sales strategies. (Mot. at PageID 76.) During the Hearing, Grover testified that with this information, a competitor could mimic Grove Bags' pricing and go-to-market strategy, understand why the company lost customers or did not obtain a new one, see how customer contracts were won, and see who the company's core customers are. (Tr. at PageID 930.) According to Grover, Tatum would be invaluable to Calyx in its efforts to launch Calyx Cure–a directly competing product

with Grove Bags'. (Tr. at PageID 931.) Grover further testified that Calyx has used Tatum to solicit Grove Bags customers for its own competing product. (Tr. at PageID 932.)  Calyx and Tatum argue that these broad categories of trade secrets are insufficient to warrant injunctive relief, and much of the information Plaintiff claims is a trade secret is publicly available on Plaintiff's website and social media. (Calyx Opp'n to Prelim. Inj. at PageID 195; Tatum Opp'n to Prelim. Inj. at PageID 365.)

Ohio law defines trade secrets as:

> [I]nformation, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:
>
> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ohio Rev. Code § 1333.61(D). Put more concisely, "[t]rade secrets are generally thought of as things that give an employer a competitive advantage over another, and as such are extremely coveted." *Dexxon*, 832 N.E. 2d at 66. An employer's customer lists, pricing information, and sales strategies can be trade secrets when the information is provided to employees with limited access, and is password protected. *Avery Dennison Corp. v. Kitsonas*, 118 F. Supp. 2d 848, 854 (S.D. Ohio 2000).

In *Avery*, the plaintiff company moved for a preliminary injunction against its former employee who had resigned and started working for a competing company in violation of the employee's non-compete and customer secrecy agreements. *Id.* at 850. One of the plaintiff's claims

was for misappropriation of trade secrets. *Id.* at 854. The *Avery* court determined that the plaintiff company's customer lists, pricing information, sales strategies, and business philosophy derived independent economic value based on their limited distribution and password protection, and that these factors indicated the company's reasonable efforts to maintain the information's secrecy. *Id.* Thus, the information, although described in broad terms, were trade secrets. *Id. See also Cap. Senior Living, Inc. v. Barnhiser*, No. 3:22-CV-00606-JGC, 2022 WL 6156860 (N.D. Ohio Oct. 7, 2022) (finding plaintiff's characterization of trade secrets sufficient where information fell into categories like those in *Avery*).

Like the *Avery* defendant, Tatum had access to customer lists, pricing information, and sales strategies, and he trained Grove Bags employees on the company's sales and pricing strategy. (Mot. at PageID 76; Tr. at PageID 911.) Tatum also regularly participated in senior leadership meetings where he joined discussions about the company's marketing strategies, financial matters, research and development, future products, strategic objectives, and customer issues. (Tr. at PageID 901–902, ECF No. 49.) This information constitutes "any business information or plans, financial information, or listing of names, addresses, or telephone numbers." Ohio Rev. Code § 1333.61(D). Furthermore, Grove Bags asserts, like the *Avery* plaintiff did, that employee access to this information is limited, and the computer systems maintaining the information are password protected. (Tr. at PageID 51, ECF No. 49.) However, Calyx introduced evidence demonstrating that at least some Grove Bags' information is generally known or readily ascertainable by competitors.

During the Hearing, Calyx introduced numerous exhibits showing how it and Grove Bags would exchange information about their respective sales strategies, job descriptions, and pricing. Calyx Exhibits 4, 8, and 11 show that Grove Bags sent Calyx information about its sales structure,

sales pitches, tiered pricing, and how to promote its product at industry conferences. Pricing information is also generally known or readily ascertainable through Grove Bags' customers who are not obligated to keep the pricing they receive secret from other potential vendors. (Tr. at PageID 990–91.) Additionally, Calyx Exhibit 9 shows Grove Bags publicizing three of its customer relationships on social media. Further challenging Grove Bags' claim that its customer list is a trade secret is the fact that each customer's contact information is published through Cannabiz Media—an online database of publicly available licensing information for United States cannabis companies. (Tr. at PageID 985–86.) Grover acknowledged that its domestic customers are included in the Cannabiz Media database, but he asserted that how Grove Bags uses the database in its broader sales system is a trade secret. (Tr. at PageID 986–91.)

Given the competing testimony on whether Grove Bags' information constitutes trade secrets as defined by Ohio law, the court concludes that Plaintiff has not shown a strong likelihood of success on the merits of its Misappropriation of Trade Secrets claim such that a preliminary injunction is warranted.

### 3. Tortious Interference - Counts IV and V

Grove Bags alleges two tortious interference claims against Defendants: one for tortious interference with business relationships against Tatum and Calyx, and one for tortious interference with contracts against Calyx. Defendants argue that Plaintiff is unlikely to succeed on either.

Ohio law recognizes claims for tortious interference with contract and for interference with a business relationship. *Georgia-Pac. Consumer Prods. LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1102 (6th Cir. 2012). To prove interference with contract, a plaintiff must show "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's

intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages." *Id.* (quoting *Miami Valley Mobile Health Servs., Inc. v. ExamOne Worldwide, Inc.*, 852 F. Supp. 2d 925, 942 (S.D. Ohio 2012) (internal quotations omitted)). The elements for interference with a business relationship mostly mirror those for interference with contract, except "that interference with a business relationship includes intentional interference with prospective contractual relations, not yet reduced to a contract." *Georgia-Pacific*, 701 F.3d at 1102 (quoting *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d 863 (Ohio 1995) (internal quotations omitted)). Additionally, the breach element for tortious interference with a business relation can be shown by the termination of a business relationship. *Diamond Wine & Spirits, Inc. v. Dayton Heidelberg Distrib. Co.*, 774 N.E.2d 775, 780 (Ohio Ct. App. 2002).

<div align="center">a.     <u>Tortious Interference with Business or Economic Relations</u></div>

Grove Bags claims Defendants interfered with its business and economic relationships with its customers and other third parties when Tatum contacted at least one third party in an attempt to use the third party's services for Calyx. (Am. Compl. ¶¶ 239–42.) Further, Grove Bags alleges that but for Tatum, Calyx would not have known of or used this third party's services, and Tatum's knowledge of the third party resulted from his employment with Grove Bags. (*Id.* at ¶¶ 243–44.) Tatum and Calyx argue Plaintiff is unlikely to succeed on this tortious interference claim because it does not show a failure of any business relationship. (Tatum Opp'n to Prelim. Inj. at PageID 366; Calyx Opp'n to Prelim. Inj. at PageID 196.) Moreover, Defendants contend that none of Grove Bags' customers have begun working with Calyx since Tatum joined the company as a consultant. (*Id.*)

In response, Grove Bags maintains that "the Knobel Declaration verifies that Calyx is now offering a product that is directly competing with Grove Bags' product and that Calyx is directly

soliciting this product to Grove Bags' customers. (Knobel Declartion at 16 and 28)."[13] (Pl. Reply in Supp. to Calyx Opp'n at PageID 346; Pl. Reply in Supp. to Tatum Opp'n at PageID 392; *see also* Tr. at PageID 79 (Grover testifying that Calyx has been relentlessly soliciting Grove Bags' customers with their competing product).) However, Plaintiff does not allege in its pleadings, briefings, or hearing testimony that it lost business relationships with those customers, much less that Calyx's alleged interference caused any such loss. At best, all Grove Bags can show is that its customers raised questions after seeing Tatum working with Calyx at the 2024 MJBizCon trade show. (Tr. at PageID 963.) Consequently, the court finds that Grove Bags has not alleged that any of its business relationships with existing customers have terminated. Thus, Plaintiff has not shown a strong likelihood of success on the merits of its Tortious Interference with Business/Economic Relations claim such that a preliminary injunction is warranted against either Defendant.

### b. Tortious Interference with Contract

Grove Bags claims Calyx tortiously interfered in its contracts with Tatum when it hired Tatum despite knowing about Tatum's contractual obligations with Grove Bags. (Am. Compl.

---

[13] Paragraphs 16 and 28 of Simon Knobel's Declaration state the following:

¶ 16 Although Calyx and Grove Bags' relationship remained amicable at the time, Calyx felt comfortable expanding its products to include flexible MAP film packaging in light of Grove Bags' incursion into the point-of-sale space. Put simply, Grove Bags moved into the point-of-sale lane, Calyx moved into the flexible packaging lane.

¶ 28 Additionally, clients and customers in the cannabis packaging space are open and transparent about pricing. Several of Grove Bags' customers have voluntarily disclosed Grove Bags' prices to Calyx and asked Calyx if it can beat Grove Bags' prices. My understanding is that Grove Bags does not require its customers or clients to sign non-disclosure agreements regarding pricing or otherwise maintain the confidentiality of Grove Bags' prices. (Knobel Decl. ¶¶ 16, 28, ECF No. 8-1.)

¶¶ 250, 254–56.) Calyx argues Plaintiff's tortious interference with contract claim fails because Grove Bags cannot show that Calyx hired Tatum with the intention of inducing him to breach the restrictive covenants in his Agreements. (Calyx Prelim. Inj. Opp'n at PageID 196–97.) Moreover, Calyx asserts it was justified in offering business to Tatum because of its reading of the Colorado non-compete statute and Tatum's warranty in their consulting agreement that he was under no restrictive employment covenants limiting his work for Calyx. (*Id.* at PageID 197.) In response, Grove Bags contends that because Ohio law, and not Colorado, applies to the underlying contract, Calyx's argument fails. (Pl. Reply in Supp. to Calyx Opp'n at PageID 346.)

Having already concluded that Grove Bags and Tatum had an agreement that under Ohio law Tatum breached, the court focuses on whether Plaintiff has shown that Calyx knew of Tatum's Grove Bags contract, that Calyx intentionally induced Tatum to breach the contract, and that Calyx's interference was unjustified. First, the record makes clear that Calyx knew about Tatum's contractual obligations with Grove Bags. At the Hearing, Knobel testified that Calyx made a verbal offer of employment to Tatum in January 2024, and that Calyx's President, Alex Gonzales ("Gonzales") had informally approached Tatum in October 2023. (Tr. at PageID 1151.) Tatum declined both offers, citing his non-compete agreement as the reason for turning Calyx down. (Pl. Ex. 18 at pg. 5–6.) Additionally, Knobel stated that in January 2024, he and Gonzales were reviewing Tatum's Grove Bags contracts to determine whether Calyx could hire Tatum. (*Id.* at PageID 1153.) Further, Grover testified that he had even had a conversation with Gonzales about Tatum's contracts in August of 2024 at an event in Cleveland. (Tr. at PageID 934.) Thus, there appears to be no dispute that Calyx knew about Tatum's contracts with Grove Bags and the non-compete clause contained therein.

With regard to Caylx's intentionality and whether its interference was justified, Calyx argues

that "it was 'justified' in offering business to Tatum based both on its reading of the plain language of § 8-2-113 and Tatum's warranty in the consulting agreement that he was not bound by any restrictive employment covenants that would preclude his work for Calyx." (Calyx Opp'n to Prelim. Inj. at PageID 197.) Grove Bags contends that Calyx cannot hide behind its purported reliance on Colorado law, especially since Knobel testified that Calyx employed Tatum despite claiming only that the restrictive covenants *may be* unenforceable. (Pl. Closing Br. at PageID 823; Tr. at PageID 1161–62.)

Ohio courts consider the following seven factors when determining if an interference was improper.

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

*Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 860 (Ohio 1999) (adopting Restatement (Second) of Torts § 767 (1979)). The nature of the actor's conduct is the primary factor in determining whether a third party's interference is improper. *Hicks v. Bryan Med. Grp., Inc.*, 287 F. Supp. 2d 795, 812 (N.D. Ohio 2003). Here, the court finds the *Fred Siegel* factors weigh against Calyx. The record shows that when it initially approached Tatum in late 2023, Calyx had only recently started moving into flexible packaging—Grove Bags' speciality. (Knobel Prelim. Inj. Decl. ¶¶ 15–17.) Moreover, this shift seemed at least somewhat motivated by Grove Bags moving into Calyx's speciality, point-of-sale packaging, such that Calyx lost several thousand dollars in accounts to Grove Bags. (*Id.* at ¶¶ 13–14.) In this context, Calyx's conduct and motive in recruiting Tatum

within a few months of him parting ways with Grove Bags appears improper, and wholly unconnected to its interpretation of Colorado law. Accordingly, the court finds that Plaintiff has shown a strong likelihood of success on its Tortious Interference with Contract claim against Defendant Calyx.

### 4. Civil Conspiracy - Count VI

Grove Bags alleges one count for civil conspiracy against both Defendants. Plaintiff claims Defendants conspired unlawfully to use its trade secrets, interfere with its customer relationships, and hide their employment relationship to avoid litigation and ultimately damage Grove Bags. (Am. Compl. ¶¶ 262–65.) Defendants argue that Plaintiff's civil conspiracy claim fails because (1) it is preempted by the Ohio Uniform Trade Secrets Act ("OUTSA"), (2) Plaintiff has not sufficiently alleged an underlying unlawful act, and (3) it is barred by the intra-corporate conspiracy doctrine. (Calyx Opp'n to Prelim. Inj. at PageID 197; Tatum Opp'n to Prelim. Inj. at PageID 367; Calyx Mot. to Dismiss Am. Compl. at PageID 424–25.)[14] Plaintiff contends it has properly pled a civil conspiracy claim that is neither preempted by OUTSA nor barred by the intra-corporate conspiracy doctrine because the claim is "based on [Defendants] secret plan to violate Tatum's contractual obligations to Grove Bags." (Pl. Reply in Supp. to Calyx Opp'n at PageID 347; Pl. Reply in Supp. to Tatum Opp'n at PageID 393.)[15]

---

[14] The court refers to Calyx's first Motion to Dismiss (ECF No. 6) because its Opposition Brief (ECF No. 8) to Plaintiff's Motion for Preliminary Injunction (ECF No. 5) incorporates its first Motion to Dismiss arguments.

[15] The court notes that Plaintiff's Amended Complaint does not state that its civil conspiracy claim is based on Calyx's interference with Tatum's contracts with Grove Bags. Indeed, its claim only references interference with customer, business, and employment *relationships*. Because the court concludes that Plaintiff's tortious interference claim with business or economic relationships is

Under Ohio law, civil conspiracy is "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Kenty*, 650 N.E.2d at 866 (quoting *LeFort v. Century 21-Maitland Realty Co.*, 512 N.E.2d 640, 645 (Ohio 1987) (quotations omitted). To establish a claim of civil conspiracy, the plaintiff must prove four elements: "(1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." *Aetna Cas. & Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519 (6th Cir. 2000) (quoting *Universal Coach, Inc. v. New York City Transit Auth., Inc.*, 629 N.E.2d 28 (Ohio Ct. App. 1993)). The malice involved in the tort "is that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another." *Fed. Ins. Co. v. Webne*, 513 F. Supp. 2d 921, 927 (N.D. Ohio 2007) (quoting *Pickle v. Swinehart*, 166 N.E.2d 227 (Ohio 1960)).

The court first considers whether Plaintiff's civil conspiracy claim is preempted by OUTSA. The Ohio Uniform Trade Secrets Act displaces "conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret." Ohio Rev. Code § 1333.67(A). OUTSA does not preempt civil remedies "not based on misappropriation of a trade secret." *Id.* In the Sixth Circuit, "courts analyzing whether OUTSA preempts a particular claim must look to whether that claim relies on the same operative facts that formed the basis for the party's trade secret misappropriation claim." *Campfield v. Safelite Grp., Inc.*, 91 F.4th 401, 414 (6th Cir. 2024). However, when a portion of the claim is supported by an independent factual basis, that portion

---

unlikely to succeed on the merits, it necessarily follows that its civil conspiracy claim would likely fail too because there would be no unlawful act. Nevertheless, the court will construe Plaintiff's civil conspiracy claim as arising from Calyx's interference with Tatum's *contracts* with Grove Bags.

survives preemption. *Id. See also Stolle Mach. Co., LLC v. RAM Precision Indus.*, 605 F. App'x 473, 484–85 (6th Cir. 2015).

To the extent that Grove Bags' civil conspiracy claim hinges on its allegations that Defendants misappropriated its trade secrets (*see* Am. Compl. ¶ 262), that part of its claim is preempted by OUTSA. Consequently, for Plaintiff's civil conspiracy claim to survive, it must arise from facts unrelated to those supporting its misappropriation of trade secrets claim. Grove Bags also cannot rely on its tortious interference with business or economic relations claim as the "unlawful act independent from the actual conspiracy" because the court already determined that claim fails. Plaintiff's argument that the underlying unlawful act is Defendants' "secret plan to violate Tatum's contractual obligations to Grove Bags" also cannot rescue its civil conspiracy claim.

Ohio law only recognizes a conspiracy to tortiously interfere with a contractual relationship when the claim "involve[s] two or more non-parties to the contract conspiring to induce a party to breach his contract." *Hicks*, 287 F. Supp. 2d at 814 (quoting *Wagoner v. Leach Co.*, No. 17580, 1999 WL 961166, at *19 (Ohio Ct. App. July 2, 1999) (internal quotations omitted). Such conspiracy claims are limited because "[i]t makes no sense to say that a party conspired to induce himself to breach a contract." *Id.* Here, Grove Bags alleges Tatum conspired with Calyx to breach his own contract with Grove Bags. Thus, because Grove Bags' tortious interference claim involves a party to the contract and only one non-party, its civil conspiracy cannot rest on its tortious interference claim.

Because Grove Bags fails to allege an unlawful act independent of the conspiracy, the court concludes Plaintiff has not shown a strong likelihood of success on the merits of its Civil Conspiracy claim such that a preliminary injunction is warranted.

-55-

### 5.    Conclusion

For the foregoing reasons, the court finds that Plaintiff has shown a strong likelihood of success on the merits of its Breach of Contract claims (Counts I and II) against Defendant Tatum, and its Tortious Interference with Contract claim (Count V) against Defendant Calyx. Plaintiff did not show a strong likelihood of success on the merits of its Misappropriation of Trade Secrets (Count III), Tortious Interference with Business/Economic Relations (Count IV), or Civil Conspiracy (Count VI) claims.

## D.    Irreparable Harm

Turning to irreparable harm, "[t]o merit a preliminary injunction, an injury 'must be both certain and immediate,' not 'speculative or theoretical.'" *Memphis A. Philip Randolph Inst.*, 978 F.3d at 391 (quoting *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019)). As a general rule, "a plaintiff's harm is not irreparable if it is fully compensable by money damages." *Nat'l Viatical, Inc. v. Universal Settlements Int'l, Inc.*, 716 F.3d 952, 957 (6th Cir. 2013) (quoting *Langley v. Prudential Mortg. Capital Co.*, LLC, 554 F.3d 647, 649 (6th Cir.2009)). On the other hand, the Sixth Circuit recognizes that damage to business reputation and loss of customer goodwill can constitute irreparable harm. *See S. Glazer's Distributors*, 860 F.3d at 852 (citing *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992)).

Grove Bags argues that if Tatum continues to work for Calyx in violation of the SA and EA, it will suffer irreparable harm. In its Motion and related briefings, Grove Bags points to the leadership role Tatum held in the company, as well as his direct access to confidential information as reasons why money damages would be difficult to calculate. (Mot. at PageID 78.) Calyx contends this alleged harm is insufficient to warrant a preliminary injunction, especially since Grove Bags

failed to show that such harm resulted in the loss of customers or business, or damage to Grove Bags' reputation in the industry. (Calyx Closing Br. at PageID 807.) Calyx also emphasizes that the harm alleged is "speculative and theoretical" despite nine months passing since Tatum began working for Calyx. (*Id.* at PageID 808.) Tatum echos many of Calyx's arguments, and adds that Grove Bags not moving for preliminary injunctive relief until two months after filing its lawsuit demonstrates unreasonable delay and undercuts its irreparable harm claim. (Tatum Closing Br. at PageID 834.)

In the context of non-competes, the Sixth Circuit observes that, "the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer." *FirstEnergy Sols. Corp. v. Flerick*, 521 F. App'x 521, 529 (6th Cir. 2013) (quoting *Basicomputer*, 973 F.2d at 512) (internal quotation omitted); *see also Office Depot, Inc. v. Impact Office Prods., LLC*, No. 1:09 CV 2791, 2011 WL 4833117, at *12–13 (N.D. Ohio Oct. 12, 2011) (finding the plaintiff demonstrated some irreparable injury stemming from former employees' breach of non-compete). Courts also should consider the future effects of a non-compete clause violation. *Id.* at *13 (quoting *Globe Servs., Inc. v. Palmer*, No. CA 86-02-028, 1986 WL 8909 (Ohio Ct. App. Aug. 18, 1986)). In *Office Depot*, the court determined that the plaintiff showed some actual and threatened irreparable harm "in the form of loss of customer good will, unfair competition, and other unquantifiable harms," stemming from the defendant former employee's breach of a non-compete agreement. 2011 WL 4833117, at *13. The *Office Depot* defendants argued there was no irreparable harm because actual damages resulting from the former employee's breach could be proven. *Id.* However, the court found that the plaintiff's testimony about customers generally, not specifically, no longer working with plaintiff reflected "the difficulty in quantifying harm in the context of non-

compete disputes." *Id.* at \*14. Conversely, in *CNG Financial Corporation v. Brichler*, No. 1:21-CV-460, 2021 WL 4189577 (S.D. Ohio Sept. 14, 2021), the court concluded that the plaintiff employer did not show irreparable harm from its former employee's breach of a non-compete agreement because there was no evidence that the plaintiff had suffered a loss of customer goodwill. Rather, the plaintiff relied on an "implied assumption that any breach of a non-compete, regardless of reasonableness, always results in a loss of fair competition." *Brichler*, 2021 WL 4189577, at \*14.

Here, the court finds that Grove Bags' evidence of irreparable harm is more analogous to the *Office Depot* plaintiff's. Like the *Office Depot* plaintiff, Grove Bags provided testimony about how Tatum's violation of the non-compete agreement gave rise to customer confusion and potentially unfair competition. At the hearing, Jaffe testified that the harm caused by Calyx using Tatum to push its new flexible MAP packaging that is directly comparable to Grove Bags' product cannot be satisfied by money damages. (Tr. at PageID 1254–55.) Grover testified that "Mr. Tatum's intimate knowledge of our business, products, practices, formulations [...] would put him in a great position [to] team[] up with Calyx to cause irreparable harm to our firm." (Tr. at PageID 969.) Grover further testified that Tatum publicly violating the non-compete agreement also irreparably harms Grove Bags because it sows doubt in the validity of the company's agreements with other employees and even customers. (Tr. at PageID 978–80.) On cross-examination, Knobel conceded that if a former Calyx employee took Calyx's customer list to a competitor, damage beyond money could result. (Tr. at PageID 1180.) Despite Grove Bags not directly naming any customers, this evidence is more than what the *Brichler* plaintiff asserted. Indeed, considering the record as a whole, there is evidence suggesting that Calyx hiring Tatum was part of a larger plan to create and sell a cannabis packaging product that directly competed with Grove Bags'. *See Procter & Gamble Co. v. Stoneham*, 747

-58-

N.E.2d 268 (Ohio Ct. App. 2000), cause dismissed, 744 N.E.2d 775 (Ohio 2001) (finding the plaintiff's former employee could use knowledge to destroy the marketability of plaintiff's product). Accordingly, the court concludes that Plaintiff has shown a clear case of irreparable harm.

**E.      Substantial Harm to Others**

The court considers next whether granting an injunction will cause substantial harm to others. This factor requires the court to "balance the harm that [Grove Bags] would face absent an injunction against that which [Calyx and Tatum] would face" if an injunction is granted. *Nexus Gas Transmission, LLC v. City of Green, Ohio*, 757 F. App'x 489, 495 (6th Cir. 2018) (quoting *Jones v. Caruso*, 569 F.3d 258, 277 (6th Cir. 2009) (internal quotations omitted)). Plaintiff asserts that an injunction will not cause harm to Defendants or third parties because Tatum's absence from Calyx will not interrupt its business, and Tatum knew when he joined Calyx that he would be violating his restrictive covenants with Grove Bags. (Pl. Prelim. Inj. Mot. at PageID 78.) Defendants contend the balance of harms weighs against an injunction because Tatum's livelihood would be threatened if he could no longer work in the packaging or cannabis industry. (Calyx Opp'n to Prelim Inj. at PageID 199; Tatum Opp'n to Prelim. Inj. at PageID 369.) Defendants' argument is not well-taken.

As the court discussed when reviewing the reasonableness of Tatum's non-compete agreement, employment limitations are not enough to show undue hardship. Moreover, the Hearing testimony showed that Tatum was able to work in other industry areas consistent with his background and experience, and that the non-compete provision did not prevent him from working in non-packaging parts of the cannabis industry. (Tr. at PageID 923–24, 1029–30.) This evidence coupled with Tatum's decision to sign four agreements with Grove Bags, each containing the same restrictive covenants, shows he knew the limits of his post-Grove Bags work and could still find

employment. Resultantly, the court concludes that this factor tips in favor of Grove Bags.

**F.      Public Interest**

Finally, the court finds that public interest does not weigh against injunctive relief. Defendants argue that because Tatum is protected by Colorado law, enforcement of the non-compete would violate the public interest. (Calyx Opp'n to Prelim. Inj. at PageID 199; Tatum Opp'n to Prelim. Inj. at PageID 369.) However, because the court finds that Ohio law applies, Defendants' argument is not well-taken. Instead, the public interest weighs in favor of injunctive relief because the Sixth Circuit and Ohio state courts have recognized that the public has an interest in enforcement of reasonable non-compete agreements. *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964 (6th Cir. 2002); *Alan v. Andrews*, No. 06 MA 151, 2007 WL 1544717 (Ohio Ct. App. May 22, 2007). Thus, the court finds that this factor also weighs in favor of granting a preliminary injunction.

### IV. CONCLUSION

For the foregoing reasons, the court grants in part Plaintiff's Motion for a Preliminary Injunction (ECF No. 5). Plaintiff has shown that it has a strong likelihood of success on the merits on three of its six claims; that it would suffer some irreparable harm in the absence of an injunction; that others would not be substantially harmed by the issuance of an injunction; and that the public interest would be served by enforcement.

Pursuant to Civil Rule 65(c), no preliminary injunction should issue without the giving of security by the applicant sufficient for payment of costs and damages as may be incurred or suffered by any party to have been wrongfully enjoined. Accordingly, in order for the injunction to be effective, Plaintiff will be required to file a supersedeas bond in the amount of $50,000 with the court in a form to be approved by the Clerk of the Court in order to compensate the Defendants should it

later be determined that the preliminary injunction should not have been entered.

For the above-mentioned reasons, IT IS ORDERED that Defendants are enjoined as follows: Tatum is enjoined from being employed by, or performing services on behalf of Calyx with or without compensation. Calyx is enjoined from renewing any contractual relationship with Tatum or receiving Tatum's services with or without compensation. Tatum is further enjoined from being employed by, or performing services on behalf of, any other company or its affiliates whose business activities include the manufacturing, marketing, distribution, or sale of packaging including packaging targeting the hemp and/or cannabis industries. The injunction shall commence immediately and should terminate only by further order of the court.[16]

IT IS SO ORDERED.

/S/ *SOLOMON OLIVER, JR.*
UNITED STATES DISTRICT COURT

August 21, 2025

---

[16] The court acknowledges that the original two-year term of Tatum's non-compete agreement is set to expire on or about August 24, 2025. (Pl.'s Ex. 4 at pg. 4.) However, Ohio law allows courts to enforce a covenant not to compete beyond its expiration. *Rogers v. Runfola & Assoc., Inc.*, 565 N.E.2d 540, 544 (Ohio 1991) (affirming trial court's order enjoining an employee who breached a non-compete covenant for three years from the date of the order, despite it exceeding the non-compete's expiration date); *see also Basicomputer Corp. v. Scott*, 973 F.2d 507, 513–14 (6th Cir. 1992) (finding the district court erred by modifying the non-compete covenant given *Runfola*'s rejection of the Sixth Circuit's contrary holding in *Moraine Indus. Supply, Inc. v. Sterling Rubber Prods. Co.*, 891 F.2d 133, 135 (6th Cir. 1989)). Accordingly, the injunction may extend beyond the expiration of Tatum's non-compete agreement.

# EXHIBIT 4

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KINZIE ADVANCED POLYMERS, LLC | ) | Case No.: 1:24 CV 1887 |
| d/b/a GROVE BAGS, | ) | |
| | ) | |
| Plaintiff | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | |
| | ) | |
| CALYX CONTAINERS, LLC *et. al,* | ) | |
| | ) | |
| Defendants | ) | <u>ORDER</u> |

Currently pending before the court in the above-captioned case are the following motions:

Defendant Calyx Containers, LLC's ("Calyx") Motion to Dismiss ("December Motion") (ECF No.

6), Calyx's Motion to Dismiss Amended the Complaint ("Calyx Motion") (ECF No. 19), Defendant

Michael Ryan Tatum's ("Tatum") Motion to Dismiss the Amended Complaint ("Tatum Motion")

(ECF No. 20), and Calyx's Oral Motion to Stay Discovery (ECF No. 40).  For the following reasons,

the court denies Calyx's December Motion and Motion to Stay Discovery as moot, grants in part and

denies in part Calyx's Motion to Dismiss the Amended Complaint, and grants in part and denies in

part Tatum's Motion to Dismiss the Amended Complaint.

## I. BACKGROUND

This action involves two competing cannabis packaging companies owned and operated by

former college friends and fraternity brothers, and a third person who worked for one, and now works for the other. On August 21, 2025, the court issued a preliminary injunction (ECF No. 56), enjoining Tatum from being employed by, or performing services on behalf of Calyx with or without compensation, as well as from being employed by, or performing services on behalf of, any other company or its affiliates whose business activities include the manufacturing, marketing, distribution, or sale of packaging including packaging, targeting the hemp and/or cannabis industries. The court also enjoined Calyx from renewing any contractual relationship with Tatum or receiving Tatum's services with or without compensation.

In the Preliminary Injunction Order, the court recounted the factual and procedural history of the case. (Prelim. Inj. Order at PageID 1295–1302.) The court also determined it could, and would, exercise personal jurisdiction over Tatum and Calyx. (*Id.* at PageID 1313–29.) Consequently, for the reasons reached in the court's Preliminary Injunction Order, the court denies Calyx's and Tatum's Motions to Dismiss the Amended Complaint for lack of personal jurisdiction.

Additionally, the court concluded that Grove Bags has a strong likelihood of success on the merits of its breach of contract claims against Tatum (Counts I and II), and tortious interference with contract claim against Calyx (Count V).[1] (*Id.* at PageID 1329–38; 1343–46.) Given the showing required for a preliminary injunction is greater than that at the motion to dismiss stage, *see Jamar-Mamon v. Univ. of Cincinnati*, 758 F. Supp. 3d 756, 762 (S.D. Ohio 2024), the court incorporates its conclusions on Plaintiff's breach of contract and tortious interference with contract

---

[1]  In determining that Plaintiff has a strong likelihood of success on the merits of its breach of contract claims against Tatum, the court also concluded that under Ohio's choice of law principals, Ohio law, not Colorado, applies to Plaintiff's breach of contract claims. (Prelim. Inj. Order at PageID 1304–13.)

-2-

claims into the instant order. Therefore, for the reasons reached in the Preliminary Injunction Order, the court denies Tatum's Motion to Dismiss the Amended Complaint for failure to state a claim on Plaintiff's breach of contract claims, and denies Calyx's Motion to Dismiss the Amended Complaint for failure to state a claim on Plaintiff's tortious interference with contract claim.

The remaining issues from Defendants' respective Motions to Dismiss are whether venue in the Northern District of Ohio is proper, and if Plaintiff's misappropriation of trade secrets (Count III), tortious interference with business/economic relations (Count IV), civil conspiracy (Count VI), and deceptive trade practices (Count VII) claims can withstand Defendants' Rule 12(b)(6) Motions.

## II. LEGAL STANDARDS

### A. Motion to Dismiss or Transfer for Improper Venue

Under Federal Rule of Civil Procedure 12(b)(3), a party can move to dismiss an action for improper venue. Rules governing venue determinations are codified at 28 U.S.C. § 1391(b). The statute allows plaintiffs to sue in three main places:

(1)     a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

(2)     a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

(3)     if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b). If a case falls into one of these categories, then venue is proper; if it does not, "venue is improper, and the case must be dismissed or transferred under § 1406(a)." *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 56 (2013). Notably, "[w]hether the

-3-

parties entered into a contract containing a forum-selection clause has no bearing on whether a case falls into one of the[se] categories." *Id*.

**B.      Motion to Dismiss for Failure to State a Claim**

The court examines the legal sufficiency of a plaintiff's claims under Federal Rule of Civil Procedure 12(b)(6). The Supreme Court clarified the law regarding what a plaintiff must plead in order to survive a Rule 12(b)(6) motion in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). When determining whether a plaintiff has stated a claim upon which relief can be granted, the court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. The plaintiff's obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. Even though a complaint need not contain "detailed" factual allegations, its "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the Complaint are true." *Id.* And a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

The Court, in *Iqbal*, further explained the "plausibility" requirement, stating that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 556 U.S. at 678. Furthermore, [t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* This determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."

*Id.* at 679.

### III. LAW AND ANALYSIS

As an initial matter, Calyx and Tatum argue that the court should only consider Daniel Jaffe's Declaration ("Jaffe Declaration"), which Plaintiff attached as an exhibit to its Opposition Briefs (ECF Nos. 23 and 24), when ruling on Defendants' personal jurisdiction and venue arguments, but not when conducting its Rule 12(b)(6) analysis. (Calyx Reply at PageID 698, ECF No. 25; Tatum Reply at PageID 713, ECF No. 26.) When facing a motion to dismiss for lack of personal jurisdiction, "the plaintiff must show by a preponderance of the evidence that venue is proper." *Tobien v. Nationwide Gen. Ins. Co.*, 133 F.4th 613 (6th Cir. 2025). A court may "examine facts outside the complaint but must draw all reasonable inferences and resolve factual conflicts in favor of the plaintiff." *Reilly v. Meffe*, 6 F. Supp. 3d 760, 765 (S.D. Ohio 2014) (quoting *Audi AG & Volkswagen of Am., Inc. v. Izumi*, 204 F. Supp. 2d 1014, 1017 (E.D. Mich. 2002)) (internal quotations omitted). Therefore, a court may decide the motion on the papers, through an evidentiary hearing, or by permitting discovery to aid in deciding the motion. *Tobien*, 133 F.4th at 621.

Conversely, when ruling on a Rule 12(b)(6) motion, the court "must focus only on the allegations in the pleadings." *Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 483 (6th Cir. 2020). Indeed, "this rule applies just as much when the plaintiff attaches evidence to its opposition as when (as is more common) the defendant attaches evidence to its motion." *Id.* (citing 5C Charles A. Wright et al., *Federal Practice and Procedure* § 1366, at 155–56 (3d ed. 2004)). Resultantly, when evaluating Plaintiff's claims under Rule 12(b)(6), the court will not consider allegations stated in the Jaffe Declaration that are not otherwise included in the Amended Complaint.

A.      **Motion to Dismiss or Transfer for Improper Venue**

Defendants move to dismiss or transfer this action for improper venue pursuant to Federal Rule of Civil Procedure 12(b)(3) and 28 U.S.C. § 1406(a). Defendants argue that venue is only proper in the District of Colorado because it is where Calyx is incorporated and where Tatum is a citizen, and it is where a substantial part of the events, omissions, or property resulting in Plaintiff's claims occurred. (Calyx Mot. at PageID 416; Tatum Mot. at PageID 442.) Tatum also argues that the forum selection clause designating Ohio as the choice of forum does not make venue here proper because Colorado law prohibits forum selection clauses in adjudicating non-compete disputes. (Tatum Mot. at PageID 442.)

Plaintiff contends that this venue is proper as to Tatum because he consented to this court's jurisdiction by signing agreements that contain a forum selection clause. (Opp'n to Tatum Mot. at PageID 591.) As to Calyx, Plaintiff asserts venue is proper because a substantial part of the events giving rise to its claims occurred here, and its alleged trade secrets are located here. (Opp'n to Calyx Mot. at PageID 485.)

Defendants correctly assert, and Plaintiff does not dispute, that the instant case does not fall within § 1391(b)(1) because neither Defendant resides in Ohio. In fact, because both Defendants reside in Colorado, the District of Colorado is a proper venue under § 1391(b)(1). Thus, venue is proper in the Northern District of Ohio only if "a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated" in this district. § 1391(b)(2); *see SmartBank v. Cartron*, No. 4:19-CV-00062, 2020 WL 1897168 (E.D. Tenn. Apr. 16, 2020) (applying *Atlantic Marine* and explaining that because venue was proper in the district argued for by the defendants, the plaintiff could not rely on § 1391(b)(3) to make its

chosen venue proper.)

In the Sixth Circuit, a plaintiff is not required to show that it has chosen the "best" venue in order to satisfy § 1391(b)(2). *First of Michigan Corp. v. Bramlet*, 141 F.3d 260, 263 (6th Cir. 1998). Rather, the relevant inquiry is whether the chosen district has a substantial connection to the claim, regardless of whether other forums have greater contacts. *Id.* Venue can be proper in multiple districts. Indeed, venue is proper in any district in which "a substantial part of the events or omissions giving rise to the claim occurred," even if a more substantial part occurred in a different district. *Capitol Specialty Ins. Corp. v. Splash Dogs LLC*, 801 F. Supp. 2d 657, 671–72 (S.D. Ohio 2011). When presented with a motion to dismiss for improper venue, courts "may examine facts outside the complaint but must draw all reasonable inferences and resolve factual conflicts in favor of the plaintiff." *Reilly v. Meffe*, 6 F. Supp. 3d 760, 765 (S.D. Ohio 2014). To defeat such a motion based solely on the parties' papers, the plaintiff must show "that his pleadings and affidavits, if accepted as true, would establish that venue was proper. *Tobien*, 133 F.4th at 621. Moreover, venue must be proper for each claim and for each defendant. *Verbis v. Iowa Dep't of Hum. Servs.*, 18 F. Supp. 2d 770, 774 (W.D. Mich. 1998). Accordingly, the court examines venue under § 1391(b)(2) by Defendant and claim, taking Plaintiff's pleadings and affidavits as true.

### 1.     Michael Ryan Tatum

Plaintiff's primary argument for why venue is proper in this district for its claims against Tatum is because Tatum consented to this court's jurisdiction when he signed agreements containing a forum selection clause. But as the Supreme Court stated in *Atlantic Marine*, "[w]hether the parties entered into a contract containing a forum-selection clause has no bearing on whether a case falls into one of the categories of cases listed in § 1391(b)." 571 U.S. at 56. This principal similarly

nullifies Tatum's argument that venue is improper because Colorado law prohibits out-of-state forum selection clauses in adjudicating non-compete disputes. As such, the court analyzes the venue issue as it pertains to Tatum by determining if "a substantial part of the events or omissions giving rise to the [contract and tort] claim[s] occurred, or a substantial part of property that is the subject of the action is situated" in the Northern District of Ohio. Fed. R. Civ. P. § 1391(b)(2).

The court examines Plaintiff's breach of contract claims (Counts I and II) against Tatum first. To determine whether venue is proper under § 1391(b)(2) in a contract dispute, courts consider "(1) where the contract was negotiated and executed, (2) where the contract was performed, and (3) where the alleged breach occurred." *Reilly*, 6 F.Supp.3d at 766. Additionally, courts may consider "where the effects of a defendant's alleged breach are experienced." *Id.*

Here, the place of contract negotiation and execution occurred, in part, in Ohio given Plaintiff resides in Ohio. (Am. Compl. ¶¶ 1–2.) Further, Tatum knew Plaintiff resided in Ohio as each Employment Agreement he signed included that fact. (*See* Opp'n to Tatum Mot. Exs. 2–6 at PageID 626, 640, 652, 664.) As for the place of contract performance, Tatum generally worked remotely from Colorado, but his managers were all Ohio residents, most of the employees Tatum managed lived in Ohio, and Tatum regularly visited Ohio for management and sales team meetings. (Jaffe Decl. ¶¶ 85, 87–88, ECF No. 24-1.) Tatum's alleged breach of his Agreements arguably occurred in Colorado as that is where he was living after departing Grove Bags, and where Calyx, his new employer, resides. However, Grove Bags experienced the effects of Tatum's alleged breach in Ohio because any harm caused by Tatum working for a direct competitor of Grove Bags' affects Grove Bags, an Ohio company. On balance, these events establish a substantial connection between the Northern District of Ohio and Plaintiff's breach of contract claims against Tatum. Thus, venue in

-8-

this District and on these claims against Tatum is proper.

The court also finds that the Northern District of Ohio is a proper venue for Plaintiff's tort claims against Tatum. Under the principle of pendent or ancillary venue, a claim "not properly venued" can be heard "as long as another properly venued claim arising out of a common nucleus of operative facts is also brought at the same time in the same district." *Reilly*, 6 F. Supp. 3d, at 765 (quoting *Pacer Glob. Logistics, Inc. v. Nat'l Passenger R.R. Corp.*, 272 F. Supp. 2d 784 (E.D. Wis. 2003)). Because this District is a proper venue for Plaintiff's breach of contract claims, it is proper for its tort claims too. As pleaded, Plaintiff's misappropriation of trade secrets, tortious interference with business relations, civil conspiracy, and deceptive trade practices (Count VII) claims arise from a common set of operative facts—namely, Tatum working for Calyx despite his Grove Bags Agreements directing him not to compete, to keep confidential information confidential, and to not solicit Plaintiff's customers. Therefore, these claims, even if not properly venued, can be litigated here under the principle of pendent or ancillary venue.

### 2. Calyx Containers, LLC

Plaintiff asserts venue in the Northern District of Ohio is proper for its claims against Calyx because a substantial part of the events or omissions giving rise to the claims, or a substantial part of property that is the subject of the action is situated in the instant District. Plaintiff chiefly points to Calyx's knowledge of Tatum's Agreements with Grove Bags, an Ohio company, as well as Calyx's alleged use of Plaintiff's trade secrets, which are based in Ohio. (Opp'n to Calyx Mot. at PageID 485.) Calyx, like Tatum, argues the only proper venue is the District of Colorado because both Defendants reside there, and the events giving rise to Plaintiff's claims, specifically Calyx hiring Tatum, occurred in Colorado, not Ohio. (Calyx Mot. at PageID 416.)

Here, Plaintiff makes four claims against Calyx: misappropriation of trade secrets, tortious interference with business relationships and tortious interference with contract, civil conspiracy, and deceptive trade practices. The primary allegations giving rise to Plaintiff's claims against Calyx are, (1) Calyx intentionally interfered with Plaintiff's non-compete agreement with Tatum when it hired Tatum despite knowing Tatum had restrictive covenants with Plaintiff, an Ohio company (Am. Compl. ¶¶ 28, 162–166); (2) Calyx is employing Tatum to gain access to Plaintiff's Ohio-based trade secrets and customer information (*id.* at ¶¶ 180–83, 206); and (3) Calyx is using Tatum at public cannabis trade events and in other advertising to misstate the quality and pricing of its competing packaging products (*id.* at ¶¶ 184–85, 205). Plaintiff also alleges that its "trade secrets, confidential business information, and contracts have significant ties to Ohio." (*Id.* at ¶ 61.)

Calyx contends these allegations are insufficient to make the Northern District of Ohio a proper venue under § 1391(b)(2). First, Calyx maintains that its alleged business relationship with Tatum is too tangential to satisfy the substantiality requirement. (Calyx Reply at PageID 696 (citing *Reilly*, 6 F. Supp. 3d at 766).) Second, Calyx argues that Plaintiff cannot establish venue under § 1391(b)(2) based on the alleged physical location of its trade secrets. (Calyx Reply at PageID 697 (citing *Alltech, Inc. v. Carter*, No. 5:08-CV-325-KKC, 2010 WL 988987 (E.D. Ky. Mar. 15, 2010).)

The purpose of the substantiality requirement in § 1391(b)(2) is "to preserve the element of fairness so that a defendant is not haled into a remote district having no relationship to the dispute." *Sechel Holdings, Inc. v. Clapp*, No. 3:12-CV-00108-H, 2012 WL 3150087 (W.D. Ky. Aug. 2, 2012) (quoting *Cottman Transmission Sys., Inc. v. Martino*, 36 F.3d 291 (3d Cir. 1994)) (internal quotations omitted). As the court discussed in its personal jurisdiction analysis in the Preliminary Injunction Order, Calyx should have reasonably anticipated being haled into Ohio court when it hired

Tatum, knowing that Tatum had a non-compete agreement with Grove Bags—an Ohio company owned and operated by Ohio residents who Calyx's leadership had known for years. (Prelim. Inj. Order at PageID 1323–25.) While Calyx may have hired Tatum in Colorado, its alleged interference with the contracts between Plaintiff, an Ohio company, and Tatum, a former employee of an Ohio company, is an event connected to this District, and one that gives rise to Plaintiff's tortious interference with contract and civil conspiracy claims. Thus, venue in this district and on these claims against Calyx is proper. The court also finds, as it did with the tort claims against Tatum, that the Northern District of Ohio is a proper venue for Plaintiff's remaining tort claims against Calyx, because they "arise[] out of a common nucleus of operative facts," and Plaintiff brought them alongside its properly venued tortious interference with contract and civil conspiracy claims. *Reilly*, 6 F. Supp. 3d at 765.

Because there is at least one claim against each Defendant properly venued in the Northern District of Ohio, and the court has pendant or ancillary venue over the remaining claims against Calyx and Tatum, the court concludes venue is proper in this district under § 1391(b)(2). Resultantly, the court denies Defendants' Motions to Dismiss for improper venue pursuant to Rule 12(b)(3).

**B.      Motion to Dismiss for Failure to State a Claim**

*1.        Misappropriation of Trade Secrets*

Grove Bags alleges one count of misappropriation of trade secrets under the federal Defend Trade Secrets Act ("DTSA") and parallel Ohio Uniform Trade Secrets Act ("OUTSA") against both Defendants. The court analyzes Plaintiff's DTSA and OUTSA claims together because the elements under both are "substantially the same." *Multilink Inc. v. Pignolet*, 774 F. Supp. 3d 905 (N.D. Ohio 2024) (quoting *Just Funky, LC v. Boom Trendz, LLC*, 2021 WL 2635377 at *6 (N.D. Ohio June 25,

2021)). For a misappropriation of trade secrets claim to survive a motion to dismiss, a plaintiff must allege, "(1) the existence of a trade secret; (2) acquisition of a trade secret as a result of a confidential relationship; and (3) unauthorized use of a trade secret." *Hoover Transp. Servs, Inc. v. Frye*, 77 F. App'x 776, 782 (6th Cir. 2003).

Defendants argue that Plaintiff's misappropriation of trade secrets claim fails because Plaintiff did not allege any trade secrets with sufficient particularity, nor allege any actual or threatened misappropriation of trade secrets by Calyx or Tatum. (Calyx Mot. at PageID 418; Tatum Mot. at PageID 444–45.) Plaintiff contends that its trade secrets claim survives at the motion to dismiss stage because it has sufficiently alleged trade secrets and Defendants' misappropriation of them. (Opp'n to Calyx Mot. at PageID 487–88; Opp'n to Tatum Mot. at PageID 598–600.)

Ohio law defines trade secrets as:

> [I]nformation, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:
>
> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ohio Rev. Code § 1333.61(D). Put more concisely, "[t]rade secrets are generally thought of as things that give an employer a competitive advantage over another, and as such are extremely coveted." *Dexxon Digital Storage, Inc. v. Haenszel*, 832 N.E. 2d 62, 66 (Ohio Ct. App. 2005). Whether

information constitutes a trade secret is a highly fact-specific inquiry. *Wellington Res. Grp. LLC v. Beck Energy Corp.*, No. 2:12-CV-104, 2013 WL 5325911 (S.D. Ohio Sept. 20, 2013) (citing *DeBoer Structures (U.S.A.) Inc. v. Shaffer Tent And Awning Co.*, 233 F. Supp. 2d 934 (S.D. Ohio 2002)). Resultantly, district courts in this Circuit explain that, "so long as [the plaintiff] can put forth general categories of its trade secrets and provide the type of factual allegations ... that allow for the reasonable inference that [the defendants] improperly disclosed some of those trade secrets ... [the plaintiff] has done all that is required to survive a motion to dismiss." *More than Gourmet, Inc. v. Finnegan*, No. 5:18CV2509, 2019 WL 13199822 (N.D. Ohio Sept. 10, 2019) (collecting cases).

Defendants contend that Plaintiff does not sufficiently allege any specific, protected trade secret, but rather "improperly attempts to list several alleged trade secrets only via 'category or broad conclusory statements.'" (Calyx Mot. at PageID 419; Tatum Mot. at PageID 445.) The court disagrees. In *Finnegan*, the court found that the plaintiff had sufficiently identified trade secrets to avoid dismissal under Rule 12(b)(6) of its DTSA and OUTSA claims. *Id.* at *6. The *Finnegan* plaintiff identified its marketing plans and strategies, pricing information, customer agreements, customer preferences and relationships, vendor and supplier information, product information, research and development, profitability and profit margins, and business plans and strategies as trade secrets. *Id.* at *5. The court determined that these allegations were sufficiently pled since "plaintiffs are not required to identify trade secret information in detail in order to avoid dismissal at the 12(b)(6) stage" under the DTSA or the OUTSA. *Id.* at *6, 11. Here, Grove Bags alleges that its costs, pricing, customer contracts, proposed contracts, distribution channels, sales information, customer list, prospective customer lists, and information and documents related to the manufacturing and selling of TerpLoc (*see* Am. Compl. ¶ 79) are trade secrets under the DTSA and OUTSA. Indeed,

this information is similar to that alleged by the *Finnegan* plaintiff, and it constitutes "any business information or plans, financial information, or listing of names, addresses, or telephone numbers." Ohio Rev. Code § 1333.61(D); 18 U.S.C. § 1839(3) ( "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information.) Thus, Plaintiff's allegations satisfy the first part of the trade secrets definition.

Plaintiff also sufficiently alleges that it has used reasonable means to maintain the secrecy of its purported trade secrets. Specifically, Plaintiff requires employees to sign confidentiality agreements, limits access of customer information to employees with a need to utilize such information to perform their duties, password protects its computers, and further limits access to certain customer, financial, and product information. (*Id.* at ¶¶ 70–75.) Plaintiff also requires departing employees to return all Grove Bags' property and equipment. (*Id.* at ¶ 76.) These precautions are sufficient to show that Plaintiff took reasonable means to maintain the information's secrecy. *See Multilink*, 744 F. Supp. 3d at 916–17 (finding plaintiff sufficiently alleged that information was not known outside the business and that it took precautions to guard the secrecy of the information by requiring employees to sign confidentiality agreements); *see also Avery Dennison Corp. v. Kitsonas*, 118 F. Supp. 2d 848, 854 (S.D. Ohio 2000) (finding that an employer's customer lists, pricing information, and sales strategies can be trade secrets when the information is provided to employees with limited access, and is password protected on motion for preliminary injunction).

Lastly, the court finds that Plaintiff sufficiently alleges that its information has independent economic value. In the Amended Complaint, Grove Bags asserts that it "has developed significant customer information that is highly valuable," (¶ 69), that its "customer information and training provide Grove Bags with a competitive advantage in the industry," (¶ 78), and that "Tatum cannot

perform services on behalf of a competitor of Grove Bags without utilizing this information to the advantage of his new employer." (¶ 206.) These allegations, if true, combined with the efforts Plaintiff takes to maintain the secrecy of its trade secrets are sufficient to show independent economic value. *See Finnegan*, 2019 WL 13199822, at *7 (finding plaintiffs allegations about the time it spent developing information about customer preferences, pricing, marketing, and business plans shows economic value, along with plaintiff's allegation that such information is valuable to potential competitors). Thus, Plaintiff has sufficiently alleged the existence of trade secrets.

Defendants also argue that even if Plaintiff alleges the existence of trade secrets, it fails to allege misappropriation by either Calyx or Tatum. (Calyx Mot. at PageID 419; Tatum Mot. at PageID 445.) Ohio defines misappropriation, in relevant part, as:

> [The] acquisition of a trade secret [...] by a person who knows or has reason to know that the trade secret was acquired by improper means;
>
> [The] disclosure or use of a trade secret [...] without the express or implied consent of the other person by a person who did any of the following:
>
> (a)     [u]sed improper means to acquire knowledge of the trade secret;
>
> (b)     [a]t the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that [...] was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use[.]

Ohio Rev. Code § 1333.61(B). The DTSA similarly defines misappropriation. *See* 18 U.S.C. § 1839(5).

Here, Plaintiff demonstrates that Tatum acquired Plaintiff's trade secrets "under circumstances giving rise to a duty to maintain its secrecy or limit its use," by alleging that Tatum signed five confidentiality agreements protecting Grove Bags' trade secrets, (Am. Compl. Exs. 1–5 at PageID 285, 294, 298, 312, 323), and by alleging that in his role, "Tatum had access to Grove Bags' confidential business information," and even "helped develop Grove Bags' confidential customer information." (*Id.* at ¶ 94, 98, 101.) Plaintiff also shows Tatum's use of its trade secrets by alleging that,"Tatum is utilizing confidential business information and trade secrets in the performance of his Calyx duties." (*Id.* at ¶ 159.) With regard to Calyx, Plaintiff sufficiently claims that Calyx acquired and is using Plaintiff's trade secrets through its work with Tatum by alleging that, "[f]ollowing MJBizCon, Grove Bags learned that Tatum and Calyx were competing for work with a prospective Grove Bags' customer" (*id.* at ¶ 180), that "Calyx is directly soliciting Grove Bags' customers" (*id.* at ¶ 182), and that "Calyx is utilizing its relationship with Tatum to improperly solicit Grove Bags' customers" (*id.* at ¶ 183).

While these allegations primarily relate to Plaintiff's customer lists, which it claims are trade secrets, the court, accepting the allegations as true, can draw a reasonable inference that Tatum and Calyx misappropriated Plaintiff's trade secrets. Therefore, the court denies Defendants' Motions to Dismiss Plaintiff's misappropriation of trade secrets claim (Count III).

### 2. Tortious Interference with Business/Economic Relations

Ohio law recognizes claims for tortious interference with contract and for interference with a business relationship. *Georgia-Pac. Consumer Prods. LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1102 (6th Cir. 2012). In its Preliminary Injunction Order, the court determined Plaintiff had shown a strong likelihood of success on the merits of its tortious interference with contract claim.

(Prelim. Inj. Order at PageID 1343–46.) Therefore, the court denies Calyx's Motion with respect to that claim for the reasons underlying its preliminary injunction decision.

To prove tortious interference with business or economic relations under Ohio law, a plaintiff must show, "(1) a business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom." *Horter Inv. Mgmt., LLC v. Cutter*, 257 F. Supp. 3d 892, 923 (S.D. Ohio 2017) (quoting *Ginn v. Stonecreek Dental Care*, 30 N.E.3d 1034, 1039 (Ohio Ct. App. 2015)).

Defendants argue first that Plaintiff's tortious interference with business relationships claim fails because it relies on the same operative facts as Plaintiff's misappropriation of trade secrets claim under OUTSA and is therefore preempted. (Calyx Mot. at PageID 421; Tatum Mot. at PageID 447.) Plaintiff does not address Defendants' preemption argument, and contends its tortious interference with business relationships claim survives because it has alleged facts showing Defendants knowingly soliciting Grove Bags' prospective and current customers. (Opp'n to Calyx Mot. at PageID 490; Opp'n to Tatum Mot. at PageID 601 (both citing Am. Compl. ¶¶ 159, 182–186).) Defendants' preemption argument is well-taken.

The Ohio Uniform Trade Secrets Act displaces "conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret." Ohio Rev. Code § 1333.67(A). OUTSA does not preempt civil remedies "not based on misappropriation of a trade secret." *Id.* In the Sixth Circuit, "courts analyzing whether OUTSA preempts a particular claim must look to whether that claim relies on the same operative facts that formed the basis for the party's trade secret misappropriation claim." *Campfield v. Safelite Grp., Inc.*, 91 F.4th 401, 414 (6th Cir. 2024). However, when a portion of the claim is supported by an independent factual basis, that

portion survives preemption. *Id. See also Stolle Mach. Co., LLC v. RAM Precision Indus.*, 605 F. App'x 473, 484–85 (6th Cir. 2015).

Here, the factual allegations Grove Bags makes in support of its tortious interference with business relations claim are the same operative facts supporting its misappropriation of trade secrets claim. In support of its tortious interference claim, Plaintiff alleges that, "Tatum is utilizing confidential business information and trade secrets in the performance of his Calyx duties," and that "Calyx is directly soliciting Grove Bags' customers [and] utilizing its relationship with Tatum to improperly solicit Grove Bags' customers." (Am. Compl. ¶ 159, 182–83.) These allegations rely on Defendants' misuse of Plaintiff's customer lists, which Plaintiff claims are trade secrets protected under Ohio and federal law. (*Id.* at ¶ 79.) Consequently, the same operative facts underlie both claims, and thus OUTSA preempts Plaintiff's tortious interference with business relationships claim. *See Keller N. Am., Inc v. Earl*, No. 1:20CV2401, 2021 WL 3737915, at *5 (N.D. Ohio Aug. 24, 2021) (finding OUTSA preempted plaintiff's tortious interference with business opportunities claim because plaintiff also alleged its business opportunities were trade secrets).

Accordingly, the court dismisses Count IV against Calyx and Tatum.

### 3. Civil Conspiracy

Grove Bags alleges one count for civil conspiracy against both Defendants. Plaintiff claims Defendants conspired unlawfully to use its trade secrets, interfere with its customer relationships, and hide their employment relationship to avoid litigation and ultimately damage Grove Bags. (Am. Compl. ¶¶ 262–65.) Defendants argue that Plaintiff's civil conspiracy claim fails because (1) it is preempted by OUTSA, (2) Plaintiff has not sufficiently alleged an underlying unlawful act, and (3) it is barred by the intra-corporate conspiracy doctrine. (Calyx Mot. at PageID 424–25; Tatum Mot.

at PageID 449–50.) Plaintiff does not address any of Defendants' arguments, and merely restates the civil conspiracy elements and contends, without citing its Amended Complaint, that Tatum and Calyx were aware of Tatum's contractual obligations to Grove Bags and of Tatum's breach. (Opp'n to Calyx Mot. at PageID 490; Opp'n to Tatum Mot. at PageID 602.)

Under Ohio law, civil conspiracy is "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995) (quoting *LeFort v. Century 21-Maitland Realty Co.*, 512 N.E.2d 640, 645 (Ohio 1987)) (internal quotations omitted). To establish a claim of civil conspiracy, the plaintiff must prove four elements: "(1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." *Aetna Cas. & Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519 (6th Cir. 2000) (quoting *Universal Coach, Inc. v. New York City Transit Auth., Inc.*, 629 N.E.2d 28 (Ohio Ct. App. 1993)). The malice involved in the tort "is that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another." *Fed. Ins. Co. v. Webne*, 513 F. Supp. 2d 921, 927 (N.D. Ohio 2007) (quoting *Pickle v. Swinehart*, 166 N.E.2d 227 (Ohio 1960)).

To the extent that Grove Bags' civil conspiracy claim hinges on its allegations that Defendants misappropriated its trade secrets (*see* Am. Compl. ¶ 262), that part of its claim is preempted by OUTSA. Consequently, for Plaintiff's civil conspiracy claim to survive, it must arise from facts unrelated to those supporting its misappropriation of trade secrets claim.

Grove Bags also cannot rely on its tortious interference with business or economic relations claim as the "unlawful act independent from the actual conspiracy" because the court already

dismissed that count for failure to state a claim. Plaintiff's argument that the underlying unlawful act is Defendants' "secret plan to violate Tatum's contractual obligations to Grove Bags" also cannot rescue its civil conspiracy claim.

Ohio law only recognizes a conspiracy to tortiously interfere with a contractual relationship when the claim "involve[s] two or more non-parties to the contract conspiring to induce a party to breach his contract." *Hicks v. Bryan Med. Grp., Inc.*, 287 F. Supp. 2d 795, 814 (N.D. Ohio 2003) (quoting *Wagoner v. Leach Co.*, No. 17580, 1999 WL 961166, at *19 (Ohio Ct. App. July 2, 1999) (internal quotations omitted). Such conspiracy claims are limited because, "[i]t makes no sense to say that a party conspired to induce himself to breach a contract." *Id.* Here, Grove Bags alleges Tatum conspired with Calyx to breach his own contract with Grove Bags. Thus, because Grove Bags' tortious interference claim involves a party to the contract and only one non-party, its civil conspiracy claim cannot rest on its tortious interference with contract claim.

Because Grove Bags fails to allege an unlawful act independent of the conspiracy, the court concludes that Plaintiff has not stated a claim for civil conspiracy upon which relief can be granted. Consequently, the court dismisses Count VI against Calyx and Tatum.

### 4. Deceptive Trade Practices

Plaintiff asserts that Defendants violated § 4165.02(A)(9) of the Ohio Deceptive Trade Practices Act ("ODTPA") by "representing that Calyx's goods are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and that Defendants violated § 4165.02(A)(10) of the ODTPA by "disparaging the goods of Grove Bags through false representations of fact." (Opp'n to Calyx Mot. at PageID 491; Opp'n to Tatum Mot. at PageID 602.) The alleged "statements" underlying these ODTPA violations are: (1) "Defendants are utilizing

Tatum to falsely provide customers with the belief that Calyx's packaging products are comparable to Grove Bags' packaging products," (¶ 277) and; (2) "Defendants are utilizing Tatum to falsely provide customers with the belief that Calyx's pricing for its inferior products are lower than Grove Bags' pricing" (¶ 278). (*Id.*)

Defendants argue that Plaintiff's ODTPA claim fails because Plaintiff has not identified any false or misleading statements by either Defendant. (Calyx Mot. at PageID 425; Tatum Mot. at PageID 451.) Additionally, Defendants contend that Plaintiff's general allegations are too vague and subjective to be actionable under ODTPA. (Calyx Mot. at PageID 427; Tatum Mot. at PageID 451.) Defendants' arguments are well-taken.

The ODTPA statute provides, in relevant part, that,

> A person engages in a deceptive trade practice when [...] the person does any of the following: [...] represents that goods or services are of a particular standard, quality, or grade [...]; disparages the goods, services, or business of another by false representation of fact[.]

Ohio Rev. Code. § 4165.02(A)(9)–(10). The necessary elements for an ODTPA claim have been described as, "(1) a false statement or statement that is misleading, (2) which statement actually deceived or has the tendency to deceive a substantial segment of the target audience, (3) the deception is material in that it is likely to influence a purchasing decision, and (4) the plaintiff has been or is likely to be injured as a result." *Torrance v. Rom*, 157 N.E.3d 172, 188 (Ohio Ct. App. 2020).

In *Torrance*, the plaintiff presented sufficient factual allegations that his decision to invest in Cleveland-area properties was influenced by the defendants' misleading statements, including those on a marketing website. *Id.* at 190. The plaintiff's complaint included numerous specific

statements by the defendants' about their property management capabilities, as well as factual allegations disputing the veracity of the defendants' marketing statements. *Id.* at 190–92. For example, one of the alleged statements included in the complaint read: "[n]o matter where you live, work, and play, our team of professionals makes it possible for you to invest in high-return US real estate. We focus on not only the acquisition of properties, but also on value-added renovations, portfolio development and growth of assets with excellent ROI." *Id.* at 190 (quoting ¶ 45 of the complaint). The *Torrance* plaintiff then refuted the truth of this statement by alleging that, "IIP Management lacked trained, certified maintenance workers. It lacked systems, policies and/or procedures. It lacked credit with which to purchase materials. Instead, IIP Management (a) employed workers who had their own, separate businesses, which they ran while being paid to perform IIP Management work, and (b) allowed contractors to define their own scopes of work." *Id.* at 191 (quoting ¶ 92 of the complaint). Together, these factual allegations were enough to satisfy the false or misleading statement element of a ODTPA claim.

Conversely, Plaintiff here alleges no direct statements by Defendants. At best, Plaintiff alleges that Defendants are leading customers to believe that Calyx's products are comparable to Plaintiff's, and cheaper. Indeed, Plaintiff never actually alleges what Calyx or Tatum *said* to these customers. Such alleged statements could have appeared in marketing materials, like those in *Torrance*, or simply placed in a more specific context of where and when they allegedly occurred. But the court cannot draw a reasonable inference that Defendants made a false or misleading statement from Plaintiff's allegation that Defendants are using Tatum to "falsely provide customers with the belief" that Calyx's packaging products are comparable to, and cheaper than, Grove Bags'.

Even if the court were to generously construe the above allegation as a false statement satisfying the first element, the claim still fails because Plaintiff does not allege that the "deception is material in that it is likely to influence a purchasing decision." *Torrance*, 157 N.E.3d at 188. In *Torrance*, the plaintiff alleged that the defendants' misleading statements about their property management services were "inextricably linked" to his decision to invest his personal money into Cleveland-area real estate. *Id.* at 191–92. Plaintiff here does not draw a connection between Defendants' "falsely providing customers with the belief" that Calyx's products are comparable and cheaper than Grove Bags,' because Plaintiff does not allege anywhere in the Amended Complaint that any customers did or were likely to purchase Calyx's products over Plaintiff's. Thus, Plaintiff fails to allege every element of an ODTPA claim. The court thereby dismisses Plaintiff's deceptive trade practices claim (Count VII) against Calyx and Tatum.

In conclusion, the court finds that Plaintiff has stated a claim upon which relief can be granted for its breach of contract (Counts I and II), misappropriation of trade secrets (Count III), and tortious interference with contract (Count V) claims. The court dismisses, however, Plaintiff's tortious interference with economic/business relations (Count IV), civil conspiracy (Count VI), and deceptive trade practices (Count VII) claims for failure to state a claim.

### IV. CONCLUSION

For the foregoing reasons, Calyx's Motion to Dismiss the Amended Complaint (ECF No. 19) is denied with respect to its personal jurisdiction and venue arguments, and with respect to Plaintiff's misappropriation of trade secrets (Count III) and tortious interference with contract claims (Count V). Calyx's Motion is granted with respect to Plaintiff's tortious interference with economic/business relationships (Count IV), civil conspiracy (Count VI), and deceptive trade practices (Count VII)

claims.

Tatum's Motion to Dismiss the Amended Complaint is denied with respect to its personal jurisdiction and venue arguments, and with respect to Plaintiff's breach of contract (Counts I and II) and misappropriation of trade secrets (Count III) claims. Tatum's Motion is granted with respect to Plaintiff's tortious interference with economic/business relationships (Count IV), civil conspiracy (Count VI), and deceptive trade practices (Count VII) claims.

The court also denies Calyx's December Motion to Dismiss (ECF No. 6) and its Oral Motion to Stay Discovery (ECF No. 40) as moot.

/S/ *SOLOMON OLIVER, JR.*
UNITED STATES DISTRICT COURT

September 17, 2025



**EXHIBIT 5**

**EXHIBIT 2**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CIVIL ACTION No. 25-cv-01321-CYC

MICHAEL RYAN TATUM, an individual; CALYX CONTAINERS, LLC, a Colorado limited
liability company, CHAZ HERMANOWSKI, an individual, and JACOB TORRISON, an
individual,

      Plaintiffs,

v.

KINZIE ADVANCED POLYMERS LLC d/b/a GROVE BAGS, an Ohio limited liability
company.

      Defendant.

---

**VERIFIED FIRST AMENDED COMPLAINT AND JURY DEMAND**

---

COME NOW, Plaintiffs Michael Ryan Tatum ("Tatum"), Calyx Containers, LLC

("Calyx"), Chaz Hermanowski ("Hermanowski"), and Jacob Torrison ("Torrison") (collectively

"Plaintiffs"), by and through their counsel, 3i Law, LLC, and for their Verified First Amended

Complaint state as follows:

**1.      PARTIES, JURISDICTION, AND VENUE**

1.      Tatum is an individual residing at 5147 Chicory Circle, Brighton, Colorado.

2.      Calyx is a Colorado limited liability company with a principal office located at 392

Mill Creek Cir., Vail, Colorado.

3.      Hermanowski is an individual residing at 5415 Flower Court, Arvada Colorado.

4.      Torrison is an individual residing at 4460 E. 121st Court, Thornton, Colorado.

1

**EXHIBIT 2**

5.     Defendant, Kinzie Advanced Polymers LLC d/b/a Grove Bags ("Defendant"), is an Ohio limited liability company with a registered agent located at 5 Lake House Lane, City of Hunting Valley, State of Ohio.

6.     On or about February 1, 2023, Defendant and Tatum entered into an agreement for the employment of Tatum ("Tatum Employment Agreement"), attached and referenced herein as **Exhibit 1**.

7.     On or about January 1, 2022, Defendant and Hermanowksi entered into an agreement for the employment of Hermanowksi ("Hermanowksi Employment Agreement"), attached and referenced herein as **Exhibit 2**.

8.     On or about January 1, 2022, Defendant and Torrison entered into an agreement for the employment of Torrison ("Torrison Employment Agreement"), attached and referenced herein as **Exhibit 3**.

9.     This is a civil action between five parties.  Each party is a citizen of a different state.  The amount in controversy of this Complaint exceeds $75,000.00.  As such, Plaintiffs invoke the jurisdiction of the court pursuant to Article III § 2 of the U.S. Constitution, 28 U.S.C. § 1332.

10.    Venue is fair and proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this state, and because Plaintiffs are citizens of the state of Colorado and Tatum, Hermanowski, and Torrison entered into their respective Employment Agreements in the state of Colorado, and performed under the Employment Agreements in the state of Colorado.  Additionally, C.R.S. § 8-2-113(6) prohibits covenants not to compete from requiring a worker who primarily resided or worked in Colorado to adjudicate the enforceability of the covenant outside of Colorado.  Colorado Revised Statute §

2

**EXHIBIT 2**

8-2-113(7) further authorizes a worker or prospective employer to seek a declaratory judgment in a court of competent jurisdiction in Colorado as to the unenforceability of such a covenant.

11.     Defendant knew Plaintiffs Tatum, Hermanowski, and Torrison were Colorado residents at the time of hire and expressly acknowledged Tatum's and Torrison's residence in Colorado in their respective Employment Agreements.[1]   *See* Exh. 1, Tatum Employment Agreement, ¶ 1; Exh. 3, Torrison Employment, ¶ 1.

12.     Although the Employment Agreements at issue contain a forum-selection clause designating a different jurisdiction, venue in the State of Colorado is proper because enforcing that clause would contravene Colorado's strong public policy.  Colorado has a significant connection to the parties and the dispute, and courts may decline to enforce a forum-selection clause where doing so would violate the forum state's fundamental public policy.  *See Morris v. Towers Fin. Corp.*, 916 P.2d 678, 682 (Colo. App. 1996) (refusing to enforce a forum-selection clause designating New York where it conflicted with Colorado's public policy under the Colorado Wage Claim Act).

## GENERAL ALLEGATIONS RELATED TO TATUM AND CALYX

13.     At all times relevant, Tatum was a resident of the State of Colorado.

14.     At all times relevant, Calyx was a Colorado limited liability company.

15.     Defendant is a packaging manufacturing company specializing in a variety of industries.

---

[1] At all times relevant, Hermanowski was a resident of the state of Colorado.  At the time he signed the Hermanowski Employment Agreement, he was between leases on two properties in Colorado and so had Defendant use Hermanowski's parents' address in Florida.  *See* Exh. 2, Hermanowski Employment Agreement, ¶ 1.

3

# EXHIBIT 2

16.     Tatum initially worked for Defendant as an independent contractor, beginning in 2020.

17.     Upon the conclusion of his independent contractor relationship approximately three months later, Tatum was hired by Defendant as a full-time employee.

18.     At the time he commenced his employment with Defendant, Tatum executed a written employment agreement.

19.     In or about January 2023, Tatum received a raise.  Defendant subsequently presented Tatum with the Tatum Employment Agreement, which replaced the prior employment agreement(s) previously executed between the parties.

20.     When presenting the Tatum Employment Agreement, Defendant informed Tatum that signing was required to retain his pay raise, and that refusal to sign would result in a reduction in pay.

21.     Defendant did not provide Tatum with a separate notice of the restrictive covenants contained in the Tatum Employment Agreement, nor was Tatum given the required 14 days' advance notice, or any notice at all.

22.     On February 1, 2023, Tatum signed the Tatum Employment Agreement at Defendant's insistence, without knowledge of his rights under Colorado law and without any opportunity to consult legal counsel or conduct research regarding those rights.

23.     The Tatum Employment Agreement contains a covenant not to compete which states:

> While employed by the Company and for a period of two (2) years immediately following the voluntary or involuntary termination of Employee's employment with the Company for any reason, Employee will not, in the United States or Canada, either directly or

4

**EXHIBIT 2**

indirectly, either independently or by act in concert with others, whether as an employee, consultant, advisor, independent contractor, agent, sole proprietor, partner, joint venture, officer, owner, or director, engage in, provide any services to or on behalf of, or promote or assist, financially or otherwise, any business entity which is engaged, in whole or in part, in any business activity which is competitive with the business of the Company or its affiliates including, but not limited to, the manufacturing, marketing, distribution, or sale of packaging including packaging targeted to the hemp and/or cannabis industries.

Exh. 1, Tatum Employment Agreement, § 6(a).

24.     The Tatum Employment Agreement contains a non-solicitation provision, which states:

While employed by the company and for a period of two (2) years immediately following the voluntary or involuntary termination of Employee's employment with the Company for any reason, Employee will not, either directly or indirectly solicit, contact, induce, or attempt to induce the Company's current or prospective contractors, clients, customers, suppliers, vendors, licensees, licensors, franchisees, franchisors, or any persons or entities with business relations with the Company to cease doing business with the Company, or in any way interfere with the relationship between any such current or prospective contractors, clients, customers, suppliers, vendors, licensees, licensors, franchisees, franchisors, or business relation with the Company.

Exh. 1, Tatum Employment Agreement, § 6(b).

25.     The Tatum Employment Agreement also includes a choice-of-law and forum-selection clause that purports to require the application of Ohio law and mandates that any disputes arising from the agreement be resolved exclusively in an Ohio forum. Exh. 1, Tatum Employment Agreement, § 16.

26.     Tatum was employed by Defendant as its Chief Commercial Officer from February 1, 2023, through August 24, 2023.

5

EXHIBIT 2

27. On or about August 24, 2023, Defendant terminated Tatum's employment.

28. Following his termination in August 2023, Tatum was compelled to accept lower-skilled employment unrelated to his area of expertise, as any position utilizing his professional skills would have risked violating the restrictive covenants contained in the Tatum Employment Agreement.

29. In October 2023, Tatum learned that Calyx, a cannabis packaging company, had expanded its capabilities to include label and flex pack printing as well as corrugated box manufacturing. At the time, Tatum was working with a client who was actively seeking those specific services.

30. Calyx approached Tatum in February 2024 and presented him with verbal offer to come work for them.

31. Believing he was bound by the terms of the restrictive covenants set forth in his Tatum Employment Agreement, Tatum informed Calyx he was unable to join the company.

32. Calyx approached Tatum again in March 2024, offering him a position as Director of Sales and Marketing with a projected on-target earnings ("OTE") salary of $240,000–$260,000 per year.

33. Again, Tatum declined the offer based on his belief in the enforcement of the restrictive covenants set forth in his Tatum Employment Agreement.

34. After Tatum declined the position for a second time, both Tatum and Calyx began evaluating the enforceability of the restrictive covenants contained in the Tatum Employment Agreement.

6

**EXHIBIT 2**

35.     Following their investigation, Tatum and Calyx discovered that Colorado law disfavors restrictive covenants and that the provisions contained in the Tatum Employment Agreement are unenforceable under applicable state law.

36.     After making this determination, but erring on the side of caution, Tatum accepted a lesser role with Calyx as an independent contractor rather than an employee in September 2024, pending further clarity regarding the enforceability of the restrictive covenants.

37.     As a consultant for Calyx, Tatum is compensated at a rate of $45 per hour, which will result in average annual earnings of approximately $93,000-$105,000.

38.     Approximately one month after beginning as a consultant with Calyx, on or about October 29, 2024, Defendant filed an action in the United States District Court, Northern District of Ohio, case number 1:24-cv-01887 ("Ohio Action"), against Calyx and Tatum attempting to enforce the restrictive covenants contained in the Tatum Employment Agreement.

**2022 Revisions to Colorado's Restrictive Covenant Statute**

39.     In 2022, Colorado significantly reformed the state's non-competition statute, codified at C.R.S. § 8-2-113.  These changes went into effect on August 10, 2022.

40.     Under the revised statute, non-competition and non-solicitation agreements are generally void unless certain specific conditions are met.  *See* C.R.S. § 8-2-113(2)(a) ("Except as provided in subsection (2)(b) and (3) of this section, any covenant not to compete that restricts the right of any person to receive compensation for performance of labor for any employer is void.").

41.     Under the revised statute, a non-compete or non-solicitation agreement is only enforceable if the worker qualifies as a "highly compensated worker," as  such threshold is determined by the Colorado Department of Labor and Employment, both at the time the agreement

7

**EXHIBIT 2**

is entered into and at the time it is enforced; the agreement is for the protection of trade secrets; and the restriction is no broader than reasonably necessary to protect the employer's legitimate interest in protecting trade secrets. C.R.S. § 8-2-113(2)(b); C.R.S. § 8-2-113(2)(d).

42.     The statute further provides that any non-compete agreement that is otherwise permissible under C.R.S. § 8-2-113(2) or (3) is void unless notice of the restrictive covenant is provided to:

> (I)  A prospective worker before the worker accepts the employer's offer of employment; or
>
> (II)  A current work at least fourteen days before the earlier of:
>
>> (A)  The effective date of the covenant; or
>>
>> (B)  The effective date of any additional compensation or change in the terms or conditions of employment that provides consideration for the covenant.

C.R.S. § 8-2-113(4)(a).

43.     The notice must be contained "in a separate document from any other covenants between the worker and employer and in clear and conspicuous terms in the language in which the worker and employer communicate about the worker's performance." C.R.S. § 8-2-113(4)(b).

44.     "The notice must be signed by the worker." *Id.*

45.     A non-compete agreement "that applies to a worker who, at the time of termination of employment, primarily resided or worked in Colorado may not require the worker to adjudicate the enforceability of the covenant outside of Colorado." C.R.S. § 8-2-113(6).

46.     "Notwithstanding any contractual provision to the contrary, Colorado law governs the enforceability of a covenant not to compete for a worker who, at the time of termination of employment, primarily resided and worked in Colorado." *Id.*

8

# EXHIBIT 2

47.     "A worker who is a party to a covenant not to compete, or a subsequent employer that has hired or is considering hiring the worker, may seek a declaratory judgment from a court of competent jurisdiction or an arbitrator that the covenant not to compete is unenforceable." C.R.S. § 8-2-113(7).

48.     "An employer shall not enter into, present to a worker or prospective worker as a term of employment, or attempt to enforce any covenant that is void" under C.R.S. § 8-2-113. C.R.S. § 8-2-113(8)(a).

49.     Colorado law provides limited exceptions to the general prohibition on restrictive covenants, including provisions related to the repayment of certain training or educational expenses, reasonable confidentiality agreements, covenants tied to the sale of a business, and scholarship repayment requirements in apprenticeship programs.  *See* C.R.S. § 8-2-113(3).

### Defendant's Violations of C.R.S. § 8-2-113

50.     At the time Defendant sought to enforce Tatum's covenant not to compete, Tatum was not a highly compensated individual, as required under C.R.S. § 8-2-113(2)(b) and as further defined under C.R.S. § 8-2-113(2)(c); Tatum was earning between $93,000-$105,000.

51.     In 2024, the Colorado Department of Labor and Employment ("CDLE") specified annualized cash compensation required to be considered a highly compensated individual was $123,750.  *See **Colo. Dep't of Lab. & Emp.,** INFO #1: Key Wage and Hour Rights and Responsibilities in Colorado: the COMPS and PAY CALC Orders* 5 at p.4 (Dec. 8, 2023), https://cdle.colorado.gov/infos.[2]

---

[2] Under C.R.E. 201(b)(2), the Court may take judicial notice of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," such as official government publications.

9

**EXHIBIT 2**

52.     At the time Defendant presented Tatum with the Tatum Employment Agreement, Tatum was a current employee.  Accordingly, Defendant was required to provide Tatum with the terms of the covenant not to compete at least 14 days before the earlier of: (A) the effective date of the covenant; or (B) the effective date of any additional compensation or change in the terms or conditions of employment that provides consideration for the covenant.  *See* C.R.S. § 8-2-113 (4)(a)(II).

53.     Additionally, Defendant was required to provide the requisite notice in a separate document from any other covenants between Tatum and Defendant and in "clear and conspicuous terms in the language in which the worker and employer communicate about the worker's performance."  *Id.* at §§ 4(b).

54.     The notice must be signed by the worker.  *Id.*

55.     Defendant failed to provide separate notice of the covenant not to compete 14 days prior to the effective date of his additional compensation or change in the terms and conditions of his employment.  Instead, Tatum was told if he did not execute the Tatum Employment Agreement that day, he would be receive an immediate reduction in pay.

56.     Because Defendant provided Tatum with no notice of the non-compete agreement whatsoever, there is no notice signed by Tatum, as required under C.R.S. § 8-2-113(4)(b).

57.     Defendant presented the non-compete provision contained in the Tatum Employment Agreement as a mandatory condition of employment, demanding Tatum's immediate acceptance under threat of pay reduction.  Defendant's use of a non-compete provision that is void under C.R.S. § 8-2-113 as a condition of employment constitutes a violation of C.R.S. § 8-2-113(8)(a).

10

## EXHIBIT 2

58.     Defendant's initiation of the Ohio Action to enforce the void non-compete agreement constitutes a further violation of C.R.S. § 8-2-113(8)(a), which expressly prohibits an employer from attempting to enforce any covenant that is void under C.R.S. § 8-2-113.

59.     Defendant continues to pursue the Ohio Action, which if permitted to continue would violate the public policy interests of the State of Colorado because Defendant is attempting to enforce an unlawful contract provision.

60.     At the time of the Tatum Employment Agreement, no statutory exception to C.R.S. § 8-2-113(2)(a) applied to Tatum.

61.     Upon information and belief, Defendant initiated and continues to prosecute the Ohio Action not for the purpose of obtaining a lawful adjudication of rights under the Tatum Employment Agreement.

62.     Rather, Defendant's actions appear intended to exert pressure on both Tatum and Calyx by using the litigation process as a tool to discourage Tatum from continuing in any professional capacity and to deter Calyx from employing him in any role.

63.     Defendant filed the Ohio Action despite having reason to know that the restrictive covenants it sought to enforce were void and unenforceable under Colorado law, including that Tatum was not a highly compensated worker and had not received the statutory notice required under C.R.S. § 8-2-113.

64.     As a result of Defendant's conduct, Calyx's business operations have been disrupted, and its ability to make independent hiring decisions has been impaired.

11

65.     The Ohio Action has also placed Tatum in the position of having to defend against out-of-state litigation based on an invalid covenant, solely for accepting a consulting engagement with a Colorado-based company.

**GENERAL ALLEGATIONS RELATED TO HERMANOWSKI**

66.     Plaintiff Hermanowski began working for Defendant in August 2019 as its fourth employee, during a time when the Company was still struggling to meet payroll.

67.     Reflecting his long-term commitment to building the brand, Hermanowski accepted a lower base salary in exchange for equity potential and executed his first employment agreement with Defendant in or around September 2019.

68.     From August 2019 through January 1, 2022, Hermanowski served as Defendant's Rocky Mountain Sales Manager.  He handled business development and sales across the region, while also performing duties in marketing, HR, and operations due to Defendant's lean team.

69.     Effective January 1, 2022, Defendant promoted Hermanowski to Director of Marketing, increasing his salary to $90,000 and later placing him under the direct supervision of the Company's new Chief Marketing Officer ("CMO").

70.     In connection with this promotion, CEO Jack Grover ("Mr. Grover") offered to rescind Hermanowski's previously granted equity interest in exchange for a higher base salary and performance-based incentives.  However, Mr. Grover implied that accepting the offer would signal a lack of commitment to the Company and reflect poorly on Hermanowski's loyalty.  As a result, Hermanowski declined and retained both his equity and the originally proposed salary.

71.     In connection with the promotion, Hermanowski signed a new employment agreement in January 2022 (the "Hermanowski Employment Agreement"), which included

12

identical restrictive covenants to the Tatum Employment Agreement, fully set forth in paragraphs 24 and 25 herein.  *See* Exh. 1, §§ 6(a)-(b); Exh. 2, §§ 6(a)-(b).

72.     The Hermanowski Employment Agreement also contained an identical forum selection clause to the Tatum Employment Agreement.  *Id.* at § 16.

73.     Throughout his three-year tenure, Hermanowski consistently performed at a high level and was never subject to any performance improvement plan.  In the months leading up to his separation, he received regular praise from the CMO and was entrusted with onboarding new marketing personnel, reflecting the Company's continued confidence in his abilities.

74.     On August 30, 2022, Mr. Grover placed a meeting on Hermanowski's calendar for the following day.  Believing the meeting would involve a performance review or promotion, based on recent successes and milestone achievements, Hermanowski prepared a detailed performance overview in advance.

75.     On August 31, 2022, Hermanowski attended the meeting and was blindsided to learn that Defendant had determined he was no longer a "cultural fit."  He was told there was no longer a place for him with Defendant and was given a severance agreement that he had fewer than 24 hours to review and sign.

76.     Hermanowski was advised that if he did not sign the agreement by the next day, he would be terminated without severance and that the Company would inform others that he had been fired.

77.     Despite diligently seeking legal advice within the limited timeframe, Hermanowski was only able to consult briefly with a family friend in the legal profession, who proposed modest

13

EXHIBIT 2

revisions to narrow the scope of the noncompete.  Defendant summarily rejected all proposed changes and refused to extend the review period.

78.     Under pressure and without the benefit of meaningful legal review, Hermanowski signed the severance agreement on September 2, 2022.

79.     Although the agreement was dated September 2, Defendant unilaterally backdated the effective date to August 31, seemingly to avoid continuing Hermanowski's health insurance coverage through the month of September.

80.     The severance agreement reaffirmed the restrictive covenants from the Hermanowski Employment Agreement without modification.

81.     Defendant failed to provide separate notice of the restrictive covenants in accordance with C.R.S. § 8-2-113(4).

82.     Following his separation, Hermanowski attended a cannabis industry trade show in October 2022 to explore new opportunities in public relations, marketing, and ancillary cannabis services, fields in which he had built his career.

83.     Shortly after the trade show, Hermanowski received a cease-and-desist letter from Defendant's legal counsel asserting the restrictive covenants remained fully enforceable.  The letter demanded that Hermanowski disclose all individuals and companies he had communicated with since his separation, identify any information he had shared concerning Defendant, and confirm that he would remain compliant with all restrictive covenants going forward.

84.     At the time Defendant sought to enforce the restrictive covenants in October 2022, Hermanowski was not employed and therefore did not meet the salary threshold required to qualify as a "highly compensated worker" under C.R.S. § 8-2-113(2)(d).  As of that date, Hermanowski

14

EXHIBIT 2

was not receiving any compensation from Defendant or any other employer and thus did not meet the statutory criteria for lawful enforcement of either a noncompete or non-solicitation provision.

85.     In addition to being unenforceable due to Hermanowski's compensation status at the time of enforcement, the restrictive covenant itself was facially overbroad.  It prohibited Plaintiff from working for any competitor of Defendant in any capacity throughout the United States and Canada for two years following his separation.

86.     This broad restriction would have prevented Plaintiff from working in any meaningful role in his industry, regardless of job function or geographic location, and effectively barred him from continuing his career.

87.     In order to respond, Hermanowski was forced to retain legal counsel using his severance funds.  Unable to sustain the cost of legal representation, and facing ongoing pressure from Defendant's legal team, Hermanowski ultimately acquiesced to the Company's interpretation of the covenants.

88.     As a direct result of Defendant' threats and attempted enforcement of the restrictive covenants, after August 10, 2022, when amendments to C.R.S. § 8-2-113 took effect, Hermanowski withdrew from two promising employment opportunities within the cannabis industry: one with Grasslands (a cannabis public relations and marketing firm) and one with Fish Head Farms (a cannabis-focused nutrient sales company).

89.     Hermanowski did not receive a formal offer from either company due to the chilling effect of Defendant's legal actions, which made clear that Defendant would treat any employment within the broader cannabis sector as a breach of the restrictive covenants.

15

EXHIBIT 2

90.     At the time of his termination, Hermanowski had recently entered into a new lease on a higher-priced residence, an arrangement encouraged by Defendant's leadership to support his role stability.

91.     Following his exit, Hermanowski learned that Defendant's CEO made disparaging comments about him to mutual contacts within the industry, further damaging his professional reputation.

92.     Losing both his job and the brand he helped build caused Hermanowski significant emotional distress, including stress, frustration, and a loss of professional identity. He experienced embarrassment, uncertainty about his future, and financial strain as a result of Defendant's actions and the ongoing enforcement of the restrictive covenants by Defendant continued to compound this harm long after his termination.

93.     Defendant's cease-and-desist letter, sent to Hermanowski in October 2022, marked the first express threat of enforcement under the restrictive covenants contained in his employment and severance agreements.

94.     Following the letter, Defendant continued to assert the validity and enforceability of the noncompete and non-solicitation provisions for the full duration of the two-year restrictive period following Hermanowski's separation.

95.     Defendant's continued assertion of those restrictions created an ongoing chilling effect that deterred Hermanowski from pursuing multiple opportunities within the cannabis industry, his field of established expertise.

16

## EXHIBIT 2

96.     As a result, the injury suffered by Hermanowski was not a one-time event but continued throughout the duration of the purported restriction, which remained in effect through at least September 2, 2024.

97.     Accordingly, Hermanowski's claims are timely under the continuing harm doctrine, as Defendant's enforcement actions imposed a sustained restraint on his employment opportunities and professional advancement.

### GENERAL ALLEGATIONS RELATED TO TORRISON

95.     Torrison began working for Defendant in December 2020 and was later promoted to Central Sales Manager effective January 1, 2022.  At the time of his promotion, Torrison signed a new employment agreement providing a $60,000 annual salary and commission compensation based on sales performance ("Torrison Employment Agreement").

96.     The Torrison Employment Agreement contained included identical restrictive covenants to the Tatum and Hermanowski Employment Agreements.  *See* Exh. 1, §§ 6(a)-(b); Exh. 2, §§ 6(a)-(b); Exh. 3, §§ 6(a)-(b).

97.     The Torrison Employment Agreement also contained an identical forum selection clause to the Tatum and Hermanowski Employment Agreements.  *Id.* at § 16.

98.     Throughout his employment, Torrison consistently met performance expectations and received no formal discipline, performance counseling, or written warnings.

99.     On March 31, 2023, Torrison attended a cannabis/hemp industry convention where he promoted Defendant's alleged proprietary packaging product, Terploc.  The conference took place in a municipality with heightened regulatory scrutiny around medical cannabis packaging,

17

EXHIBIT 2

where compliance with intellectual property and labeling claims was critical to product approval and consumer trust.

100.   In the course of that event, multiple prospective customers asked Torrison to provide proof of a patent for the Terploc product, which Defendant had directed employees to market and represent as patented.

101.   Torrison had not been provided with any documentation verifying that Terploc was, in fact, patented, and became concerned that continuing to make such representations without proof could violate intellectual property, consumer protection, or marketing laws.

102.   Upon returning from the conference, Torrison raised the issue directly with Defendant's management, requesting verification or documentation of the patent status before continuing to represent the product as patented.

103.   Torrison became concerned that continuing to market the product as patented, without verification, could create exposure or liability for both himself and Defendant, particularly given the scrutiny in the regulated cannabis market.

104.   Within 24 hours of raising this concern, Defendant abruptly presented Torrison with a severance agreement and gave him less than eight hours to review and return it.  When Torrison did not sign, he was informed via email on April 7, 2023, that he was being terminated for cause.

105.   Shortly after his termination, Torrison accepted an offer of employment with DIZPOT, a packaging company headquartered in Arizona.  He signed the offer on October 20, 2023, and began onboarding and training in early November 2023.

18

EXHIBIT 2

106. On November 9, 2023, during the course of Torrison's training, DIZPOT executives informed him that Defendant had contacted the company, asserted that Torrison remained subject to a noncompete agreement, and implied legal consequences if he remained employed.

107. That same day, DIZPOT terminated Torrison's employment. Torrison was forced to fly home immediately and abandon a role that offered a base salary of $80,000. Defendant's interference deprived Torrison of this opportunity and caused significant financial harm.

108. At the time Defendant attempted to enforce the alleged noncompete in November 2023, Torrison did not meet the salary threshold required to qualify as a "highly compensated worker" under C.R.S. § 8-2-113(2)(b). Torrison's base salary at DIZPOT was $80,000, well below the $112,500 threshold established by the Colorado Department of Labor and Employment for 2023.

109. Even if the restrictive covenant Defendant attempted to enforce were otherwise valid, it was sweeping in scope. It barred Torrison from working for any competitor of Defendant in any capacity, anywhere in the United States or Canada, for a full year following his separation.

110. The breadth of this restriction would have prevented Torrison from taking on any meaningful role in his field, regardless of function, location, or employer, effectively excluding him from the entire industry.

111. Defendant's actions directly interfered with Torrison's employment contract with DIZPOT and destroyed a valid and valuable economic opportunity.

19

EXHIBIT 2

112. Following his termination and Defendant's interference with subsequent employment, Torrison suffered severe financial instability. He was forced to rely on his spouse to return to full-time work in order to maintain health insurance and housing stability.

113. As a result of Defendant's conduct, Torrison experienced emotional distress, anxiety, and loss of professional identity. Fearing reputational harm, Torrison refrained from seeking further employment in his field.

**DEFENDANT'S ABUSE OF PROCESS AGAINST HERMANOWSKI AND TORRISON**

114. On June 10, 2025, Defendant filed a lawsuit against Plaintiffs Hermanowski and Torrison in the U.S. District Court for the Northern District of Ohio ("Second Ohio Action").

115. The Second Ohio Action seeks declaratory relief affirming the validity of the Hermanowski Employment Agreement and his severance agreement, and of the Torrison Employment Agreement, as well as asserting claims for breach of contract.

116. It contains no factual allegations connecting either plaintiff to any specific conduct that would plausibly support those claims, relying instead on bare, conclusory assertions.

117. Defendant filed the Second Ohio Action shortly after learning Hermanowski and Torrison intended to join the present lawsuit in Colorado.

118. Both Hermanowski and Torrison reside and worked exclusively in Colorado, and the claims they assert in this case concern the enforceability of noncompete provisions governed by Colorado law.

119. Although their employment agreements contain Ohio forum selection clauses, those clauses are unenforceable in this context because Defendant's claims arise from the same

20

**EXHIBIT 2**

employment relationships and implicate restrictive covenants that must be litigated under Colorado law. *See* C.R.S. § 8-2-113(6).

120.    Defendant's attempt to reframe its Ohio complaint as unrelated to noncompete enforcement is a transparent effort to sidestep Colorado's public policy and statutory protections.

121.    Rather than pursue a legitimate legal dispute, Defendant used the filing to retaliate against Hermanowski and Torrison for asserting their legal rights and to deter them from participating in this litigation.

122.    Defendant used the legal process not to seek redress, but to impose cost, fear, and delay; this conduct constitutes an abuse of process.

123.    The Second Ohio Action is the latest in a pattern of legal threats and filings aimed at suppressing former employees who challenge the enforceability of restrictive covenants.

124.    Defendant has now turned those tactics toward Hermanowski and Torrison, using the court system as a weapon in direct response to their protected activity.

125.    The harm to Hermanowski and Torrison includes the cost of defending a meritless action, the burden of litigating in a distant forum, and the chilling of their rights under Colorado law.

### FIRST CLAIM FOR RELIEF
**(Declaratory Judgment that Restrictive Covenants are Void and Unenforceable – C.R.S. § 8-2-113 and § 13-51-105; 28 U.S.C. § 2201 / Fed. R. Civ. P. 57)**

126.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 125 above.

127.    An actual and justiciable controversy exists between Plaintiffs and Defendant concerning the enforceability of the restrictive covenants contained in the Tatum Employment

21

**EXHIBIT 2**

Agreement with Defendant, including but not limited to provisions purporting to restrict Plaintiff's right to engage in lawful employment following his termination.

128. Pursuant to C.R.S. § 8-2-113(2)(a), any covenant not to compete that restricts the right of a person to receive compensation for the performance of labor for any employer is void unless it satisfies the exceptions outlined in the statute.

129. Tatum was not a "highly compensated worker" at the time Defendant attempted to enforce it. Tatum's compensation fell below the threshold set forth by the Colorado Department of Labor and Employment for 2024, as required under C.R.S. § 8-2-113(2)(b) and (c). *See Colo. Dep't of Lab. & Emp., INFO #1, supra* ¶ 50.

130. Additionally, Defendant failed to comply with C.R.S. § 8-2-113(4), which requires that employers provide notice of a restrictive covenant to a current employee at least 14 days in advance, in a separate document, using clear and conspicuous language, and signed by the worker. No such notice was provided to Tatum.

131. The restrictive covenants are not protected by any of the limited statutory exceptions outlined in C.R.S. § 8-2-113(3).

132. Defendant's presentation of the void non-compete as a condition of employment, and its subsequent attempt to enforce that agreement in an out-of-state forum, violates C.R.S. § 8-2-113(8)(a), which prohibits employers from entering into or attempting to enforce a covenant that is void under the statute.

133. Colorado Revised Statute § 8-2-113(6) prohibits employers from requiring workers who primarily resided or worked in Colorado to adjudicate the enforceability of a non-compete agreement outside of Colorado. Defendant's initiation and continued prosecution of the Ohio

22

**EXHIBIT 2**

Action is a direct violation of this statutory protection and contrary to Colorado's strong public policy interest in shielding its workers from unenforceable restrictive covenants.

134.   Tatum and Calyx are entitled under C.R.S. § 8-2-113(7) to seek a declaratory judgment from this Court that the restrictive covenants are void and unenforceable.

135.   This Court is further authorized to issue declaratory relief under C.R.S. § 13-51-105, which empowers courts of record to declare the rights, status, and legal relationships of parties, regardless of whether additional relief is sought.

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in his favor and against Defendant, and issue a declaration that:

1.   The restrictive covenants contained in the Tatum Employment Agreement, including the non-compete and non-solicitation provisions, are void and unenforceable under Colorado law;

2.   Colorado law governs the enforceability of the restrictive covenants pursuant to C.R.S. § 8-2-113(6), regardless of any choice-of-law or forum-selection clause in the Tatum Employment Agreement;

3.   Defendant is prohibited from enforcing or attempting to enforce the restrictive covenants against Tatum;

4.   Any litigation concerning the enforceability of the restrictive covenants must occur in a court of competent jurisdiction in the State of Colorado;

5.   Defendant must cease all efforts to prosecute or maintain the Ohio Action or any other action seeking to enforce the restrictive covenants outside of Colorado; and

23

# EXHIBIT 2

6.      Such other and further relief as the Court deems just and proper, including an award of costs and attorneys' fees as permitted by law

Plaintiffs further requests the Court set this matter for an evidentiary hearing or oral argument on the requested declaratory relief at the Court's earliest convenience, pursuant to Fed. R. Civ. P. 57, so that the controversy regarding the enforceability of the restrictive covenants may be promptly resolved.

## SECOND CLAIM FOR RELIEF
### (Violation of C.R.S. § 8-2-113 / Tatum v. Defendant)

136.    Tatum incorporates by reference the allegations set forth in Paragraphs 1 through 135 as if fully set forth herein.

137.    An employer is prohibited from entering into, presenting to a worker as a term of employment, or attempting to enforce any covenant not to compete that is void under the statute. C.R.S. § 8-2-113(8)(a).

138.    Defendant violated C.R.S. § 8-2-113(8)(a) by presenting Tatum with a void restrictive covenant as a mandatory condition of employment, without the required statutory notice, and under threat of immediate reduction in pay.

139.    Defendant further violated C.R.S. § 8-2-113(8)(a) by initiating the Ohio Action and continuing to pursue enforcement of the void non-compete provision, in direct contravention of the statute and Colorado public policy.

140.    Any worker harmed by such conduct may bring an action for injunctive relief, actual damages, a statutory penalty of $5,000 per violation, and reasonable attorneys' fees and costs.  C.R.S. § 8-2-113(8)(b).

24

**EXHIBIT 2**

141.    Tatum has suffered financial harm as a result of Defendant's unlawful conduct, including lost earning potential, professional disruption, and the burden of defending against an out-of-state lawsuit enforcing void contractual provisions.

WHEREFORE, Plaintiff Tatum respectfully requests that the Court enter judgment in his favor and against Defendant, and award a permanent injunction enjoining Defendant from prosecuting or maintaining the Ohio Action or otherwise attempting to enforce the restrictive covenants contained in the Tatum Employment Agreement, damages in an amount to be determined at trial, statutory penalties, attorney's fees and costs, pre- and post-judgment interest, and any such other and further relief as the Court deems just and proper.  Plaintiff Tatum also reserves the right to seek a temporary restraining order or preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure.

### Third Claim for Relief
### (Abuse of Process / All Plaintiffs v. Defendant)

142.    Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 141 as if fully set forth herein.

143.    Defendant initiated and continues to prosecute the Ohio Action against Plaintiffs Tatum and Calyx, including claims seeking to enforce restrictive covenants that are facially void under Colorado law and inapplicable to Plaintiff Tatum's post-employment activities.

144.    Upon information and belief, Defendant initiated and maintained the Ohio Action not to obtain a lawful adjudication of rights, but to create economic and professional pressure on Plaintiffs by burdening them with costly litigation and casting a cloud over Tatum's ability to work in the industry.

25

145. Defendant initiated the Second Ohio Action against Plaintiffs Hermanowski and Torrison, asserting claims arising from their employment and severance agreements while avoiding direct enforcement of the restrictive covenants in an apparent effort to circumvent Colorado law and deter them from pursuing their rights in this forum.

146. Defendant's use of legal process, including filing and continuing to pursue claims it knew or should have known were unenforceable under Colorado law, was undertaken to deter Plaintiff Tatum from pursuing lawful employment and to chill lawful competition, rather than to obtain a legitimate judicial remedy.

147. Such conduct reflects a willful use of legal proceedings for an ulterior purpose, namely to interfere with Plaintiffs' employment relationships, damage their reputations, and extract leverage in ongoing disputes unrelated to the claims asserted in the Ohio Action and the Second Ohio Action.

148. As a direct and proximate result of Defendant's conduct, Plaintiffs have suffered harm including reputational injury, emotional distress, lost employment opportunities, loss of income, and the incurrence of litigation-related expenses.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendant, and award damages in an amount to be determined at trial, attorneys' fees and costs associated with defending the Ohio Action and the Second Ohio Action, punitive damages to the extent permitted by law, pre- and post-judgment interest, and any further relief this Court deems just and proper.

**EXHIBIT 2**

**FOURTH CLAIM FOR RELIEF**
**(Breach of the Duty of Good Faith and Fair Dealing / Tatum v. Defendant)**

149.    Tatum incorporates by reference the allegations set forth in Paragraphs 1 through 148 as if fully set forth herein.

150.    Tatum and Defendant were parties to a valid and enforceable employment agreement, the Tatum Employment Agreement, which governed the terms and conditions of Tatum's employment, including his compensation, duties, and post-employment obligations.

151.    Under Colorado law, every contract includes an implied covenant of good faith and fair dealing, which requires that neither party engage in conduct that prevents the other from receiving the benefits of the agreement.

152.    Defendant exercised its discretion under the Tatum Employment Agreement in a manner inconsistent with good faith and fair dealing, thereby depriving Tatum of the reasonably expected benefits of the contract.

153.    Specifically, Defendant acted in bad faith by:

a. Presenting Tatum with the Tatum Employment Agreement, and conditioning his previously increased salary on immediate execution of the agreement, without prior notice or opportunity to review the restrictive covenants as required under C.R.S. § 8-2-113;

b. Failing to provide the separate, signed notice required by law before imposing restrictive covenants that would substantially limit Tatum's future employment options;

c. Terminating Tatum's employment without cause on August 24, 2023;

27

d. Presenting Tatum with a severance agreement after his termination that reaffirmed the same restrictive covenants, again without providing requisite notice of restrictive covenants required under C.R.S. § 8-2-113;

e. Providing Tatum with an initial demand for immediate signature, followed by only 24 hours to sign the severance agreement after he raised objections, creating significant economic pressure and depriving him of a reasonable opportunity to seek legal advice or understand his rights under Colorado law;

f. Relying on the restrictive covenants in both the employment and severance agreements to interfere with Tatum's ability to pursue work in his area of expertise, and to justify the filing of out-of-state litigation intended to chill lawful employment activity.

154. Defendant's conduct was not the result of legitimate business judgment or good faith contract enforcement, but rather a deliberate effort to secure leverage over Tatum and suppress his professional mobility using facially invalid contract provisions.

155. As a direct and proximate result of Defendant's breach of the covenant of good faith and fair dealing, Tatum has suffered damages, including lost income, diminished professional opportunities, legal expenses, and emotional distress.

WHEREFORE, Plaintiff Tatum respectfully requests that this Court enter judgment in his favor and against Defendant, and award damages in an amount to be determined at trial, costs, pre- and post-judgment interest, and any further relief this Court deems just and proper.

EXHIBIT 2

## FIFTH CLAIM FOR RELIEF
### (Violation of C.R.S. § 8-2-113 – Hermanowski v. Defendant)

156.    Hermanowski incorporates by reference the allegations set forth in Paragraphs 1 through 155 as if fully set forth herein.

157.    On August 10, 2022, amendments to C.R.S. § 8-2-113 took effect, substantially limiting the enforceability of noncompete and non-solicitation provisions in Colorado employment agreements.

158.    At the time of Hermanowski's termination on September 2, 2022, and at the time Defendant attempted to enforce the restrictive covenants (beginning in or around October 2022), Hermanowski did not qualify as a "highly compensated worker" under the thresholds set by the Colorado Department of Labor and Employment pursuant to C.R.S. § 8-2-113(2)(d).

159.    Additionally, the noncompete provision in the Hermanowski Employment Agreement was not reasonably limited in scope, geography, or duration.

160.    The restriction purported to bar Hermanowski from working in any capacity for any competitor of Defendant throughout the United States and Canada for two years.

161.    Defendant further failed to provide notice of the restrictive covenants in the form and manner required by § 8-2-113(4)(b), including any separate written notice at the time of the severance agreement, which reinforced the restrictive covenants set forth in the Hermanowski Employment Agreement.

162.    In or around October 2022, counsel for Defendant instructed Hermanowski to cease attempting to work with other companies based on the restrictive covenants, despite the covenants being facially unenforceable under both the amended and prior versions of C.R.S. § 8-2-113, as they were not reasonably limited in geographic scope, duration, or job function.

29

## EXHIBIT 2

163. Although Defendant did not initiate legal proceedings at the time, the communication from counsel conveyed an intent to enforce the restrictions, which had the effect of discouraging Hermanowski from pursuing lawful employment opportunities.

164. Defendant's conduct constituted an unlawful attempt to enforce a void covenant, in violation of C.R.S. § 8-2-113(8)(a), as the covenant failed to satisfy statutory requirements and Hermanowski did not meet the compensation threshold for lawful enforcement.

165. As a direct result of Defendant's unlawful conduct, Hermanowski suffered economic harm, lost employment opportunities, and incurred legal expenses.

166. Pursuant to C.R.S. § 8-2-113(8)(b), Hermanowski is entitled to recover actual damages, reasonable attorneys' fees, and costs.

WHEREFORE, Plaintiff Hermanowski respectfully requests that the Court enter judgment in his favor and against Defendant, and award damages in an amount to be determined at trial, statutory penalties, attorney's fees and costs, pre- and post-judgment interest, and any such other and further relief as the Court deems just and proper.

### SIXTH CLAIM FOR RELIEF
**(Breach of the Duty of Good Faith and Fair Dealing / Hermanowski v. Defendant)**

167. Hermanowski incorporates by reference the allegations set forth in Paragraphs 1 through 166 as if fully set forth herein.

168. The Hermanowski Employment Agreement provided for compensation including salary, vested equity (later revoked), and severance-related provisions. It also contained restrictive covenants that purported to limit Hermanowski's post-employment activities.

30

**EXHIBIT 2**

169. Defendant owed Hermanowski a duty of good faith and fair dealing in the performance and enforcement of the employment agreement, as well as in its post-employment dealings arising from that agreement.

170. Hermanowski fulfilled his job responsibilities throughout his tenure and was never subject to any performance improvement plan.

171. Defendant breached its duty of good faith and fair dealing by engaging in a course of conduct designed to deprive Hermanowski of the benefit of his employment relationship and future employment opportunities. This conduct included:

a. Terminating Hermanowski without prior warning and under vague, pretextual circumstances despite his strong performance record;

b. Presenting Hermanowski with a severance agreement under coercive time constraints and rejecting all proposed revisions;

c. Backdating the severance agreement to avoid continuation of Hermanowski's health insurance coverage;

d. Continuing to assert the enforceability of restrictive covenants that were void under Colorado law at the time of enforcement, including because Hermanowski did not meet the statutory compensation threshold and because the provisions were overbroad in scope and geography;

e. Interfering with Hermanowski's subsequent job prospects by threatening legal action against him and asserting post-employment restrictions to third parties; and

f. Forcing Hermanowski to incur legal expenses and to withdraw from viable employment opportunities as a result of these actions.

31

EXHIBIT 2

172.    Defendant's actions were commercially unreasonable and undertaken in bad faith, with the effect of depriving Hermanowski of compensation, career mobility, and the ability to work in his chosen profession.

173.    As a result, Hermanowski suffered financial loss, reputational harm, and significant emotional distress.

WHEREFORE, Plaintiff Hermanowski respectfully requests that the Court enter judgment in his favor and against Defendant, and award damages in an amount to be determined at trial, pre- and post-judgment interest, costs, and any such other and further relief as the Court deems just and proper.

**SEVENTH CLAIM FOR RELIEF**
**(Violation of C.R.S. § 8-2-113 – Torrison v. Defendant)**

174.    Torrison incorporates by reference the allegations set forth in Paragraphs 1 through 173 as if fully set forth herein.

175.    On or after August 10, 2022, amendments to C.R.S. § 8-2-113 rendered noncompete and non-solicitation agreements presumptively void unless specific statutory conditions are met, including that the worker qualifies as a "highly compensated worker" at the time of enforcement.

176.    Torrison executed the Torrison Employment Agreement, which contained a non-competition provision restricting Torrison from competing with Defendant for one year following termination anywhere in the United States or Canada.

177.    Torrison was terminated by Defendant in April 2023.

32

# EXHIBIT 2

178.    In or around November 2023, Defendant contacted Torrison's new employer and asserted that Torrison was subject to a restrictive covenant prohibiting him from working in the cannabis packaging industry due to his prior employment with Defendant.

179.    At the time of this enforcement attempt, Torrison's base salary was $80,000—substantially below the "highly compensated worker" threshold of $112,500 set by the Colorado Department of Labor and Employment for 2023.

180.    Defendant's act of communicating with Torrison's employer and asserting that he was contractually barred from working in his field constituted an unlawful attempt to enforce a void restrictive covenant, in violation of C.R.S. § 8-2-113(8)(a).

181.    As a direct result of Defendant's conduct, Torrison suffered actual damages, including loss of employment, diminished earning capacity, and interference with professional opportunities. Pursuant to C.R.S. § 8-2-113(8)(b), he is entitled to recover damages, attorneys' fees, and costs.

182.    In the alternative, even if the covenant Defendant attempted to enforce were facially valid under § 8-2-113(2), it was not reasonably limited in geographic scope, duration, or job function. The restriction purports to bar Torrison from working in any capacity for any competitor of Defendant throughout the United States and Canada for a period of one year.

183.    Such a restriction imposed an undue burden on Torrison's ability to earn a living and was not narrowly tailored to protect any legitimate business interest of Defendant.

WHEREFORE, Plaintiff Torrison respectfully requests that the Court enter judgment in his favor and against Defendant, and award damages in an amount to be determined at trial,

EXHIBIT 2

statutory penalties, attorney's fees and costs, pre- and post-judgment interest, and any such other and further relief as the Court deems just and proper.

## EIGHTH CLAIM FOR RELIEF
### (Tortious Interference with Contractual Relations – Torrison v. Defendant)

184.    Torrison incorporates by reference the allegations set forth in Paragraphs 1 through 183 as if fully set forth herein.

185.    In October 2023, Torrison entered into a valid and enforceable employment agreement with DIZPOT, a cannabis packaging company.  The agreement included a guaranteed base salary and commission structure.

186.    Defendant was aware of Torrison's employment with DIZPOT and his role within the company.

187.    On or about November 2023, Defendant contacted DIZPOT and asserted that Torrison was prohibited from working for DIZPOT due to a prior noncompete agreement, despite knowing or having reason to know that no such enforceable agreement existed.

188.    Upon receiving this communication, DIZPOT terminated Torrison's employment the same day.

189.    Defendant's actions were intentional and were undertaken to interfere with Torrison's employment relationship with DIZPOT.

190.    Although the Torrison Employment Agreement contained a noncompete provision, Defendant knew or should have known that the provision was void and unenforceable under Colorado law, because it was not reasonably limited in scope, duration, or job function, and because Torrison did not meet the statutory threshold to be classified as a highly compensated worker under C.R.S. § 8-2-113.

34

# EXHIBIT 2

191.    As a direct result of Defendant's interference, Torrison suffered economic harm, including loss of income, commissions, benefits, and reputational damage.

WHEREFORE, Plaintiff Torrison respectfully requests that the Court enter judgment in his favor and against Defendant, and award damages in an amount to be determined at trial, pre- and post-judgment interest, costs, and any such other and further relief as the Court deems just and proper.

## NINTH CLAIM FOR RELIEF
### (Breach of the Duty of Good Faith and Fair Dealing – Torrison v. Defendant)

192.    Torrison incorporates by reference the allegations set forth in Paragraphs 1 through 191 as if fully set forth herein.

193.    The Torrison Employment Agreement governed the terms of Torrison's employment, including his entitlement to compensation such as base salary, commissions, and accrued leave.  The agreement also governed post-employment obligations, including provisions regarding confidentiality and restrictive covenants.

194.    As a matter of law, every contract includes an implied covenant of good faith and fair dealing, which prohibits a party from acting in a manner that prevents the other party from receiving the benefit of the bargain.  Defendant owed Torrison such a duty in both the performance and enforcement of the Torrison Employment Agreement and in its related conduct during and following the employment relationship.

195.    Torrison fully performed his duties under the employment agreement.  He met or exceeded the expectations of his role and was never subject to disciplinary or corrective action.

35

EXHIBIT 2

196. Defendant breached the implied covenant of good faith and fair dealing by engaging in conduct intended to deprive Torrison of the benefits of his contractual relationship and to unfairly restrict his ability to earn a living after his termination. Such conduct included:

a. Terminating Torrison shortly after he raised concerns about the Company's representations related to its products;

b. Presenting Torrison with a severance agreement under coercive conditions, including a limited time for review and without an opportunity to seek legal counsel, while misrepresenting his rights under Colorado law;

c. Continuing to assert the enforceability of a restrictive covenant that was void under C.R.S. § 8-2-113; and

d. Interfering with Torrison's prospective employment by representing to third parties, including his subsequent employer, that he remained bound by the covenant.

197. Defendant's actions were not the result of good faith contractual enforcement, but instead reflected an effort to avoid obligations under the agreement and to suppress Torrison's post-employment mobility in violation of his contractual and statutory rights.

198. As a direct and proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Torrison has suffered damages including lost compensation, loss of professional standing, emotional distress, and diminished earning capacity.

WHEREFORE, Plaintiff Torrison respectfully requests that the Court enter judgment in his favor and against Defendant, and award damages in an amount to be determined at trial, pre-

EXHIBIT 2

and post-judgment interest, costs, and any such other and further relief as the Court deems just and

proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Docusign Envelope ID: C7AAA5CD-B931-4BEF-A18D-41A77DDAB47C

**EXHIBIT 2**

## VERIFICATION

I, Michael Ryan Tatum, the undersigned, verify under the penalty of perjury, that the contents of this document are true and correct to the best of my knowledge. I am over the age of 18 and I am competent to testify.

Dated this ⎯20⎯ day of June, 2025.



Michael Ryan Tatum

I, Simon Knobel, Chief Executive Officer of Calyx Containers, LLC, the undersigned, verify under the penalty of perjury, that the contents of this document are true and correct to the best of my knowledge. I am over the age of 18 and I am competent to testify.

Dated this ⎯20⎯ day of June, 2025.

Simon Knobel, CEO of Calyx Containers

I, Chaz Hermanowski, the undersigned, verify under the penalty of perjury, that the contents of this document are true and correct to the best of my knowledge. I am over the age of 18 and I am competent to testify.

Dated this ⎯20⎯ day of June, 2025.

Chaz Hermanowski

Docusign Envelope ID: C7AAA5CD-B931-4BEF-A18D-41A77DDAB47C

**EXHIBIT 2**

I, Jacob Torrison, the undersigned, verify under the penalty of perjury, that the contents of this document are true and correct to the best of my knowledge.  I am over the age of 18 and I am competent to testify.

Dated this ___ 20 day of June, 2025.

Signed by:

*Jacob Torrison*

E1323DADE0FD4A0...

Jacob Torrison

**EXHIBIT 2**

DATED  this 20th day of June, 2025.

<div style="margin-left:45%">

Respectfully submitted,

3i Law, LLC
*[A duly signed original on file at office of undersigned.]*

By: /s/ Jessamyn L. Jones
Jessamyn L. Jones
Grant T. Shibao
2000 S. Colorado Blvd. Tower 1
Suite 10000
Denver, CO 80222
Telephone: (303) 245-2162
Facsimile: (303) 245-2108
jjones@3ilawfirm.com
gshibao@3ilawfirm.com

*Attorneys for Plaintiffs*

</div>

40

DocuSign Envelope ID: 202A905E-E4F5-4B98-9809-4098C2E03833

**EXHIBIT 1**

Page 1 of 13                           Michael Tatum Employment



# GROVE BAGS EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement"), is made and entered into as of February 1st, 2023, by and between **KINZIE ADVANCED POLYMERS LLC**, an Ohio limited liability company (dba Grove Bags), having a principal place of business at 26201 Richmond Rd Bedford Heights, OH 44146 (the "Company"), and Michael Tatum having an address at
5147 Chicory Circle Brighton, CO 80601
_____("Employee").

WHEREAS, the Company has created TerpLoc®, a cannabis film that is the first of its kind;

WHEREAS, the Company is a leader in the cannabis industry with valuable contacts with all levels of the supply chain from growers to retailers;

WHEREAS, as an employee of the Company, Employee will have access to the Company's various trade secrets and confidential information belonging to the Company and others;

WHEREAS, this Agreement is a condition of Employee's employment with the Company because this Agreement protects the Company's valuable confidential business information, trade secrets, employment relationships, and customer relationships;

NOW, THEREFORE, in consideration of the promises and mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the parties hereto declare and agree as follows:

4876-4404-1008.1

TATUM-0015

DocuSign Envelope ID: 202A905E-E4F5-4B98-9809-4098C2E03833

**EXHIBIT 1**

1. Employment. Continuing as of February 1st, 2023 (the "Commencement Date"), the Company agrees to, and does hereby, engage Employee and Employee hereby agrees to provide to the Company the Services (as hereinafter defined) upon the terms and conditions of this Agreement.

2. Term. This Agreement shall be effective as of the Commencement Date and continue for no definite term or tenure of employment, subject to the termination and notice requirements set forth in Paragraph 5 below (the "Employment Period"). The first three (3) consecutive months of the Employee's employment under this Agreement are agreed to constitute a period of probation during which the Company shall have the opportunity to assess the suitability of the Employee's performance and conduct (the "Probation Period"). At any time during the Probation Period, Company may terminate the Employee's employment, on the grounds of unsuitability, without providing any working notice or payment in lieu thereof.

3. Compensation. The Company shall pay Employee a base annual salary of $145,000.00 ("Compensation") to be paid in bi-monthly installments. Employee may receive bonus payments of up to $6,500 based on performance of each defined territory, as listed in Exhibit A. Employee receives a $1,000.00 bonus for each of the 6 territories that achieve their goal. An additional $500.00 bonus is available for the team achieving its total goal, regardless of which territories the revenue is generated from. Employee must be an active employee in good standing at time of bonus or commission disbursement to be eligible. Termination of employment by either party results in the employee forfeiting any claim to any and all future bonuses and commissions.

All compensation will be payable in installments in accordance with the Company's standard payroll practice. The Company may consider, in its sole discretion, whether to adjust the Employee's compensation from time to time. The Compensation will be paid to Employee less all applicable withholding of income taxes, social security taxes, or any other required deductions.

4. Position & Duties

4876-4404-1008.1

TATUM-0016

DocuSign Envelope ID: 202A905E-E4F5-4B98-9809-4098C2E03833

(a) Position. Employee shall serve as the Chief Commercial Officer for Company.

(b) Duties. Employee shall have the duties, responsibilities and obligations customarily assigned to individuals serving in the Position in which Employee serves hereunder and such other duties, responsibilities and obligations as the Company shall from time to time specify.

(c) Extent of Duties. Employee shall devote Employee's full business time to the duties required of Employee hereunder and shall use his or her best efforts, judgment, skill, and energy to perform such duties. Employee shall comply with all policies, practices, and procedures of the Company and that Company may elect to adopt from time-to-time, all of which shall remain subject to modification and/or termination at the Company's discretion. Employee agrees that Employee owes a duty of loyalty and good faith to the Company.

(d) Exclusive Employment. Employee shall not, without the prior written consent of the Company, directly or indirectly, during the term of this Agreement, other than in the performance of Employee's duties for the Company and in furtherance thereof, provide services to any person, firm or corporation, or entity, whether for compensation or otherwise.

(e)Kickback. Employee shall not receive any compensation from any vendors or customers while employed at Company. Violation this provision will result in immediate termination, return of compensation to Company, and any damages.

5. Termination.

(a) The Company or Employee may terminate the Agreement and the Employment Period by giving the other party written notice of such termination. The Employee is and shall remain an at-will Employee of the Company and nothing contained in this Agreement shall be deemed to create a principal/agent, partnership, or joint venture relationship between the parties. Upon termination of this Agreement, Employee shall only be

4876-4404-1008.1

TATUM-0017

DocuSign Envelope ID: 202A905E-E4F5-4B98-9809-4098C2E03833

entitled to salary through the date of termination of this Agreement.  No commission or other payments shall survive the termination of the Agreement.

(b) The termination of this Agreement and the Employment Period under any circumstances shall not be deemed to deprive the Company of any rights or release the Employee from any duties which were intended to survive the termination of the employment relationship including, without limitation, such rights and duties established under **Paragraph 6, Paragraph 7,** and **Paragraph 8** herein.

(c) Upon termination of this Agreement, Employee shall immediately discontinue any and all representations that he or she is an Employee of, or otherwise affiliated with, the Company. Employee shall submit all client lists and active accounts to the Company, and Employee acknowledges and agrees that all such client lists and active accounts belong to, and are the property of, the Company.

6. Restrictive Covenants.

(a) **Agreement Not To Directly Compete With The Company.** While employed by the Company and for a period of two (2) years immediately following the voluntary or involuntary termination of Employee's employment with the Company for any reason, Employee will not, in the United States or Canada, either directly or indirectly, either independently or by act in concert with others, whether as an employee, consultant, advisor, independent contractor, agent, sole proprietor, partner, joint venture, officer, owner, or director, engage in, provide any services to or on behalf of, or promote or assist, financially or otherwise, any business entity which is engaged, in whole or in part, in any business activity which is competitive with the business of the Company or its affiliates including, but not limited to, the manufacturing, marketing, distribution, or sale of packaging including packaging targeted to the hemp and/or cannabis industries.

(b) **Non-Solicitation of Customers And Other Third Parties.** While employed by the Company and for a period of two (2) years immediately

4876-4404-1008.1

DocuSign Envelope ID: 202A905E-E4F5-4B98-9809-4098C2E03833

following the voluntary or involuntary termination of Employee's employment with the Company for any reason, Employee will not, either directly or indirectly solicit, contact, induce, or attempt to induce the Company's current or prospective contractors, clients, customers, suppliers, vendors, licensees, licensors, franchisees, franchisors, or any persons or entities with business relations with the Company to cease doing business with the Company, or in any way interfere with the relationship between any such current or prospective contractors, clients, customers, suppliers, vendors, licensees, licensors, franchisees, franchisors, or business relation with the Company

(c) **Non-Solicitation of Employees.** While employed by the Company and for a period of two (2) years immediately following the voluntary or involuntary termination of Employee's employment with the Company for any reason, Employee will not, either directly or indirectly, induce or attempt to induce any employee of the Company to leave the employ of the Company, or in any way interfere with the relationship between the Company and any employee.

(d) **Non-Disparagement.**  Employee agrees and covenants that Employee will not at any time make, publish or communicate to any person or entity or in any public forum any defamatory or disparaging remarks, comments or statements concerning the Company or its business, or any of its employees, officers, and existing and prospective customers, suppliers, investors and other associated third parties.

(e) **Remedies for Breach of Restrictive Covenants.** Employee acknowledges that a breach of this Agreement may cause the Company continuing and irreparable injury which may not be adequately compensated through monetary damages. Employee therefore agrees that in the event of any actual or threatened breach of this Agreement, the Company will be entitled, in addition to any other remedies available to it, to immediate injunctive relief and may obtain a temporary restraining order and injunctive relief to prevent any violations of this Agreement.

(f) **Recovery of Attorneys' Fees.**  In the event of litigation claiming breach of this Agreement by the Employee, the Company shall have the right to

4876-4404-1008.1

DocuSign Envelope ID: 202A905E-E4F5-4B98-9809-4098C2E03833

recover from the Employee its attorneys' fees and costs incurred as a result of such litigation if the Employee is found to have violated this Agreement.

(g) **Continuation of Restrictive Covenants.** Employee's obligations under the Restrictive Covenants contained in this Paragraph 6, including its subparagraphs, are continuing in nature and are intended to survive the termination of this Agreement and Employee's employment with the Company.

7. Confidential Information.

(a) Employee acknowledges and agrees that during the Employment Period, confidential employee, customer, and/or Company information will be or may be made available to Employee, which may include, without limitation, financial information of the Company, information regarding the Company's employees, customers, suppliers, and/or vendors, information regarding the Company's pricing and materials, the Company's computer programs, confidential website and other internet information, and other trade secrets and proprietary information including, without limitation, information relating in any way to any (i) purchasing practices, procedures, and/or techniques used or employed by the Company; (ii) pricing received by the Company from any of the Company's suppliers or vendors; (iii) pricing given by the Company to any of the Company's customers; (iv) names, addresses, email addresses, telephone numbers and all other information regarding the Company's customers; and (v) any products, services, methods, computer/software or any other similar or related matters/items developed, enhanced or modified (collectively, the "Confidential Information").

(b) Employee agrees that the Confidential Information (a) shall be used by Employee solely for the performance of Employee's duties for the Company as directed by the Company from time to time; (b) is the sole and exclusive property of the Company (and Employee shall execute and deliver, at any time, such documents as the Company shall request in order to confirm the same); (c) is absolutely confidential to the Company; and (d) except as expressly permitted in writing by the Company, must not be disseminated, disclosed to others (including, without limitation, employees

4876-4404-1008.1

DocuSign Envelope ID: 202A905E-E4F5-4B98-9809-4098C2E03833

who do not have the Company's authorization to know any such Confidential Information), or used outside of the Company in any manner whatsoever. During the Employment Period, and in the event of the termination of this Agreement, whether voluntary or involuntary, Employee agrees not to use, disclose, transfer or exploit the Confidential Information at any time and in any manner whatsoever (other than using such Confidential Information for the Company's benefit and as expressly permitted by the Company during the Employment Period).

(c) Employee further agrees to immediately return all Company property and documents upon the termination of Employee's contractual relationship with the Company including, without limitation, all such Confidential Information. At all times, Employee agrees that Employee will not take or otherwise remove from the Company any of the Company's property and/or Confidential Information, without the express written consent of the Company.  Employee also agrees to provide the Company with all usernames and passwords for any and all computers, tablets, files, documents, websites, applications, software, or any other electronic or technical device, program, or file in which Employee used and/or created in connection with any duty Employee performed on behalf of the Company. This Section does not apply to any username or password which pertains solely to Employee's personal information or matters that do not involve the Company or its businesses or in any way violate any local, state, or federal law.

(d) Notwithstanding anything contained in this Agreement to the contrary, if Employee is requested or required (by oral questions or request for information or documents in court or administrative proceedings, interrogatories, subpoena, civil investigation, demand or similar court or administrative agency process) to disclose any Confidential Information, Employee will promptly notify the Company of such request or requirement prior to any disclosure of the Confidential Information so that the Company may seek an appropriate protective order and/or consider the possible waiver of Employee's compliance with this Agreement. However, if in the opinion of Employee's counsel, Employee is required by law or regulation

4876-4404-1008.1

DocuSign Envelope ID: 202A905E-E4F5-4B98-9809-4098C2E03833

to disclose the requested information prior to notice to the Company or prior to receipt of the Company's agreement of waiver, Employee may make such disclosure of such information (and only such information) without liability to the Company.

(e) Employee hereby acknowledges and agrees that the Company's remedy at law for any breach of any of Employee's obligations under this **Paragraph 7** would be inadequate, and Employee agrees and consents that temporary and permanent injunctive relief may be granted in any proceeding which may be brought to enforce any provision of this **Paragraph 7** without the necessity of proof of actual damages, it being acknowledged by Employee that any such breach would cause irreparable injury to the Company.

(f) For purposes of this **Paragraph 7**, the term "Company" shall include the Company and all of its parents, subsidiaries, affiliates and related companies and/or entities.

8. Intellectual Property. Employee acknowledges and agrees that all Intellectual Property (hereinafter defined) developed by Employee, solely by Employee or jointly with others, during the Employment Period, whether or not during regular work hours, is a "work made for hire" to the greatest extent permitted by applicable law. Employee hereby assigns, conveys, and transfers to the Company, all of Employee's right, title, estate and interest which Employee has, or may have during the Employment Period, in and to the following:

Any and all intellectual and other intangible property including, without limitation, trade names, trademarks and service marks (whether registered or unregistered) and all registrations and applications therefor, mask works, websites, domain names, works of authorship and all copyrights related thereto, and all registrations and applications therefor, inventions, discoveries, developments, concepts, improvements, designs, industrial models (whether patentable or not), and all patent rights relating thereto and all applications therefor and all reissues, divisions, continuations and extensions thereof, know-how, trade secrets, processes, technology, discoveries, formulae and procedures, and software (collectively

4876-4404-1008.1

TATUM-0022

DocuSign Envelope ID: 202A905E-E4F5-4B98-9809-4098C2E03833

**EXHIBIT 1**

hereinafter referred to as "Intellectual Property"), together with the right to sue for infringement or improper, unlawful or unfair use or disclosure of any of the foregoing.

The assignment set forth in this **Paragraph 8** shall apply to Intellectual Property which meets any one of the following criteria: (a) results, at least in part, from Employee's use of time, equipment, supplies, facility, or trade secret information of the Company; (b) relates, at the time of conception or reduction to practice, directly or indirectly, (i) to the business, project or products of the Company, or the manufacture or utilization thereof, or (ii) to the Company's actual or anticipated research or development; and/or (c) results or arises, directly or indirectly, from any work performed or expected to be performed by Employee for the Company and is conceived or reduced to practice by Employee during or within two (2) years after termination of the Employment Period. The assignment set forth herein shall extend to all Intellectual Property resulting from information obtained by the Employee during the Employment Period, whether or not conceived or reduced to practice by Employee during or after termination of the Employment Period, except as explicitly set forth in this **Paragraph 8.**

9. Reasonableness of Restrictions and Assignment. Employee acknowledges that Employee has carefully read and considered the provisions of this Agreement and, having done so, agrees that the restrictions and requirements set forth in this Agreement including, without limitation, the non-competition provisions set forth in **Paragraph 6**, the Confidential Information restrictions set forth in **Paragraph 7**, and the assignment of Intellectual Property set for in **Paragraph 8** herein, are fair and reasonable and are reasonably required for the protection of the interests of the Company and its officers, members, directors, shareholders and other employees.

10. Employee Benefits. Employee shall be eligible to participate in any benefit plan sponsored or maintained by the Company to the extent that the Company offers such plans and the Employee is eligible to participate under the terms thereof.

4876-4404-1008.1

DocuSign Envelope ID: 202A905E-E4F5-4B98-9809-4098C2E03833

**EXHIBIT 1**

11. Expenses. The Company shall pay or reimburse Employee for out-of-pocket business expenses specific to the Employee's scope of work and sales efforts, in accordance with Company policy. To be eligible for reimbursement, an itemized documentation of expenses must be submitted monthly to the appropriate administrator.

12. Entire Agreement; Modification. This Agreement sets forth the entire agreement and understanding of the parties hereto concerning the subject matter hereof, and, except as otherwise specifically provided below, supersedes all prior and contemporaneous correspondence, agreements, arrangements and understandings, both oral and written, between the parties hereto concerning the subject matter hereof. No modification hereof shall be binding upon the parties hereto except by written instrument duly executed by such parties or their duly authorized representatives.

13. Successor in Interest. This Agreement and the various rights and obligations arising hereunder shall inure to the benefit of and be binding upon the Company and the Company's successors and assigns including, without limitation, any successors in interest as a result of a merger, consolidation or change of name. This Agreement may not be assigned by Employee.

14. Severability. If any term or provision of this Agreement or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the other terms of this Agreement, or the application of such terms or provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

15. Interpretation. The paragraph headings of this Agreement are inserted for convenience only and shall not constitute a part of this Agreement in construing or interpreting any provision hereof. Whenever the context requires, words used in the singular shall be construed to include the plural and vice versa, and pronouns of any gender shall be deemed to include and designate the masculine, feminine, or neuter gender.

4876-4404-1008.1

TATUM-0024

DocuSign Envelope ID: 202A905E-E4F5-4B98-9809-4098C2E03833

**EXHIBIT 1**

Page 11 of 13          Michael Tatum Employment

16. Governing Law. This Agreement shall in all respects be construed in accordance with and governed by the laws of the State of Ohio. Any suit involving any dispute or matter arising under this Agreement may only be brought in the courts of the State of Ohio, in Cuyahoga County. Employee hereby consents to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

17. Counterparts. This Agreement may be executed in any number of counterparts, including electronically, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

18. Waiver. The failure of the Company at any time or from time to time to require performance of any of Employee's obligations under this Agreement shall in no manner affect the Company's rights to enforce any provision of this Agreement at a subsequent time, and the waiver of any rights arising out of any breach shall not be construed as a waiver of any rights arising out of any subsequent or prior breach.

19. Notices. Any notice which may be or is required to be given pursuant to the provisions of this Agreement shall be personally delivered, sent by certified or registered mail, postage prepaid, return receipt requested, or by overnight delivery service and addressed as follows: if to the Company, to Kinzie Advanced Polymers LLC, Attention: Jacob Grover at 26201 Richmond Rd, Bedford Heights, OH 44146; if to the Employee, to Michael Tatum at

The parties hereto have executed this Agreement as of the day and year first above written.

4876-4404-1008.1

TATUM-0025

DocuSign Envelope ID: 202A905E-E4F5-4B98-9809-4098C2E03833

Company:

KINZIE ADVANCED POLYMERS LLC ,
an Ohio limited liability company, dba Grove Bags

By: Daniel Jaffe
Its: CFO

*Dan Jaffe*
8F06C007B06B407...

Date: 2/3/2023

Employee:

Michael Tatum

*Michael Ryan Tatum*
CF403C5D30EA482...

Date: 2/2/2023

4876-4404-1008.1

TATUM-0026

DocuSign Envelope ID: 4A388463-27EC-4332-B3E8-031C97EE2D48



# GROVE BAGS EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement"), is made and entered into as of January 1st, 2022 by and between **KINZIE ADVANCED POLYMERS LLC**, an Ohio limited liability company (dba Grove Bags), having a principal place of business at 1648 Clair St Ave NE Cleveland OH, 44114 (the "Company"), and Chaz Hermanowski having an address at 8298 Bridle Path Boca Raton FL 33496 _____("Employee").

WHEREAS, the financial and business acumen of Employee are valuable to the Company; and

WHEREAS, the Company desires to employ Employee under the terms and conditions set forth below, and Employee desires to accept such employment;

NOW, THEREFORE, in consideration of the promises and mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the parties hereto declare and agree as follows:

1. Employment. Beginning as of January 1st, 2022 (the "Commencement Date"), the Company agrees to, and does hereby, engage Employee and Employee hereby agrees to provide to the Company the Services (as hereinafter defined) upon the terms and conditions of this Agreement.

2. Term. This Agreement shall be effective as of the Commencement Date and continue for no definite term or tenure of employment, subject to the termination and notice requirements set forth in Paragraph 5 below (the

CHAZ-0038

DocuSign Envelope ID: 4A388463-27EC-4332-B3E8-031C97EE2D48

"Employment Period"). The first three (3) consecutive months of the Employee's employment under this Agreement are agreed to constitute a period of probation during which the Company shall have the opportunity to assess the suitability of the Employee's performance and conduct (the "Probation Period"). At any time during the Probation Period, Company may terminate the Employee's employment, on the grounds of unsuitability, without providing any working notice or payment in lieu thereof.

3. Compensation. The Company shall pay Employee a base annual salary of $90,000.00 ("Compensation") to be paid in bi-monthly installments. Employee may receive discretionary bonus payments based on performance, to be determined in Company's sole discretion. All compensation will be payable in installments in accordance with the Company's standard payroll practice. The Company may consider, in its sole discretion, whether to adjust the Employee's compensation from time to time. The Compensation will be paid to Employee less all applicable withholding of income taxes, social security taxes, or any other required deductions.

4. Position & Duties

(a) Position. Employee shall serve as the Director of Marketing for Company.

(b) Duties. Employee shall have the duties, responsibilities and obligations customarily assigned to individuals serving in the Position in which Employee serves hereunder and such other duties, responsibilities and obligations as the Company shall from time to time specify.

(c) Extent of Duties. Employee shall devote Employee's full business time to the duties required of Employee hereunder and shall use his or her best efforts, judgment, skill, and energy to perform such duties. Employee shall comply with all policies, practices, and procedures of the Company and that Company may elect to adopt from time-to-time, all of which shall remain subject to modification and/or termination at the Company's discretion.

CHAZ-0039

DocuSign Envelope ID: 4A388463-27EC-4332-B3E8-031C97EE2D48

Employee agrees that Employee owes a duty of loyalty and good faith to the Company.

(d) Exclusive Employment. Employee shall not, without the prior written consent of the Company, directly or indirectly, during the term of this Agreement, other than in the performance of Employee's duties for the Company and in furtherance thereof, provide services to any person, firm or corporation, or entity, whether for compensation or otherwise.

(e)Kickback. Employee shall not receive any compensation from any vendors or customers while employed at Company. Violation this provision will result in immediate termination, return of compensation to Company, and any damages.

5. Termination.

(a) The Company or Employee may terminate the Agreement and the Employment Period by giving the other party written notice of such termination. The Employee is and shall remain an at-will Employee of the Company and nothing contained in this Agreement shall be deemed to create a principal/agent, partnership, or joint venture relationship between the parties.

(b) The termination of this Agreement and the Employment Period under any circumstances shall not be deemed to deprive the Company of any rights or release the Employee from any duties which were intended to survive the termination of the employment relationship including, without limitation, such rights and duties established under **Paragraph 6, Paragraph 7,** and **Paragraph 8** herein.

(c) Upon termination of this Agreement, Employee shall immediately discontinue any and all representations that he or she is an Employee of, or otherwise affiliated with, the Company. Employee shall submit all client lists and active accounts to the Company, and Employee acknowledges and agrees that all such client lists and active accounts belong to, and are the property of, the Company.

6. Restrictive Covenants.

CHAZ-0040

DocuSign Envelope ID: 4A388463-27EC-4332-B3E8-031C97EE2D48

**EXHIBIT 2**

Page 4 of 12                    Hermanoski Employment

(a) Non-Competition. Employee agrees that during Employee's employment with the Company and for two (2) years following the termination of Employee's employment  with the Company, for any reason, Employee will not, in the United States or Canada, either directly or indirectly, either independently or by act in concert with others, whether as an employee, consultant, advisor, independent contractor, agent, sole proprietor, partner, joint venture, officer, owner, or director, engage in, provide any services to or on behalf of, or promote or assist, financially or otherwise, any business entity which is engaged, in whole or in part, in any business activity which is competitive with the business of the Company or its affiliates including, but not limited to, the manufacturing, marketing, distribution, or sale of packaging including packaging targeted to the hemp and/or cannabis industries.

(b) Non-Solicitation of Customers. Employee agrees that during Employee's term of employment with the Company and for two (2) years following the termination of Employee's employment with the Company, for any reason, Employee will not, either directly or indirectly, either independently or by act in concert with others, whether as an employee, consultant, advisor, independent contractor, agent, sole proprietor, partner, joint venture, officer, owner, or director of any business entity, solicit, divert, take away, or attempt to divert or take away any: (a) customer or business of the Company or its affiliates; or (b) any potential customer or business of the Company or its affiliates that had been actively solicited by the Company or its affiliates at any time during Employee's employment with the Company.

(c) Non-Solicitation of Employees. Employee agrees that during Employee's term with the Company and for two (2) years following the termination of Employee's employment with the Company, for any reason, Employee will not, either directly or indirectly, either independently or in concert with others, whether as an employee, consultant, advisor, independent contractor, agent, sole proprietor, partner, joint venture, officer, owner, or director of any business entity, solicit any employee, partner, member, shareholder, agent, representative, or other person associated with the Company or its affiliates for the purpose of causing

CHAZ-0041

DocuSign Envelope ID: 4A388463-27EC-4332-B3E8-031C97EE2D48

**EXHIBIT 2**

such person(s) to terminate such person(s) employment and/or association with the Company or its affiliates.

(d) Remedies for Breach of Restrictive Covenants. Employee acknowledges that a breach of this Agreement may cause the Company continuing and irreparable injury which may not be adequately compensated through monetary damages. Employee therefore agrees that in the event of any actual or threatened breach of this Agreement, the Company will be entitled, in addition to any other remedies available to it, to immediate injunctive relief and may obtain a temporary restraining order and injunctive relief to prevent any violations of this Agreement.

(e) Continuation of Restrictive Covenants. Employee's obligations under the Restrictive Covenants contained in this Paragraph 6, including its subparagraphs, are continuing in nature and are intended to survive the termination of this Agreement and Employee's employment with the Company.

7. Confidential Information.

(a) Employee acknowledges and agrees that during the Employment Period, confidential employee, customer, and/or Company information will be or may be made available to Employee, which may include, without limitation, financial information of the Company, information regarding the Company's employees, customers, suppliers, and/or vendors, information regarding the Company's pricing and materials, the Company's computer programs, confidential website and other internet information, and other trade secrets and proprietary information including, without limitation, information relating in any way to any (i) purchasing practices, procedures, and/or techniques used or employed by the Company; (ii) pricing received by the Company from any of the Company's suppliers or vendors; (iii) pricing given by the Company to any of the Company's customers; (iv) names, addresses, email addresses, telephone numbers and all other information regarding the Company's customers; and (v) any products, services, methods, computer/software or any other similar or related matters/items developed, enhanced or modified (collectively, the "Confidential Information").

CHAZ-0042

Case No. 1:25-cv-01321-CYD-CYC   Document 19-2   filed 06/26/25   USDC Colorado   pg 55 of 75

EXHIBIT 2

Page 6 of 12                    Hermanoski Employment

(b) Employee agrees that the Confidential Information (a) shall be used by Employee solely for the performance of Employee's duties for the Company as directed by the Company from time to time; (b) is the sole and exclusive property of the Company (and Employee shall execute and deliver, at any time, such documents as the Company shall request in order to confirm the same); (c) is absolutely confidential to the Company; and (d) except as expressly permitted in writing by the Company, must not be disseminated, disclosed to others (including, without limitation, employees who do not have the Company's authorization to know any such Confidential Information), or used outside of the Company in any manner whatsoever. During the Employment Period, and in the event of the termination of this Agreement, whether voluntary or involuntary, Employee agrees not to use, disclose, transfer or exploit the Confidential Information at any time and in any manner whatsoever (other than using such Confidential Information for the Company's benefit and as expressly permitted by the Company during the Employment Period). Employee further agrees to immediately return all Company property and documents upon the termination of Employee's contractual relationship with the Company including, without limitation, all such Confidential Information. At all times, Employee agrees that Employee will not take or otherwise remove from the Company any of the Company's property and/or Confidential Information, without the express written consent of the Company.

(c) Notwithstanding anything contained in this Agreement to the contrary, if Employee is requested or required (by oral questions or request for information or documents in court or administrative proceedings, interrogatories, subpoena, civil investigation, demand or similar court or administrative agency process) to disclose any Confidential Information, Employee will promptly notify the Company of such request or requirement prior to any disclosure of the Confidential Information so that the Company may seek an appropriate protective order and/or consider the possible waiver of Employee's compliance with this Agreement. However, if in the opinion of Employee's counsel, Employee is required by law or regulation to disclose the requested information prior to notice to the Company or prior to receipt of the Company's agreement of waiver, Employee may

CHAZ-0043

DocuSign Envelope ID: 4A388463-27EC-4332-B3E8-031C97EE2D48

make such disclosure of such information (and only such information) without liability to the Company.

(d) Employee hereby acknowledges and agrees that the Company's remedy at law for any breach of any of Employee's obligations under this **Paragraph 7** would be inadequate, and Employee agrees and consents that temporary and permanent injunctive relief may be granted in any proceeding which may be brought to enforce any provision of this **Paragraph 7** without the necessity of proof of actual damages, it being acknowledged by Employee that any such breach would cause irreparable injury to the Company.

(e) For purposes of this **Paragraph 7**, the term "Company" shall include the Company and all of its parents, subsidiaries, affiliates and related companies and/or entities.

8. Intellectual Property. Employee acknowledges and agrees that all Intellectual Property (hereinafter defined) developed by Employee, solely by Employee or jointly with others, during the Employment Period, whether or not during regular work hours, is a "work made for hire" to the greatest extent permitted by applicable law. Employee hereby assigns, conveys, and transfers to the Company, all of Employee's right, title, estate and interest which Employee has, or may have during the Employment Period, in and to the following:

Any and all intellectual and other intangible property including, without limitation, trade names, trademarks and service marks (whether registered or unregistered) and all registrations and applications therefor, mask works, websites, domain names, works of authorship and all copyrights related thereto, and all registrations and applications therefor, inventions, discoveries, developments, concepts, improvements, designs, industrial models (whether patentable or not), and all patent rights relating thereto and all applications therefor and all reissues, divisions, continuations and extensions thereof, know-how, trade secrets, processes, technology, discoveries, formulae and procedures, and software (collectively hereinafter referred to as "Intellectual Property"), together with the right to

DocuSign Envelope ID: 4A388463-27EC-4332-B3E8-031C97EE2D48

EXHIBIT 2

Page 8 of 12                          Hermanoski Employment

sue for infringement or improper, unlawful or unfair use or disclosure of any of the foregoing.

The assignment set forth in this **Paragraph 8** shall apply to Intellectual Property which meets any one of the following criteria: (a) results, at least in part, from Employee's use of time, equipment, supplies, facility, or trade secret information of the Company; (b) relates, at the time of conception or reduction to practice, directly or indirectly, (i) to the business, project or products of the Company, or the manufacture or utilization thereof, or (ii) to the Company's actual or anticipated research or development; and/or (c) results or arises, directly or indirectly, from any work performed or expected to be performed by Employee for the Company and is conceived or reduced to practice by Employee during or within two (2) years after termination of the Employment Period. The assignment set forth herein shall extend to all Intellectual Property resulting from information obtained by the Employee during the Employment Period, whether or not conceived or reduced to practice by Employee during or after termination of the Employment Period, except as explicitly set forth in this **Paragraph 8.**

9. Reasonableness of Restrictions and Assignment. Employee acknowledges that Employee has carefully read and considered the provisions of this Agreement and, having done so, agrees that the restrictions and requirements set forth in this Agreement including, without limitation, the non-competition provisions set forth in **Paragraph 6**, the Confidential Information restrictions set forth in **Paragraph 7**, and the assignment of Intellectual Property set for in **Paragraph 8** herein, are fair and reasonable and are reasonably required for the protection of the interests of the Company and its officers, members, directors, shareholders and other employees.

10. Employee Benefits. Employee shall be eligible to participate in any benefit plan sponsored or maintained by the Company to the extent that the Company offers such plans and the Employee is eligible to participate under the terms thereof.

11. Expenses. The Company shall pay or reimburse Employee for out-of-pocket business expenses specific to the Employee's scope of work and

CHAZ-0045

DocuSign Envelope ID: 4A388463-27EC-4332-B3E8-031C97EE2D48

sales efforts, in accordance with Company policy. To be eligible for reimbursement, an itemized documentation of expenses must be submitted monthly to the appropriate administrator.

12. Entire Agreement; Modification. This Agreement sets forth the entire agreement and understanding of the parties hereto concerning the subject matter hereof, and, except as otherwise specifically provided below, supersedes all prior and contemporaneous correspondence, agreements, arrangements and understandings, both oral and written, between the parties hereto concerning the subject matter hereof. No modification hereof shall be binding upon the parties hereto except by written instrument duly executed by such parties or their duly authorized representatives.

13. Successor in Interest. This Agreement and the various rights and obligations arising hereunder shall inure to the benefit of and be binding upon the Company and the Company's successors and assigns including, without limitation, any successors in interest as a result of a merger, consolidation or change of name. This Agreement may not be assigned by Employee.

14. Severability. If any term or provision of this Agreement or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the other terms of this Agreement, or the application of such terms or provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

15. Interpretation. The paragraph headings of this Agreement are inserted for convenience only and shall not constitute a part of this Agreement in construing or interpreting any provision hereof. Whenever the context requires, words used in the singular shall be construed to include the plural and vice versa, and pronouns of any gender shall be deemed to include and designate the masculine, feminine, or neuter gender.

16. Governing Law. This Agreement shall in all respects be construed in accordance with and governed by the laws of the State of Ohio. Any suit

CHAZ-0046

DocuSign Envelope ID: 4A388463-27EC-4332-B3E8-031C97EE2D48

involving any dispute or matter arising under this Agreement may only be brought in the courts of the State of Ohio, in Cuyahoga County. Employee hereby consents to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

17. Counterparts. This Agreement may be executed in any number of counterparts, including electronically, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

18. Waiver. The failure of the Company at any time or from time to time to require performance of any of Employee's obligations under this Agreement shall in no manner affect the Company's rights to enforce any provision of this Agreement at a subsequent time, and the waiver of any rights arising out of any breach shall not be construed as a waiver of any rights arising out of any subsequent or prior breach.

19. Notices. Any notice which may be or is required to be given pursuant to the provisions of this Agreement shall be personally delivered, sent by certified or registered mail, postage prepaid, return receipt requested, or by overnight delivery service and addressed as follows: if to the Company, to Kinzie Advanced Polymers LLC, Attention: Jacob Grover at 1648 St Clair Ave. NE, Cleveland, OH 44114; if to the Employee, to Chaz Hermanowski at 8298 Bridle Path Boca Raton FL 33496

**[SIGNATURE PAGE FOLLOWS]**

CHAZ-0047

DocuSign Envelope ID: 4A388463-27EC-4332-B3E8-031C97EE2D48

The parties hereto have executed this Agreement as of the day and year first above written.

Company:

KINZIE ADVANCED POLYMERS LLC ,
an Ohio limited liability company, dba Grove Bags

By: Daniel Jaffe
Its: Director of Finance and Human Resources

*Dan Jaffe*

Date: 1/10/2022

Employee:

Chaz Hermanowski

*Chaz Hermanowski*

Date: 1/10/2022

CHAZ-0048

DocuSign Envelope ID: 1152BC65-04A0-4838-9FEF-ED9E87B8FD55

**EXHIBIT 3**

Page 1 of 12              Torrison Employment



## GROVE BAGS EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement"), is made and entered into as of January 1st, 2022 by and between **KINZIE ADVANCED POLYMERS LLC**, an Ohio limited liability company (dba Grove Bags), having a principal place of business at 1648 Clair St Ave NE Cleveland OH, 44114 (the "Company"), and Jacob Torrison having an address at 4460 E 121st CT Thornton, CO 80241 _____("Employee").

WHEREAS, the skill and business acumen of Employee are valuable to the Company; and

WHEREAS, the Company desires to employ Employee under the terms and conditions set forth below, and Employee desires to accept such employment;

NOW, THEREFORE, in consideration of the promises and mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the parties hereto declare and agree as follows:

1. Employment. Beginning as of January 1st, 2022 (the "Commencement Date"), the Company agrees to, and does hereby, engage Employee and Employee hereby agrees to provide to the Company the Services (as hereinafter defined) upon the terms and conditions of this Agreement.

2. Term. This Agreement shall be effective as of the Commencement Date and continue for no definite term or tenure of employment, subject to the termination and notice requirements set forth in Paragraph 5 below (the

TORRISON-0014

DocuSign Envelope ID: 1152BC65-04A0-4838-9FEF-ED9E87B8FD55

"Employment Period"). The first three (3) consecutive months of the Employee's employment under this Agreement are agreed to constitute a period of probation during which the Company shall have the opportunity to assess the suitability of the Employee's performance and conduct (the "Probation Period"). At any time during the Probation Period, Company may terminate the Employee's employment, on the grounds of unsuitability, without providing any working notice or payment in lieu thereof.

3. Compensation. The Company shall pay Employee a base annual salary of $60,000.00 ("Compensation") to be paid in bi-monthly installments. All compensation will be payable in installments in accordance with the Company's standard payroll practice. Employee shall also receive a commission, calculated as percentage of revenue, for profitable sales from accounts made solely by Employee. The breakdown of commission is outlined in Exhibit A to this Agreement. The Company may consider, in its sole discretion, whether to adjust the Employee's compensation from time to time. The Compensation will be paid to Employee less all applicable withholding of income taxes, social security taxes, or any other required deductions.

4. Position & Duties

(a) Position. Employee shall serve as a Central Territory Sales Manager for Company with a goal of generating at least $800,000 in revenue.

(b) Duties. Employee shall have the duties, responsibilities and obligations customarily assigned to individuals serving in the Position in which Employee serves hereunder and such other duties, responsibilities and obligations as the Company shall from time to time specify.

(c) Extent of Duties. Employee shall devote Employee's full business time to the duties required of Employee hereunder and shall use his or her best efforts, judgment, skill, and energy to perform such duties. Employee shall comply with all policies, practices, and procedures of the Company and that Company may elect to adopt from time-to-time, all of which shall remain subject to modification and/or termination at the Company's discretion.

TORRISON-0015

DocuSign Envelope ID: 1152BC65-04A0-4838-9FEF-ED9E87B8FD55

Employee agrees that Employee owes a duty of loyalty and good faith to the Company.

(d) Exclusive Employment. Employee shall not, without the prior written consent of the Company, directly or indirectly, during the term of this Agreement, other than in the performance of Employee's duties for the Company and in furtherance thereof, provide services to any person, firm or corporation, or entity, whether for compensation or otherwise.

(e)Kickback. Employee shall not receive any compensation from any vendors or customers while employed at Company. Violation this provision will result in immediate termination, return of compensation to Company, and any damages.

5. Termination.

(a) The Company or Employee may terminate the Agreement and the Employment Period by giving the other party written notice of such termination. The Employee is and shall remain an at-will Employee of the Company and nothing contained in this Agreement shall be deemed to create a principal/agent, partnership, or joint venture relationship between the parties.

(b) The termination of this Agreement and the Employment Period under any circumstances shall not be deemed to deprive the Company of any rights or release the Employee from any duties which were intended to survive the termination of the employment relationship including, without limitation, such rights and duties established under **Paragraph 6, Paragraph 7,** and **Paragraph 8** herein.

(c) Upon termination of this Agreement, Employee shall immediately discontinue any and all representations that he or she is an Employee of, or otherwise affiliated with, the Company. Employee shall submit all client lists and active accounts to the Company, and Employee acknowledges and agrees that all such client lists and active accounts belong to, and are the property of, the Company.

6. Restrictive Covenants.

TORRISON-0016

DocuSign Envelope ID: 1152BC65-04A0-4838-9FEF-ED9E87B8FD55

EXHIBIT 3

Page 4 of 12                                    Torrison Employment

(a) Non-Competition. Employee agrees that during Employee's employment with the Company and for one (1) year following the termination of Employee's employment  with the Company, for any reason, Employee will not, in the United States or Canada, either directly or indirectly, either independently or by act in concert with others, whether as an employee, consultant, advisor, independent contractor, agent, sole proprietor, partner, joint venture, officer, owner, or director, engage in, provide any services to or on behalf of, or promote or assist, financially or otherwise, any business entity which is engaged, in whole or in part, in any business activity which is competitive with the business of the Company or its affiliates including, but not limited to, the manufacturing, marketing, distribution, or sale of packaging including packaging targeted to the hemp and/or cannabis industries.

(b) Non-Solicitation of Customers. Employee agrees that during Employee's term of employment with the Company and for two (2) years following the termination of Employee's employment with the Company, for any reason, Employee will not, either directly or indirectly, either independently or by act in concert with others, whether as an employee, consultant, advisor, independent contractor, agent, sole proprietor, partner, joint venture, officer, owner, or director of any business entity, solicit, divert, take away, or attempt to divert or take away any: (a) customer or business of the Company or its affiliates; or (b) any potential customer or business of the Company or its affiliates that had been actively solicited by the Company or its affiliates at any time during Employee's employment with the Company.

(c) Non-Solicitation of Employees. Employee agrees that during Employee's term with the Company and for two (2) years following the termination of Employee's employment with the Company, for any reason, Employee will not, either directly or indirectly, either independently or in concert with others, whether as an employee, consultant, advisor, independent contractor, agent, sole proprietor, partner, joint venture, officer, owner, or director of any business entity, solicit any employee, partner, member, shareholder, agent, representative, or other person associated with the Company or its affiliates for the purpose of causing

TORRISON-0017

DocuSign Envelope ID: 1152BC65-04A0-4838-9FEF-ED9E87B8FD55

EXHIBIT 3

Page 5 of 12                    Torrison Employment

such person(s) to terminate such person(s) employment and/or association with the Company or its affiliates.

(d) Remedies for Breach of Restrictive Covenants. Employee acknowledges that a breach of this Agreement may cause the Company continuing and irreparable injury which may not be adequately compensated through monetary damages. Employee therefore agrees that in the event of any actual or threatened breach of this Agreement, the Company will be entitled, in addition to any other remedies available to it, to immediate injunctive relief and may obtain a temporary restraining order and injunctive relief to prevent any violations of this Agreement.

(e) Continuation of Restrictive Covenants. Employee's obligations under the Restrictive Covenants contained in this Paragraph 6, including its subparagraphs, are continuing in nature and are intended to survive the termination of this Agreement and Employee's employment with the Company.

7. Confidential Information.

(a) Employee acknowledges and agrees that during the Employment Period, confidential employee, customer, and/or Company information will be or may be made available to Employee, which may include, without limitation, financial information of the Company, information regarding the Company's employees, customers, suppliers, and/or vendors, information regarding the Company's pricing and materials, the Company's computer programs, confidential website and other internet information, and other trade secrets and proprietary information including, without limitation, information relating in any way to any (i) purchasing practices, procedures, and/or techniques used or employed by the Company; (ii) pricing received by the Company from any of the Company's suppliers or vendors; (iii) pricing given by the Company to any of the Company's customers; (iv) names, addresses, email addresses, telephone numbers and all other information regarding the Company's customers; and (v) any products, services, methods, computer/software or any other similar or related matters/items developed, enhanced or modified (collectively, the "Confidential Information").

TORRISON-0018

DocuSign Envelope ID: 1152BC65-04A0-4838-9FEF-ED9E87B8FD55

**EXHIBIT 3**

(b) Employee agrees that the Confidential Information (a) shall be used by Employee solely for the performance of Employee's duties for the Company as directed by the Company from time to time; (b) is the sole and exclusive property of the Company (and Employee shall execute and deliver, at any time, such documents as the Company shall request in order to confirm the same); (c) is absolutely confidential to the Company; and (d) except as expressly permitted in writing by the Company, must not be disseminated, disclosed to others (including, without limitation, employees who do not have the Company's authorization to know any such Confidential Information), or used outside of the Company in any manner whatsoever. During the Employment Period, and in the event of the termination of this Agreement, whether voluntary or involuntary, Employee agrees not to use, disclose, transfer or exploit the Confidential Information at any time and in any manner whatsoever (other than using such Confidential Information for the Company's benefit and as expressly permitted by the Company during the Employment Period). Employee further agrees to immediately return all Company property and documents upon the termination of Employee's contractual relationship with the Company including, without limitation, all such Confidential Information. At all times, Employee agrees that Employee will not take or otherwise remove from the Company any of the Company's property and/or Confidential Information, without the express written consent of the Company.

(c) Notwithstanding anything contained in this Agreement to the contrary, if Employee is requested or required (by oral questions or request for information or documents in court or administrative proceedings, interrogatories, subpoena, civil investigation, demand or similar court or administrative agency process) to disclose any Confidential Information, Employee will promptly notify the Company of such request or requirement prior to any disclosure of the Confidential Information so that the Company may seek an appropriate protective order and/or consider the possible waiver of Employee's compliance with this Agreement. However, if in the opinion of Employee's counsel, Employee is required by law or regulation to disclose the requested information prior to notice to the Company or prior to receipt of the Company's agreement of waiver, Employee may

DocuSign Envelope ID: 1152BC65-04A0-4838-9FEF-ED9E87B8FD55

**EXHIBIT 3**

make such disclosure of such information (and only such information) without liability to the Company.

(d) Employee hereby acknowledges and agrees that the Company's remedy at law for any breach of any of Employee's obligations under this **Paragraph 7** would be inadequate, and Employee agrees and consents that temporary and permanent injunctive relief may be granted in any proceeding which may be brought to enforce any provision of this **Paragraph 7** without the necessity of proof of actual damages, it being acknowledged by Employee that any such breach would cause irreparable injury to the Company.

(e) For purposes of this **Paragraph 7**, the term "Company" shall include the Company and all of its parents, subsidiaries, affiliates and related companies and/or entities.

8. Intellectual Property. Employee acknowledges and agrees that all Intellectual Property (hereinafter defined) developed by Employee, solely by Employee or jointly with others, during the Employment Period, whether or not during regular work hours, is a "work made for hire" to the greatest extent permitted by applicable law. Employee hereby assigns, conveys, and transfers to the Company, all of Employee's right, title, estate and interest which Employee has, or may have during the Employment Period, in and to the following:

Any and all intellectual and other intangible property including, without limitation, trade names, trademarks and service marks (whether registered or unregistered) and all registrations and applications therefor, mask works, websites, domain names, works of authorship and all copyrights related thereto, and all registrations and applications therefor, inventions, discoveries, developments, concepts, improvements, designs, industrial models (whether patentable or not), and all patent rights relating thereto and all applications therefor and all reissues, divisions, continuations and extensions thereof, know-how, trade secrets, processes, technology, discoveries, formulae and procedures, and software (collectively hereinafter referred to as "Intellectual Property"), together with the right to

DocuSign Envelope ID: 1152BC65-04A0-4838-9FEF-ED9E87B8FD55

EXHIBIT 3

Page 8 of 12                    Torrison Employment

sue for infringement or improper, unlawful or unfair use or disclosure of any of the foregoing.

The assignment set forth in this **Paragraph 8** shall apply to Intellectual Property which meets any one of the following criteria: (a) results, at least in part, from Employee's use of time, equipment, supplies, facility, or trade secret information of the Company; (b) relates, at the time of conception or reduction to practice, directly or indirectly, (i) to the business, project or products of the Company, or the manufacture or utilization thereof, or (ii) to the Company's actual or anticipated research or development; and/or (c) results or arises, directly or indirectly, from any work performed or expected to be performed by Employee for the Company and is conceived or reduced to practice by Employee during or within two (2) years after termination of the Employment Period. The assignment set forth herein shall extend to all Intellectual Property resulting from information obtained by the Employee during the Employment Period, whether or not conceived or reduced to practice by Employee during or after termination of the Employment Period, except as explicitly set forth in this **Paragraph 8.**

9. Reasonableness of Restrictions and Assignment. Employee acknowledges that Employee has carefully read and considered the provisions of this Agreement and, having done so, agrees that the restrictions and requirements set forth in this Agreement including, without limitation, the non-competition provisions set forth in **Paragraph 6**, the Confidential Information restrictions set forth in **Paragraph 7**, and the assignment of Intellectual Property set for in **Paragraph 8** herein, are fair and reasonable and are reasonably required for the protection of the interests of the Company and its officers, members, directors, shareholders and other employees.

10. Employee Benefits. Employee shall be eligible to participate in any benefit plan sponsored or maintained by the Company to the extent that the Company offers such plans and the Employee is eligible to participate under the terms thereof.

11. Expenses. The Company shall pay or reimburse Employee for out-of-pocket business expenses specific to the Employee's scope of work and

TORRISON-0021

DocuSign Envelope ID: 1152BC65-04A0-4838-9FEF-ED9E87B8FD55

**EXHIBIT 3**

Page 9 of 12                              Torrison Employment

sales efforts, in accordance with Company policy. To be eligible for reimbursement, an itemized documentation of expenses must be submitted monthly to the appropriate administrator.

12. Entire Agreement; Modification. This Agreement sets forth the entire agreement and understanding of the parties hereto concerning the subject matter hereof, and, except as otherwise specifically provided below, supersedes all prior and contemporaneous correspondence, agreements, arrangements and understandings, both oral and written, between the parties hereto concerning the subject matter hereof. No modification hereof shall be binding upon the parties hereto except by written instrument duly executed by such parties or their duly authorized representatives.

13. Successor in Interest. This Agreement and the various rights and obligations arising hereunder shall inure to the benefit of and be binding upon the Company and the Company's successors and assigns including, without limitation, any successors in interest as a result of a merger, consolidation or change of name. This Agreement may not be assigned by Employee.

14. Severability. If any term or provision of this Agreement or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the other terms of this Agreement, or the application of such terms or provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

15. Interpretation. The paragraph headings of this Agreement are inserted for convenience only and shall not constitute a part of this Agreement in construing or interpreting any provision hereof. Whenever the context requires, words used in the singular shall be construed to include the plural and vice versa, and pronouns of any gender shall be deemed to include and designate the masculine, feminine, or neuter gender.

16. Governing Law. This Agreement shall in all respects be construed in accordance with and governed by the laws of the State of Ohio. Any suit

TORRISON-0022

DocuSign Envelope ID: 1152BC65-04A0-4838-9FEF-ED9E87B8FD55

involving any dispute or matter arising under this Agreement may only be brought in the courts of the State of Ohio, in Cuyahoga County. Employee hereby consents to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

17. Counterparts. This Agreement may be executed in any number of counterparts, including electronically, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

18. Waiver. The failure of the Company at any time or from time to time to require performance of any of Employee's obligations under this Agreement shall in no manner affect the Company's rights to enforce any provision of this Agreement at a subsequent time, and the waiver of any rights arising out of any breach shall not be construed as a waiver of any rights arising out of any subsequent or prior breach.

19. Notices. Any notice which may be or is required to be given pursuant to the provisions of this Agreement shall be personally delivered, sent by certified or registered mail, postage prepaid, return receipt requested, or by overnight delivery service and addressed as follows: if to the Company, to Kinzie Advanced Polymers LLC, Attention: Jacob Grover at 1648 St Clair Ave. NE, Cleveland, OH 44114; if to the Employee, to Jacob Torrison at 4460 E 121st CT Thornton, CO 80241

---

**[SIGNATURE PAGE FOLLOWS]**

TORRISON-0023

DocuSign Envelope ID: 1152BC65-04A0-4838-9FEF-ED9E87B8FD55

**EXHIBIT 3**

Page 11 of 12                 Torrison Employment

The parties hereto have executed this Agreement as of the day and year first above written.


Company:

KINZIE ADVANCED POLYMERS LLC ,
an Ohio limited liability company, dba Grove Bags

By: Daniel Jaffe
Its: Director of Finance & HR

DocuSigned by:

*Dan Jaffe*

8F06C007B06B407...

Date: 1/10/2022



Employee:

Jacob Torrison

DocuSigned by:

*Jacob Torrison*

83B905C9530B497...

Date: 1/10/2022

TORRISON-0024

DocuSign Envelope ID: 1152BC65-04A0-4838-9FEF-ED9E87B8FD55

**EXHIBIT 3**

## EXHIBIT A

| Commission Granted as a % of Revenue | Realized GP% for Project |
|---|---|
| 5% | >41% |
| 4% | 40%-31% |
| 3% | <30% |

TORRISON-0025

# EXHIBIT 6

**From:** COD_ENotice@cod.uscourts.gov <COD_ENotice@cod.uscourts.gov>
**Sent:** Sunday, March 29, 2026 11:27 AM
**To:** COD_ENotice@cod.uscourts.gov
**Subject:** Activity in Case 1:25-cv-01321-DDD-CYC Tatum et al v. Kinzie Advanced Polymers Order on Motion for Hearing/Conference

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**
**U.S. District Court - District of Colorado**
**District of Colorado**
**Notice of Electronic Filing**

The following transaction was entered on 3/29/2026 at 11:27 AM MDT and filed on 3/29/2026
**Case Name:**  Tatum et al v. Kinzie Advanced Polymers
**Case Number:**  1:25-cv-01321-DDD-CYC
**Filer:**
**Document Number:** 43(No document attached)
**Docket Text:**
**ORDER GRANTING [22] Defendant's Rule 12(b)(1) Motion to Dismiss.**

**The defendant is correct that this case should be dismissed because it essentially replicates a case previously filed and currently pending in the Northern District of Ohio. *See Kinzie Advanced Polymers, LLC v. Calyx Containers, LLC*, No. 1:24-cv-01887-SO (N.D. Ohio filed Oct. 29, 2024). While the plaintiffs are not wrong that dismissal under the first-to-file rule is discretionary, the applicable factors strongly favor dismissal here. *See Wakaya Perfection, LLC v. Youngevity Int'l, Inc.*, 910 F.3d 1118, 1124 (10th Cir. 2018). The Ohio case was filed first, involves the same parties, and addresses identical or nearly identical issues, and that court has already decided that venue is proper there. *See Kinzie*, 2025 WL 2903642 (N.D. Ohio Sept. 17, 2025).**

**The plaintiffs' arguments about, for example, the timing of a requested extension or the importance of Colorado law to the case do not change the analysis; to the extent they are relevant, the Ohio court is perfectly capable of addressing them. Under such circumstances, this case should be dismissed. *See Cessna Aircraft Co. v. Brown*, 348 F.2d 689, 692 (10th Cir. 1965).**

**[21] Verified First Amended Complaint is therefore DISMISSED WITHOUT PREJUDICE, and [40] Plaintiffs' Forthwith Motion for Speedy Hearing is DENIED AS MOOT.**

**The Clerk of Court is DIRECTED to close this case.**

**SO ORDERED by Chief Judge Daniel D. Domenico on 3/29/2026. Text Only Entry (dddlc1, )**

**1:25-cv-01321-DDD-CYC Notice has been electronically mailed to:**

Andrew Keith Lavin    alavin@grsm.com, , ccaterson@grsm.com, drewlavin@gmail.com, ersmith@grsm.com, lhubchikquelland@grsm.com, lreyes@grsm.com

Jessamyn Lynn Jones    jjones@3ilawfirm.com, jpape@3ilawfirm.com, mbear@3ilawfirm.com

Grant Takeshi Shibao    gshibao@3ilawfirm.com, jpape@3ilawfirm.com, mbear@3ilawfirm.com

Brittney T. Bulawa    bbulawa@grsm.com, lhubchikquelland@grsm.com, lreyes@grsm.com

**1:25-cv-01321-DDD-CYC Notice has been mailed by the filer to:**

# EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:25-cv-0642-RBJ

CALYX CONTAINERS, LLC

        Plaintiff,

v.

KINZIE ADVANCED POLYMERS LLC d/b/a GROVE BAGS,

        Defendant.

---

**DECLARATION OF JACOB TORRISON
IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

---

I, Jacob Torrison, hereby declare as follows:

1. I am over 18 years of age. Unless otherwise indicated, I have personal knowledge of the facts stated herein, and, if called as a witness, could and would testify to the following matters.

2. I was employed by Kinzie Advanced Polymers, LLC ("Grove Bags") from December 2020, until April 2023. I was a Colorado resident for the entirety of my employment with Grove Bags.

3. During my onboard training with Grove Bags in 2020 and throughout my employment, I was instructed by Jack Grover, the CEO, to tell customers and sales prospects that TerpLoc was a patented product. Furthermore, language that Grove Bags held a patent for,

- 1 -

TerpLoc, was expressed in the company's sales materials, public marketing efforts, and public interviews/speaking engagements conducted by Jack Grover.

4. During my employment, I attended multiple trade shows with Jack Grover in Colorado, as well as in other states within my sales territory. During those trade shows, I heard Jack Grover inform me, team members, and sales prospects regularly that TerpLoc is a patented product.

5. On March 31, 2023, I attended the NoCo Hemp Expo, a cannabis/hemp industry trade show in Colorado. During that event, multiple prospective customers asked me to provide proof of a patent for the TerpLoc products. I had not seen or been provided with any documentation verifying that TerpLoc was patented, and became concerned that continuing to make such representations without proof could violate intellectual property, consumer protection, or marketing laws. Upon returning from the conference in early April 2023, I raised concerns about and asked for proof of a patent directly with Grove Bags' leadership, specifically Jack Grover, requesting verification or documentation of the patent status to provide to the inquiring sales prospects. Those Colorado based sales prospects included Buku Loud, Apothecary Farms, and Maggie's Farm. Within 24 hours of raising this direct concern, Grove Bags abruptly presented me with a severance agreement and gave me less than eight hours to review, sign, and return it. When I did not sign, I was informed via email on April 7, 2023, that I was being terminated "for cause."

6. Throughout my employment with Grove Bags, I was instructed to tell customers and sales prospects that the Grove Bags packaging film, TerpLoc, was patented.

- 3 -

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.

Date: December 4, 2025

*Jacob Mark Torrison*

*Jacob Mark Torrison*